**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THE SOUTHERN NEW ENGLAND | : | CIVIL ACTION NO. |
| TELEPHONE COMPANY | : | 303CV00278 (SRU) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| THE CONNECTICUT DEPARTMENT | : | |
| OF PUBLIC UTILITY CONTROL, ET AL. | : | |
| *Defendants* | : | October 23, 2003 |

<u>**MEMORANDUM OF LAW BY THE CONNECTICUT DEPARTMENT OF PUBLIC
UTILITY CONTROL, DONALD W. DOWNES, LINDA J. KELLY, GLENN ARTHUR,
JOHN W. BETKOSKI, III, and JACK R. GOLDBERG IN REPLY TO THE
OPPOSITION BY THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY TO
MOTION FOR SUMMARY JUDGMENT FILED BY THE NAMED DEFENDANTS**</u>

Tatiana D. Eirmann
Assistant Attorney General
Office of the Attorney General
D. Conn. Federal Bar: ct03398
10 Franklin Square
New Britain, CT 06051
Tel: (860) 827-2620
Fax: (860) 827-2893

October 23, 2003

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ……………………………………………………………........ 1

ARGUMENT ……………………………………………………………………... 4

    A.    The Court Lacks Subject Matter Jurisdiction to Entertain the
        Instant Action …………………………………………………………… 4

        1.    The DPUC's Investigation Was Not a § 252 Proceeding.
               Therefore, SNET Cannot Invoke § 252(e)(6) as a Basis for
               Federal Jurisdiction ……………………………………………...... 5

        2.    There Is No Federal-Question Jurisdiction …………………….…... 11

        3.    *Burford* Abstention is Appropriate ………………………......……… 13

    B.    The DPUC's Decisions Are Consistent With State and Federal Law …..……. 16

        1.    The DPUC's Authority Over Interconnection Offered as CTTS
               Is Not Preempted by Federal Law ………………………………..… 17

        2.    The DPUC's Decisions Are Consistent With State Law ……….…... 25

              a.    The DPUC's Decisions Are Consistent with P.A. 94-83 …….. 25

              b.    Conn. Gen. Stat. § 16-247b(b) Does Not Require the Finding
                  of "Necessary" Interconnection.  The Evidence on the
                  Administrative Record Supports the DPUC's Conclusion that
                  SNET's Markup for the CTTS Rates Was Excessive,
                  Anticompetitive and Against the Public Interest in Violation
                  of State Law …………………………………………………… 30

    C.    The DPUC's Final Decision Does Not Violate the Contract Clause of
        The United States Constitution, Art. I, § 10 …………………………..…….. 34

## **TABLE OF AUTHORITIES**

Cases                                                                                                      Pages


AT&T Corp. v. Iowa Utils. Bd, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 834 (1999) … 9, 20, 21

Atlantic Coast Line R. Co. v. Goldsboro, 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721 (1914) …... 36

Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) …….… 13, 14, 15, 16

Central Land Co. of West Virginia v. Laidley, 159 U.S. 103, 16 S.Ct. 80,
        40 L.Ed. 91, 94 (1895) …………………………………………………….………… 35


Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct.
        1236, 47 L.Ed.2d 483 (1976) ………………………………………………….…….. 13

Coombes v. Getz, 285 U.S. 434, 52 S.Ct. 435, 76 L.Ed. 866 (1932) …………………………… 35

Connecticut Light & Power Co. v. Dept. of Public Utility Control, 219 Conn. 51,
        591 A.2d 1231 (1991) …………………………………………………………….. 28

English v. General Electric Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) ………... 18

Fidelity Federal Sav. & Loan Ass'n v. DelaCuesta, 458 U.S. 141, 102 S.Ct. 3014,
        73 L.Ed.2d 664 (1982) ………………………………………………………………… 17

Fleet Bank v. Burke, 160 F.3d 883 (2d Cir. 1998) ……………………………….....……. 12, 13

Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210,
        10 L.Ed.2d 248 (1963) …………………………………………………….……… 17

Greenwich v. Dept. of Public Utility Control, 219 Conn. 121, 592 A.2d 372 (1991)…….…….. 28


Grimes v. Conservation Commission, 243 Conn. 266, 703 A.2d 101 (1997) ……………....… 14

Hays v. Port of Seattle, 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243 (1920) ……….…………. 35

Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941) …………………...…. 17

Home Bldg. & Loan Asso. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231,
78 L.Ed. 413 (1934) ........................................................................................ 36, 37

John P. King Mfg. Co. v. City Council of Augusta, 277 U.S. 100, 48 S.Ct. 489,
72 L.Ed. 801 (1928) …………………………………………………….……… 36

Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) ……………... 17

Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed.
126 (1908) …………………………………………………………...……..… 11

MCI Telecommunications Corp. v. U.S. West Communications, 204 F.3d 1262
(9th Cir. 2000), cert. denied, 531 U.S. 1001, 121 S.Ct. 504,
148 L.Ed.2d 473 (2001) ........................................................................................ 18, 19

MCI WorldCom Network Services, Inc. v. FCC, 274 F.3d 542, (D.C. Cir. 2001) …………...… 18

New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350,
109 S.Ct. 2506, 105 L.Ed. 2d 298 (1989) ………………………………………… 13

New Orleans Waterworks Co. v. Louisiana Sugar Refining Co., 125 U.S. 18, 8 S.Ct. 741,
31 L.Ed. 607 (1888) …………………………………………………….……… 35

New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ……………………………….. 18

Northwestern Fertilizer Co. v. Hyde Park, 97 U.S. 659, 24 L.Ed. 1036 (1878) …………...… 36

Ohio & M.R. Co. v. McClure, 77 U.S. 511, 19 L.Ed. 997 (1870) ……………………………… 35

Pacific Gas & Electric Co. v. Energy Resources Conservation Dev. Comm'n, 461 U.S. 190,
103 S.Ct. 1713, 75 L.E.d.2d 752 (1983) …………………………………………….. 17

Pet v. Dept. of Health Services, 228 Conn. 651, 661 A.2d 6 (1994) …………………….…...… 34

Puerto Rico Telephone Co. v. Telecommunications Regulatory Board of Puerto Rico,
189 F.3d 1 (1st Cir. 1999) …………………………………………………… 6, 7, 9, 18

Railroad Com. of California v. Los Angeles R. Corp., 280 U.S. 145, 50 S.Ct. 71,
74 L.Ed. 234 (1929) …………………………………………………………… 35

Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed.2d 1447 (1947) ………. 17

Richmond Boro Gun Club, Inc. v. New York, 97 F.2d 681 (2d Cir. 1996) …………...…....…… 18

Schneiderwind v. ANR Pipeline Co., 485 U.S. 298, 108 S. Ct. 1150, 99 L.Ed.2d 316 (1988) .... 17

Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890,
    77 L.Ed.2d 490 (1983) …………………………………………………....…… 12

Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ……...… 17

Skakel v. Benedict, 54 Conn. App. 663, 738 A.2d 170 (1999) …………………………..…….. 27

Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 118 S.Ct. 1003,
    140 L.Ed.2d 210 (1998) …………………………………………………...……… 12

Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 (1880) ………………………….…… 36

The Southern New England Telephone Company v. Conn. Dept. of Pub. Util. Cont.,
    Civil Action No. 3-02-1022(JCH) ……………………………………….…… 9

The Southern New England Telephone Company v. Department of Public
    Utility Control, 261 Conn. 1, 803 A.2d 879 (2002) (Appendix A)……………………… 3

U.S. ex rel. Hoffman v. City of Quincy, 71 U.S. 535, 18 L.Ed. 403 (1866) ………..…..……… 35

United States Telecom Assoc. v. FCC, 290 F.3d 415, (D.C. Cir. 2002) …………….…...…… 4

Verizon Communications, Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646,
    152 L.Ed.2d 701 (2002) …………………………………………………....… 24, 33

Verizon Maryland, Inc. v. Public Service Commission of Maryland, et al, 535 U.S. 635,
    122 S.Ct. 753, 152 L.Ed.2d 871 (2002) ……………………………………….… 11, 12

WorldCom v. Conn. Dept. of Public Util. Cont., 229 F.Supp.2d 109 (2002) ……………. 9, 10, 12

Zanavich v. Board of Education, 8 Conn. App. 508, 513 A.2d 196 ,
    cert. denied, 201 Conn. 809, 515 A.2d 381 (1986) …………………………...….. 34

### Statutes

Conn. Gen. Stat. § 4-166 ……………………………………………………….…… 5
Conn. Gen. Stat. § 16-1 ……………………………………………………….…… 26
Conn. Gen. Stat. § 16-19e …………………………………………………….….. 28
Conn. Gen. Stat. § 16-22 ……………………………………………….…….…… 34
Conn. Gen. Stat. § 16-247a ………………………………………………... passim
Conn. Gen. Stat. § 16-247a(a) ……………………………………………….... passim
Conn. Gen. Stat. § 16-247a(b) ………………………………………...………… 14
Conn. Gen. Stat. § 16-247b ……………………………………………..……... passim
Conn. Gen. Stat. § 16-247b(a) …………………………………………….…… 1, 25
Conn. Gen. Stat. § 16-247b(b) …………………………………………….….. passim
Conn. Gen. Stat § 16-247f ……………………………………………….. 2, 5, 6, 25
Conn. Gen. Stat. § 16-247f(a) ……………………………………………... passim

47 C.F.R. § 51.315(c)-(f) …………………………………………………….… 23
47 C.F. R. § 51.317 …………………………………………………………...… 19

28 U.S.C. § 1331  …………………………………………………………….... 4, 5, 12
28 U.S.C. § 1338 …………………………………………………………………. 8
47 U.S.C. § 151 ……………………………………………………………...…... 2
47 U.S.C. § 201(b) ………………………………………………...……..…… 20
47 U.S.C. § 251 ……………………………………………………………... passim
47 U.S.C. § 251(a)(1) …………………………………………………........ 19, 24
47 U.S.C. § 251(b) ……………………………………………………………... 38
47 U.S.C. § 251(c) …………………………………………………………... passim
47 U.S.C. § 251(c)(2) ……………………………………………………….... passim
47 U.S.C. § 251(c)(2)(D) ……………………………………………………… 34
47 U.S.C. 251(d)(3) ……………………………………………………………. 19
47 U.S.C. § 252 ……………………………………………………………….. passim
47 U.S.C. § 252(a)(1) …………………………………………………...…… 38
47 U.S.C. § 252(c) ………………………………………………………….… 20
47 U.S.C. § 252(d) ……………………………………………………… 3, 27, 30
47 U.S.C. § 252(d)(1) …………………………………………………………… 22
47 U.S.C. § 252(e)(2)(A) ……………………………………………………… 38
47 U.S.C. § 252(e)(3) …………………………………………………………… 20
47 U.S.C. § 252(e)(5) ……………………………………………………….… 24
47 U.S.C. § 252(e)(6) …………………………………………...…… passim
47 U.S.C. § 253 …………………………………………………… ...19, 20
47 U.S.C. § 271 ………………………………………………………….... 21, 22
47 U.S.C. § 271(c)(B)(i) …………………………………………………….. 22

## Law Journal Articles

Rosario & Kohler, <u>The Telecommunications Act of 1996; A State Perspective,</u>
29 Conn. L.Rev. 331 (1996) ……………………………………………………..………… 9

## Federal Communication Commission, Orders

<u>Developing a Unified Intercarrier Compensation Regime,</u> CC Docket No. 01-92,
        Notice of Propose Rulemaking, 16 FCC Rcd 9610 (2001) ……………………...…..… 23

<u>In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the
        Communications Act for Preemption of the Jurisdiction of the Virginia State
        Corporation Commission Regarding Interconnection Disputes with Verizon
        Virginia, Inc., and for Expedited Arbitration,</u> CC Docket Nos. 00-218, 00-249,
        00-251 ……………………………………………………………….……..……… 25

<u>In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local
        Exchange Carriers, Implementation of the Local Competition Provisions of the
        Telecommunications Act of 1996, Deployment of Wireline Services Offering
        Advanced Telecommunications Capability,</u> CC Docket Nos. 01-338, 96-98,
        98-147, FCC Rcd  ¶534 n. 1640 (2003) ……………………………………………..… 23


<u>Implementation of the Local Competition Provisions of the Telecommunications Act
        of 1996,</u> CC Docket No. 96-98, 11 FCC 15499 (1996)………………………………….. 9


<u>In the Matter of Application by BellSouth Corporation, BellSouth Telecommunications, Inc.,
        and BellSouth Long Distance, Inc., for Authorization to Provide In-Region
        InterLATA Services in Florida and Tennessee,</u> WC Docket No. 02-307 (2002) ……… 22

<u>In the Matter of Joint Application by BellSouth Corporation, BellSouth Telecommunications,
        Inc., and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA
        Services in Alabama, Kentucky, Mississippi, North Carolina, and South Carolina,</u>
        WC Docket No. 02-150 (2002) ...................................................................................... 21

I.    **INTRODUCTION**.

The Department of Public Utility Control ("DPUC" or "Department"), Donald W. Downes, Linda Kelly, Glenn Arthur, John W. Betkoski, III, and Jack R. Goldberg ("Commissioners") (collectively, the "State") respectfully submit this Memorandum of Law ("State's Reply Memorandum of Law") in Support of the State's Motion for Summary Judgment of July 22, 2003, and in response to the Opposition to Motions to Dismiss and for Summary Judgment of The Southern New England Telephone Company ("SNET" or "Telco") of October 6, 2003.

Connecticut law imposes an obligation on each telephone company, such as SNET, to provide reasonable nondiscriminatory access and pricing to all telecommunications services and interconnection.  Conn. Gen. Stat. §§ 16-247b(a) and 16-247b(b).  In accordance with those statutes the Department has a duty to ensure reasonable and nondiscriminatory rates for telecommunications services and interconnection.  Further, the Department must regulate the provision of telecommunications services in the state in the manner designed to foster competition and to protect the public interest.  Conn. Gen. Stat. § 16-247f(a).  In passing Public Act 94-83 ("P.A. 94-83"), codified as Conn. Gen. Stat. § 16-247a et seq., the General Assembly set out the following goals:

> to (1) ensure the universal availability and accessibility of high quality, affordable telecommunications services to all residents and businesses in the state, (2) promote the development of effective competition as a means of providing customers with the widest possible choice of services, (3) utilize forms of regulation commensurate with the level of competition in the relevant telecommunications services market, (4) facilitate the efficient development and deployment of an advanced telecommunications infrastructure, including open networks with maximum interoperability and interconnectivity, (5) encourage shared use of existing facilities and cooperative development of new facilities ….
> .  The department shall implement the provisions of this section, sections  …, 16-247b, …, in accordance with these goals.

Conn. Gen. Stat. § 16-247a(a).

In its Petition for Investigation Into Transit Service Cost Study and Rates, dated January 30, 2002, Cox Connecticut Telcom. L.L.C. ("Cox), a certified local exchange carrier ("CLEC") and a SNET's competitor, claimed that SNET's markup for its transit traffic service, provided under the rubric of Connecticut Transit Traffic Service ("CTTS"),[1] is exorbitant, anticompetitive and against the public interest. ("Cox's Petition"). (Appendix B).[2]  The issue before the Court is whether the DPUC had jurisdiction, under Conn. Gen. Stat. §§ 16-247b(b), 16-247f and 16-247a, to review Cox's claim of excessiveness of SNET's rates for CTTS, which, admittedly, is a type of interconnection.  The administrative proceeding ("Investigation") before the DPUC did NOT involve the approval or rejection of an interconnection agreement pursuant to the Federal Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56, 47 U.S.C. § 151 et seq. ("1996 Act" or "Act").  Nor did the investigation of the claim that SNET's rates for CTTS were unreasonable, excessive and contrary to the public interest amount to an interpretation of an interconnection agreement or its enforcement.  Therefore, the Investigation was not a § 252[3] action under the 1996 Act.

SNET's misleading characterization of the Department's Interim Decision, dated July 3, 2002 ("DPUC's Interim Decision") (Appendix F) and the Department's Decision of January 15, 2003 ("DPUC's Final Decision") (Appendix G) (collectively, "Decisions") is glaring.  While

---

[1]  Connecticut Transit Traffic Service is an interconnection product that enables traffic originating and/or terminating from an end user of a certified local exchange provider and passed through SNET's tandem switch where that traffic neither originates nor terminate from/to a SNET's end user.  CTTS is used for transmitting telephone exchange service to other carriers.  It is a type of interconnection.

[2]  For judicial convenience, the State will use the Appendix attached to its Memorandum of Law in Support of Its Motion for Summary Judgment of July 22, 2003, as indexed therein.

SNET avers that the DPUC made "findings that SNET's Connecticut Transit Traffic Service ('CTTS') was a required interconnection service under § 251(c)(2) of the Federal Telecommunications Act of 1996 ('1996 Act' or 'Act') and thus was regulated subject to the cost-based rate requirement of § 252(d)" (SNET's Memorandum of Law In Opposition to Motions to Dismiss and for Summary Judgment Filed by the Defendants and Intervening Defendants and in Further Support of Its Motion for Summary Judgment, 10/06/03, p. 1) ("SNET's Opposition Memorandum of Law"), SNET fails to refer to the precise language in those Decisions where the alleged findings and conclusions exist.  Following the recommendation of the State Supreme Court in <u>The Southern New England Telephone Company v. Dept. of Public Utility Control</u>, 261 Conn. 1, 803 A.2d 879 (2002) ("<u>EPS Decision</u>") (Appendix A), the DPUC was very precise when it asserted subject matter jurisdiction over Cox's claim pursuant to Conn. Gen. Stat. §§ 16-247b(b) in conjunction with 16- 247f(a) and 16-247a.  (DPUC's Interim Decision, p. 4:  "In the opinion of the Department Conn. Gen. Stat. § 16-247b(b) provides the Department with the authority over rates and charges for CTTS without first demonstrating that they are necessary for the provision of telecommunications services.") (Appendix F); (DPUC's Final Decision, p. 10:  "The Department is asserting authority over the Telco's CTTS based on Conn. Gen. Stat. §§ 16-247b(b) in conjunction with 16-247f(a) and 16-247a.") (Appendix G).

The recognition by the Department that "[s]uch exercise of authority is consistent with the federal provisions of §§ 251 and 252 of the Act" (DPUC's Final Decision, p. 10) (Appendix G) illustrates the Department's commitment to regulate SNET consistent with both state and federal law.  It does NOT amount to an assertion of authority **under** the 1996 Act.

---

[3]   That section addresses the procedures for negotiation, arbitration and approval/rejection of

Further, SNET is wrong that the Federal Communications Commission ("FCC" or "Commission") affirmatively "chose not to regulate transit services like CTTS and that determination is dispositive here." (SNET's Opposition Memorandum of Law, p. 1). FCC did NOT take a position on the issue one way or the other and it admitted as much in a number of orders. Even if the FCC's pronouncements could be construed as a choice not to regulate transit traffic, which they are not, such a decision does NOT translate into a prohibition on the state commissions to do so.

SNET also fails to provide any authority for its argument that "incumbent local exchange carriers ['ILECs'] like SNET must offer at cost-based rates <u>only</u> direct interconnection between their networks and the networks of another carrier – not all interconnections." (SNET's Opposition Memorandum of Law, p. 3) (emphasis in the original). <u>United States Telecom Assoc. v. FCC</u>, 290 F.3d 415, 419-21 (D.C. Cir. 2002), relied upon by SNET, does not even mention transit traffic, let alone, hold that only direct interconnection must be offered at cost-based rates.

## II.    ARGUMENT

### A.    The Court Lacks Subject Matter Jurisdiction to Entertain the Instant Action

SNET claims that, "alone or together," 47 U.S.C. § 252(e)(6), 28 U.S.C. § 1331 and the U.S. Constitution, Article IV, Clause 2 and Article I, § 10 (SNET's Opposition Memorandum of Law, p. 3) provide this Court with subject matter jurisdiction. SNET's arguments in support of this claim have no merit.

Contrary to SNET's contention, the Department did not act "under the auspices of the 1996 Act" (SNET's Opposition Memorandum of Law, p. 4) when it entertained Cox's claim.

interconnection agreements.

The administrative proceeding was not an approval, a rejection, interpretation or enforcement of an interconnection agreement pursuant to § 252 of the 1996 Act.  Therefore, SNET cannot invoke § 252(e)(6) to obtain this Court's jurisdiction.  The Department's review of Cox's claim of excessiveness of the CTTS rates was based on the state statutes referenced earlier and was conducted in accordance with the provisions of the Connecticut Uniform Administrative Procedure Act ("UAPA"), Conn. Gen. Stat. § 4-166 et seq.  Neither of the Decisions subject to this lawsuit was rendered "under" the 1996 Act.  Indeed, if this case is not about preemption of a state statute, as admitted by SNET (SNET's Opposition Memorandum of Law, p. 4), then the issue is whether the Department acted consistent with Conn. Gen. Stat. §§ 16-247b(b), 16-247f(a) and 16-247a.  There is no need to reach beyond the state statutes, i.e., there is no federal-question jurisdiction under 28 U.S.C. § 1331.  And finally, SNET's allegations of preemption and violation of the U.S. Constitution are used only as tools of forum shopping.

1.      **The DPUC's Investigation Was Not a § 252 Proceeding.  Therefore, <u>SNET Cannot Invoke § 252(e)(6) as a Basis for Federal Jurisdiction</u>**.

The State argued in its Memorandum of Law In Support of Its Motion for Summary Judgment, dated July 22, 2003, pp. 7-14 ("State's July Memorandum of Law") as well as in its Memorandum of Law In Opposition to SNET's Motion for Summary Judgment, dated October 3, 2003, pp. 6-11 ("State's October Memorandum of Law") that the Decisions at issue were NOT rendered "under" the 1996 Act.  The State incorporates by reference those arguments here.

SNET has not claimed that the Investigation constitutes an approval/rejection, interpretation or enforcement of any agreement.  Rather, SNET has generally argued that the Decisions were rendered "under" the 1996 Act.

Section 252(e)(6) authorizing review in cases where "a State commission makes a determination under [§ 252]," clearly requires at least a substantial nexus between the

commission's determination and an interconnection agreement.  <u>Puerto Rico Telephone Company v. Telecom. Regulatory Board of Puerto Rico</u>, 189 F.3d 1 (1st Cir. 1999) ("<u>Puerto Rico</u>").  The whole subject of § 252 is such agreements – the procedure for putting them into place, the standards for the prices they contain.  Indeed, the courts that have thus far extended § 252(e)(6) review to post-approval/rejection determinations have done so in circumstances, such as a state commission's interpretation of a term in the agreement, in which the commission's determination was closely tied to the agreement itself.

In the Decisions subject to this lawsuit, the Department found SNET in breach of state law mandating provision of telecommunications services and interconnection at reasonable and competitive rates.  Conn. Gen. Stat. §§ 16-247b(b), 16-247a(a) and 16-247f.  Consequently, the Department provided for remedies in accordance with Conn. Gen. Stat. § 16-247b(b).  The pertinent question here is whether the DPUC's determinations have a sufficient nexus to the interconnection agreements between SNET and other CLECs.  The State respectfully submits that the answer is negative.

It is unrefuted that the Department has subject matter jurisdiction over claims of excessiveness of SNET's rates that are contrary to the state legislative goal of providing affordable telephone service, promoting competition and protecting the public interest.  Conn. Gen. Stat. § 16-247a.  <u>EPS Decision</u>, 261 Conn. at 25-26.  (Appendix A).  Asserting jurisdiction over Cox's claim did not bring the Investigation under the umbrella of the 1996 Act.  Ensuring that the exercise of state authority is consistent with federal law did not change the nature of the administrative proceeding.  The applicability of certain federal statutes in reviewing and adjudicating Cox's claim did not transform the source of the authority to conduct the Investigation and provide for remedies under state law.  Indeed, the DPUC relied upon a number

of federal law provisions in its substantive analysis of the issues before it. This, however, did not cause a metamorphosis of the purely state law action for enforcement of state law into a § 252 action under the 1996 Act. SNET's labeling of the Investigation as "a second arbitration" (SNET's Opposition Memorandum of Law, p. 7) is an unacceptable misnomer of the administrative proceeding.

The circumstances of this case are similar to the facts in <u>Puerto Rico</u>, 189 F.3d <u>supra</u>. In that case, there was an interconnection agreement between the ILEC and the CLEC which had been approved as "consistent with section 252 of the Act, local law," as well as "nondiscriminatory and … consistent with the public interest, convenience and necessity." <u>Puerto Rico</u>, 189 F.3d. at 2. Following the approval of the agreement, however, the ILEC began charging its customers long-distance charges for the calls subject to the interconnection agreement in violation of certain state law provisions. The First Circuit Court of Appeals affirmed the District's Court conclusion that the facts do not warrant federal jurisdiction under § 252(e)(6).

Here, the claim was not that SNET was in violation of its interconnection agreements previously negotiated.[4] Rather, Cox challenged the SNET's markup for CTTS rates as excessive, anticompetitive and not in the public interest in contravention of the mandates of P.A. 94-83. Like in <u>Puerto Rico</u>, the issue was not SNET's compliance with the provisions of SNET's interconnection agreements with CLECs. The issue was Telco's compliance with its obligations under Conn. Gen. Stat. §§ 16-247b(b), 16-247a(a) and other relevant state statutes. Indeed, the Investigation had no nexus to any such agreements. In point of fact, no such

---

[4] In approving any previous interconnection agreements, the DPUC did not arbitrate or in any other fashion address the CTTS because all agreements were negotiated and no party contested the CTTS. Affidavit by Peter A. Pescosolido, (Attachment 1).

agreements were entered into evidence and no party requested the interpretation of the agreements. SNET is "aggrieved" by the DPUC's assertion of jurisdiction over Cox's claim of excessive markup and DPUC's remedies under Conn. Gen. Stat. § 16-247b(b). Such enforcement of state law is not in any sense an interpretation of the agreements. Importantly, SNET has made no reference to those contracts in any of its claims to this Court.[5] But it has alleged, inter alia, that to the extent the DPUC relied on Connecticut law, it was misapplied (SNET's Verified Complaint for Declaratory and Injunctive Relief, pp. 15-17) ("Verified Complaint"), that the DPUC's Final Decision denies SNET its right to administrative fairness (claiming violations of the UAPA) (SNET's Verified Complaint, p. 17), that the DPUC's Decisions contravene both state and federal law (SNET's Verified Complaint, pp. 18-21).

The DPUC's Final Decision was not a "determination" under § 252, because it was insufficiently linked to SNET's interconnection agreements with CLECs. Although the Final Decision may have affected those agreements in a secondary way, Congress – although it could have spoken more broadly (cf., e.g., 28 U.S.C. § 1338 (conferring on the federal courts exclusive jurisdiction over any action arising under a federal statute "relating to" patents and copyrights) – did not choose to grant the federal courts jurisdiction over any state commission determination that merely relates to or has some effect on an interconnection agreement or on competition between the players in a local telecommunications market. Given the proliferation of interconnection agreements, it is easy to predict that an agreement will often be in the background and be potentially affected in some way by state commission rulings, including pro-competition and public interest protection rulings such as the one in this case.

---

[5] SNET brings the agreements to this Court's attention for the first time in its Opposition Memorandum of Law as Exhibit 4 to Atty. K. Krom's Affidavit of October 6, 2003.

Finally, § 252(e)(6) does not confer authority on federal courts to review the actions of state commissions for compliance with state law. If Congress intended federal courts' review to encompass any kind of alleged legal flaw in a state commission determination, then there would have been little need to include the language "meets the requirements of section 251 .. and [section 252]." Puerto Rico, 189 F.3d at 9. The 1996 Act exemplifies a cooperative federalism system, in which state commissions can exercise their expertise about the needs of the local market and local consumers, but are guided by the provisions of the Act and by the concomitant FCC regulations. It would be "surpassing strange" to preserve state authority in this fashion and then to put federal courts in the position of overruling a state agency on an issue of state law. AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 386 n. 6, 119 S.Ct. 721, 142 L.Ed.2d 834 (1999); Rosario & Kohler, The Telecommunications Act of 1996; A State Perspective, 29 Conn. L.Rev. 331, 332 (1996) (suggesting that in the wake of the Act "states should be afforded flexibility to craft regulation to the needs of their local markets" and that states should focus on "consumer protection"). See also In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499 ("First Report and Order") ("The rules that the FCC establishes … are minimum requirements upon which the states may build.").

SNET's reliance on The Southern New England Telephone Company v. Conn. Dept. of Pub. Util. Cont., Civil Action No. 3-02-1022(JCH) (SNET's Opposition Memorandum of Law, p. 7) is misplaced. That case involved the interpretation of the mutual compensation provision from the interconnection agreement between SNET and the CLEC. 2003 U.S. Dist. LEXIS 17473 (9/30/03). Undisputedly, the District Court there had jurisdiction in accordance with § 252(e)(6) of the 1996 Act. Additionally, WorldCom v. Conn. Dept. of Public Util. Cont., 229 F.Supp.2d 109 (2002) is inapposite. In that case, although the Department's determination

regarding a rate for the network elements at issue was not made as part of an order approving or rejecting the interconnection agreement, that agreement clearly contemplated that future determinations by the Department regarding SNET tariffs would be incorporated in the terms of the agreement. The administrative proceeding appealed from in this instant, however, does not involve an interconnection agreement. It is a review of SNET's compliance with state law to provide interconnection at a price that is reasonable, competitive and in the public interest.

Also, contrary to SNET's blatant contention (SNET's Opposition Memorandum of Law, p. 8), nowhere in the Decisions did the Department rely on the FCC's interpretation of the term "interconnection" as the basis for its authority to address the excessiveness of the markup for CTTS rates. Rather, the Department offered the following rationale for its conclusion that it has authority over rates and charges for interconnection services including the Telco's CTTS without first having to demonstrate the necessity of such service.

> The Department believes that the Legislature recognized the 'necessary' nature of interconnection services and their value to an integrated telecommunications network (i.e., the public switched telecommunications network) when drafting Conn. Gen. Stat. § 16-247b(b). To interpret the exception otherwise would be of little value to individual telecommunications service providers since end users would not be able to communicate with other subscribers to their respective service providers or require the maintaining of multiple service accounts with other service providers to reach those subscribers of those providers. Clearly, interconnection was a necessary function in the Legislature's eyes in order to provide for an efficient mutual exchange of telecommunications traffic.

(DPUC's Final Decision, pp. 11-12). (Appendix G).

The basis for the Department's jurisdiction was Conn. Gen. Stat. § 16-247b(b) in conjunction with Conn. Gen. Stat. §§ 16-247f(a) and 16-247a(a). Since the Investigation was an administrative review into SNET's compliance with its obligations under state law, and did not involve the approval, rejection or interpretation of an interconnection agreement in accordance

with  the provisions of the 1996 Act, SNET cannot invoke the Court's jurisdiction under 47
U.S.C. § 252(e)(6).

### 2.    There Is No Federal-Question Jurisdiction.

The State argued in its prior submissions to this Court that there is no federal-question
jurisdiction here.  (State's July Memorandum of Law, pp. 14-17; State's October Memorandum
of Law, pp. 11-13).  The State will not reiterate its discussion here, but it stands by those
arguments.

It clearly appears that SNET's preemption claim was made solely for the purpose of
obtaining federal jurisdiction.  SNET raises a federal preemption claim merely as a defense to the
enforcement of the DPUC's Decisions.  Had SNET challenged these decisions in state court, it is
very likely that it would have lost in light of the EPS Decision, 261 Conn. supra.  SNET is
looking for a more friendly forum.  Federal subject matter jurisdiction is lacking for a declaratory
judgment action or an action for injunction that anticipates a federal preemption defense to a
threatened state law enforcement action.  Louisville & Nashville R. Co. v. Mottley, 211 U.S.
149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).  A mere presence of a federal issue in a state cause of
action does not automatically confer federal-question jurisdiction.  The Supremacy Clause of the
United States Constitution, which is the basis for the preemption argument, is concerned with
promoting the supremacy of federal law, not federal courts.  Albeit SNET clearly states its
claimed basis for federal jurisdiction, the allegations remain defensive in nature.

Further, SNET's reliance on Verizon Maryland, Inc. v. Public Service Commission of
Maryland, 535 U.S. 635, 122 S.Ct. 753, 152 L.Ed.2d 871 (2002) ("Verizon Maryland") and
WorldCom, Inc. v. Connecticut Dept. of Pub. Util. Control, 229 F.Supp.2d supra ("WorldCom")
in support of its claim that there is a federal-question jurisdiction (SNET's Opposition

Memorandum of Law, pp. 11-12) is misplaced.  Both <u>Verizon Maryland</u> and <u>WorldCom</u> are

distinguishable from the instant action.  They involved the interpretation of two interconnection

agreements.  As it has been discussed earlier, this case amounts to an administrative appeal from

DPUC's Decisions which addressed issues of SNET's compliance with P.A. 94-83.  SNET

conveniently omits to mention the exception carved out by the U.S. Supreme Court in <u>Verizon</u>

<u>Maryland</u>.  District court jurisdiction exists "unless the claim 'clearly appears to be immaterial

and **made solely for the purpose of obtaining jurisdiction** or where such a claim is wholly

insubstantial and frivolous.'"  <u>Verizon Maryland</u>, 535 U.S. at 644 (emphasis added), quoting

<u>Steel Co. v. Citizens for Better Environment</u>, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210

(1998).  SNET's sole purpose in claiming federal preemption is to obtain this Court's

jurisdiction.

      Equally unpersuasive is SNET's attempt to distinguish <u>Fleet Bank v. Burke</u>, 160 F.3d 883

(2d Cir. 1998) ("<u>Fleet Bank</u>") from the instant case.  (SNET's Opposition Memorandum of Law,

pp. 14-15).  SNET's disingenuous argument is transparent.  As it has been pointed out earlier, the

DPUC's Decisions address claims of violation of state law and provide remedies based on state

law.  SNET has raised numerous state law claims.  (SNET's Verified Complaint, pp. 15-21,

Paragraphs 46-69).  However, SNET does not allege that state law is preempted by federal law.

Under the circumstances, if the Court decides that the DPUC's Decisions are valid under state

law, there will be no outstanding federal question.  The "well-pleaded complaint" rule is alive

and applies to this case.  The U.S. Supreme Court's statement that if a claim "thus presents a

federal question which the federal courts have jurisdiction under 28 USC § 1331 [28 USCS

§ 1331] to resolve," <u>Verizon Maryland</u>, 535 U.S. at 644, quoting <u>Shaw v. Delta Air Lines, Inc.</u>,

463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) does not affect the validity of the

long standing and widely accepted "well-pleaded complaint" rule.  Under the facts of the instant

case, the Court should decide against federal jurisdiction for the reasons thoroughly explored in

Fleet Bank.

      SNET, just like the plaintiff in Fleet Bank, 160 F.3d supra, should not be afforded the

opportunity to use a preemption claim as a way to force the State to defend in federal court the

validity of the DPUC's Decisions.

<h3 style="text-align:center;">3.    <em>Burford</em> Abstention is Appropriate</h3>

      As the State argued in its July and October Memoranda of Law (State's July

Memorandum of Law, pp. 23-27; and State's October Memorandum of Law, pp. 13-16), the

facts of this case warrant abstention under the Burford abstention doctrine.  Burford v. Sun Oil

Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) ("Burford").

      The Burford doctrine teaches that where timely and adequate state court review is

available, a federal court sitting in equity must decline to interfere with the proceedings or order

of state administrative agencies:  (1) when there are "difficult questions of state law bearing on

policy problems of substantial public import whose importance transcends the result in the case

then at abar"; or (2) where the "exercise of federal review of the question in a case and in similar

cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of

substantial public concern."  Colorado River Water Conservation Dist. v. United States, 424 U.S.

800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)  ("Colorado River").  See also New Orleans Pub.

Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed. 2d

298 (1989) ("NOPSI II").  The Burford abstention doctrine is concerned with protecting complex

state administrative processes from undue federal interference.

13

Contrary to SNET's bold assertion that none of the conditions for the application of the Burford abstention doctrine is satisfied (SNET's Opposition Memorandum of Law, pp. 18-22), its Verified Complaint indicates otherwise.

First, the Verified Complaint, to considerable extent, reads like an administrative appeal before a State Superior Court. For example, SNET claims:

(a) "CTTS is not a necessary service as defined by Conn. Gen. Stat. § 16-247b(b). The DPUC has previously interpreted § 16-247b(b) as applying to SNET services [to] which cannot be duplicated by other providers. … ." (SNET's Verified Complaint, p. 15, Paragraph 47);

(b) "The criteria set forth in Conn. Gen. Stat. § 16-247f(c) do not apply to CTTS. By the clear statutory language contained in § 16-247f(d) the criteria apply when seeking to reclassify a 'noncompetitive' service to 'emerging competitive' or 'competitive service.' Each one of those terms is defined in § 16-247a(b). … ." (SNET's Verified Complaint, pp. 15-16, Paragraph 48);

(c) "Without any legal basis, and without explanation, the DPUC's Final Decision misapplies governing statutes and finds CTTS a noncompetitive service subject to the reclassification criteria set out in Conn. Gen. Stat. § 16-247f(d). Accordingly, the Final Decision violates state law." (SNET's Verified Complaint, pp. 16-17, Paragraph 53);

(d) "There is a right to fundamental fairness in the conduct of administrative proceedings. See Grimes v. Conservation Commission, 243 Conn. 266, 273-74, 703 A.2d 101 (1997)." (SNET's Verified Complaint, p. 17, Paragraph 54);

(e) ".. The DPUC denied SNET the ability to obtain this information for the record and yet held in its Final Decision that SNET had the burden of defending its CTTS rates and failed to provide evidence demonstrating the market for transit services." (SNET's Verified Complaint, p. 17, Paragraph 55).

14

In light of those specific state law claims, SNET cannot credibly assert that the first factor of the <u>Burford</u> abstention doctrine does not apply. Clearly, a major part of SNET's complaint to this Court is its claim that the DPUC has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors. Second, and not surprisingly, SNET continually mischaracterizes the DPUC's Decisions as rulings concerning interconnection agreements. Since Congress has given the federal courts exclusive jurisdiction to review such rulings, SNET contends that the second <u>Burford</u> factor is not present here. (SNET's Opposition Memorandum of Law, pp. 20-22). SNET's reliance on a number of cases where federal courts have refused to abstain from deciding issues brought properly in accordance with § 252(e)(6) (SNET's Opposition Memorandum of Law, pp. 20-21) is misplaced. Again, this case involves an investigation of SNET's compliance with state law. SNET's argument against abstention is based entirely on the premise that the Investigation was a proceeding "under" the 1996 Act. The State addressed that issue earlier. Cox's claim that SNET's markup for CTTS was excessive was an issue of state law and was dealt with in accordance with the provisions of Conn. Gen. Stat. §§ 16-247b(b) in conjunction with 16-247f(a) and 16-247a(a).

Further, contrary to SNET's assertion that there is no risk "that the suit will require the Court to interfere with the existing state regulatory scheme" (SNET's Opposition Memorandum of Law, p. 21), if the Court entertains the appeal, there is a possibility that the Court's decision may be contrary to the DPUC's application of state law upheld in a series of cases rendered since the enactment of P.A. 94-83. <u>See</u> <u>EPS Decision</u>, 261 Conn. <u>supra</u>, and the Connecticut Superior Court decisions in the cases cited by the State in its July and October Memoranda of Law, p. 26 and p. 15, respectively. Federal adjudication of SNET's preemption claim will disrupt the State's attempt to ensure uniformity in the treatment of an essentially a local problem, i.e., the

excessiveness of the markup for the CTTS in Connecticut, i.e., SNET's compliance with the mandates of P.A. 94-83. <u>NOPSI II</u> , 491 U.S. <u>supra</u>, is inapposite.  The facts of that case amply demonstrated that wholesale electricity is not bought and sold within a predominantly local market.  As it has been pointed out, in 1994 the General Assembly adopted a comprehensive regulatory regime stressing the promotion of competition in the telecommunications market in Connecticut and the public interest in affordable universal telecommunications services.  Three years after the passage of the 1996 Act, the Connecticut legislature enacted further changes to the state telecommunications regime.  Public Act 99-222.  The statutory scheme thus crafted is elaborate and complex.  It was developed to achieve the goals enunciated in Conn. Gen. Stat. § 16-247a(a).  The degree of legislative specificity is, indeed, impressive.  For nearly 10 years, the Department implemented and administered that regime in accordance with both state and federal law.

Since there is a potential for conflict with state regulatory law and policy from federal litigation over claims of state law violations by SNET, this Court's exercise of jurisdiction would entail just the sort of undue interference that <u>Burford</u> seeks to avoid.

For the reasons delineated above and in the State's July and October Memoranda of Law, pp. 23-27 and pp. 13-16, respectively, the State respectfully requests the Court to abstain from entertaining this appeal.

**B.**     **<u>The DPUC's Decisions Are Consistent With State and Federal Law.</u>**

If the Court elects to entertain the merits of this appeal, the State respectfully requests the Court to uphold the validity of the DPUC's Decisions on both state and federal law grounds.

**1.     The DPUC's Authority Over Interconnection Offered as CTTS Is Not <u>Preempted by Federal Law</u>**.

Even though SNET admits at the end of its Opposition Memorandum of Law that "[I]t is undisputed that this service [CTTS] was not regulated before at the state or federal level." (SNET's Opposition Memorandum of Law, p. 40), SNET, incomprehensibly, pursues its preemption claim.

Under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, the enforcement of a state law may be preempted by federal law in several circumstances, <u>Schneiderwind v. ANR Pipeline Co.</u>, 485 U.S. 298, 108 S. Ct. 1150, 99 L.Ed.2d 316 (1988):  (1) when Congress has demonstrated a clear intent to preempt state law expressly in explicit statutory language or implicitly in the purpose and structure of the federal statute ("express/implied preemption"), <u>Jones v. Rath Packing Co.</u>, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); (2) when it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy the entire field of regulation ("field preemption"), <u>Fidelity Federal Sav. & Loan Ass'n v. DelaCuesta</u>, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed.2d 1447 (1947); and (3) when compliance with both state and federal law is impossible because either state law actually conflicts with federal law, <u>Pacific Gas & Electric Co. v. Energy Resources Conservation Dev. Comm'n</u>, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or state law "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress," <u>Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67, 61 S.Ct. 399, 85

L.Ed. 581 (1941); English v. General Electric Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65

(1990) ("conflict preemption").

Preemption is a question of congressional intent, and there is a strong presumption

against federal preemption of state and local legislation.  English v. General Electric Co., 496

U.S. at 79; Richmond Boro Gun Club, Inc. v. New York, 97 F.2d 681, 687 (2d Cir. 1996).  This

presumption is especially strong in areas traditionally occupied by the states, such as regulation

of intrastate telecommunications services.  English v. General Electric Co., 496 U.S. at 79.

Consideration of issues arising under the Supremacy Clause starts with the assumption that the

historic police powers of the states are not to be superseded by federal act unless that is the clear

and manifest purpose of Congress.  New York State Conference of Blue Cross & Blue Shield

Plans v. Travelers Ins. Co.,  514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

None of the conditions for federal preemption are satisfied here.  First, the 1996 Act does

NOT **expressly** preempt states from regulating CTTS.  Second, Congress has NOT intended to

occupy the **entire** field of regulation.  Indeed, the 1996 Act prescribes a power sharing

arrangement between the FCC and the state commissioners.  MCI WorldCom Network Services,

Inc. v. FCC, 274 F.3d 542, 544 (D.C. Cir. 2001) (1996 Act is "a kind of 'intergovernmental

partnership' with a division of responsibility between the FCC and the states"); Puerto Rico, 189

F.3d supra (1996 Act is an "exercise in … cooperative federalism"); see also MCI

Telecommunications Corp. v. U.S. West Communications, 204 F.3d 1262, 1265 (9th Cir. 2000),

cert. denied, 531 U.S. 1001, 121 S.Ct. 504, 148 L.Ed.2d 473 (2001) (noting irony of "statute

intended to promote competition [but that] creates two levels of regulatory control").  "The

[FCC] is charged with the responsibility of promulgating regulations necessary to implement the

[1996 federal act], but the [federal] [a]ct reserves to states the ability to impose additional

requirements so long as these requirements are consistent with the [federal act] and 'further competition.'" <u>MCI Telecommunications Corp. v. U.S. West Communications</u>, 204 F.3d at 1265; <u>see</u> 47 U.S.C. §§ 251(d)(3) and 253; 47 C.F.R. § 51.317.  Third, the DPUC's exercise of jurisdiction over SNET's CTTS does not conflict with any provision of the 1996 Act or any of the FCC's rules or orders and, certainly, does not stand as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress, i.e., competition in the market of telecommunications services.

SNET prefaces its discussion on the preemption claim by the interpretation of § 251(a)(1) in juxtaposition to § 251(c)(2).  (SNET's Opposition Memorandum of Law, pp. 23-26).  SNET's construction is not supported by the express language of the statutes or by the goals of Congress. It is also contrary to any FCC pronouncements on the issue of transit traffic.

SNET concedes that ILECs have the duty to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers (SNET's Opposition Memorandum of Law, pp. 23-24), citing 47 U.S.C. § 251(a)(1).  At the same time, however, SNET argues that its obligation to provide "interconnection" under the terms of § 251(c)(2) extends only to "direct interconnection."  (SNET's Opposition Memorandum of Law, pp. 24-25).  There is no logic in SNET's position.  There is no indication that Congress intended to limit the applicability of § 251(c)(2) to direct interconnection.  Moreover, SNET's interpretation amounts to impermissible legislating by inserting a limitation on the scope of the statute that Congress has deliberately chosen to omit.

SNET surmises that the absence of reference to either direct or indirect interconnection translates to only "direct" interconnection.  While there is no linguistic parity between § 251(a)(1) and § 251(c)(2), the latter does not contain any qualifying language and the Court

cannot add it.  CTTS is an **interconnection** and as such, falls within the ambit of § 251(c)(2).

Therefore, the statute's pricing conditions attach.  Neither Congress nor the FCC has prohibited

states from applying the price requirements of § 251(c)(2) to CTTS.  Importantly, Congress

expressly preserved the authority of state regulators by providing:

> Notwithstanding paragraph (2), but subject to section 253 of this title, nothing is
> this section shall prohibit a State commission from establishing or enforcing other
> requirements of State law in its review of an agreement, including requiring
> compliance with intrastate telecommunications service quality standards or
> requirement.

47 U.S.C. § 252(e)(3).

The U.S. Supreme Court's decision in <u>AT&T Corp. v. Iowa Utils. Bd.</u>, 525 U.S. <u>supra</u>,

supports the State's interpretation of § 251(c)(2).  There, the incumbent carriers challenging the

regulations of the FCC establishing a specific methodology for ratemaking, contended that

specific language in 47 U.S.C. § 252(c) authorizing the state commissioners to "establish rates"

entrusted jurisdiction over establishing rates to those commissioners.  The U.S. Supreme Court

rejected that contention, reasoning that the state commissioners' application of the prescribed

cost methodology to determine a concrete result was sufficient to constitute establishing rates.

<u>Id.</u> at 384.  More importantly, that court also rejected the ILECs' contention that, because the

FCC was mandated to promulgate regulations in one provision of § 252(c) that was unrelated to

rates, it thereby was precluded from promulgating regulations pursuant to the subsection

addressing rates, which contained no express grant of authority to the FCC.  <u>Id</u>. at 384-85.  The

ILECs had contended that the absence of an express grant of jurisdiction evinced Congress'

intention to limit the FCC's otherwise broad grant of authority to regulate under § 201(b).  The

U.S. Supreme Court explained in rejecting that contention:

> It seems to us not peculiar that the mandated regulations should be specifically
> referenced, whereas regulations permitted pursuant to the [FCC's] § 201(b)

20

authority are not.  In any event, the mere lack of parallelism is surely not enough to displace that explicit authority.

AT&T Corp. v. Iowa Utils. Bd., 525 U.S. at 385.

Neither the 1996 Act nor the FCC itself, has prohibited state regulation of indirect interconnection, such as SNET's CTTS.  The FCC conceded that it "ha [d] not had occasion to determine whether incumbent LECs have a duty to provide transit service under section 251(c)(2), and we do not find clear Commission precedent or rules declaring such a duty.  We therefore do not [find] a violation of checklist item 1 in connection with BellSouth's provision of transit trunks."  In the Matter of Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in Alabama, Kentucky, Mississippi, North Carolina, and South Carolina, WC Docket No. 02-150, ¶ 222 n. 849 (2002) ("BellSouth Multistate Order").[6]  Notably, in declining to address the issue of transit traffic in the framework of § 271[7] orders, the FCC observed:

> In accordance with prior section 271 orders, 'new interpretive disputes concerning the precise content of an incumbent LEC's obligations to its competitors, disputes that our rules have not yet addressed and that do not involve per se violations of the Act or our rules, are not appropriately dealt with in the context of a section 271 proceeding.'

BellSouth Multistate Order, ¶ 227.[8]

---

[6] On June 20, 2002, BellSouth Corporation and its subsidiaries, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc. (collectively, "BellSouth") filed an application pursuant to section 271 of the 1996 Act, for authority to provide in-region, interLATA service originating in the states of Alabama, Kentucky, Mississippi, North Carolina, and South Carolina.  On September 18, 2002, the FCC granted BellSouth's application.

[7] Part III of the 1996 Act, entitled "Special Provisions Concerning Bell Operating Companies," governs the Bell operating companies' entry into interLATA services.  47 U.S.C. § 271.

[8] In support of its declination to review the issue, the FCC cited Verizon Pennsylvania Order, 16 FCC Rcd at 17470, ¶ 92; BellSouth Georgia/Louisiana Order, 17 FCC Rcd at 9075, ¶ 114; SWBT Texas Order, 15 FCC Rcd at 18366, ¶ 24; SWBT Kansas/Oklahoma Order, 16 FCC Rcd at 6246, ¶ 19.  BellSouth Multistate Order, ¶ 227, n. 872.

The FCC reaffirmed its position yet again in <u>In the Matter of Application by BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc., for Authorization to Provide In-Region InterLATA Services in Florida and Tennessee</u>, WC Docket No. 02-307, ¶ 155 (2002) ("<u>BellSouth Florida/Tennessee Order</u>").[9]   The FCC declined to entertain the issue of transit traffic involved in the mutual compensation dispute between the parties.   It expressly stated: "we cannot conclude that either state commission committed clear error when it found that BellSouth provides interconnection and reciprocal compensation in compliance with checklist items 1 and 13." <u>BellSouth Florida/Tennessee Order</u>, ¶ 155 and footnote 564.[10]   Once again, the FCC acquiesced to a state finding that transit traffic is an interconnection within the meaning of § 251(c)(2).   Since the companies' dispute was limited to 4% of the traffic, the transit traffic, the FCC concluded:  "Resolving this dispute requires an interpretation of the language of the interconnection agreement in connection with the routing of and compensation for interconnection traffic.   It is difficult to address the many unresolved factual questions presented in such a dispute in the 90-day period of this proceeding.   These are matters for the state commissions to decide in the first place." <u>BellSouth Florida/Tennessee Order</u>, ¶¶ 155 n. 564, and 156.

---

[9]   On September 20, 2002, BellSouth filed an application pursuant to § 271 of the 1996 Act for authority to provide in-region, interLATA service originating in the states of Florida and Tennessee.  On December 19, 2002, the FCC rendered its approval.  The question between the parties was, in fact, a dispute over mutual compensation, and the issue of transit traffic was raised only because two types of traffic formed the basis of that dispute, transit traffic representing 4% of traffic traversing the relevant interconnection trunk group.

[10]  "**Competitive checklist** -  Access or interconnection provided or generally offered by a Bell operating company to other telecommunications carriers meets the requirements of the subparagraph if such access and interconnection includes each of the following: (i) Interconnection in accordance with the requirements of section 251(c)(2) and 252(d)(1) of this title. … "  47 U.S.C. § 271(c)(B)(i).

FCC's most recent comment on transit traffic supports the State's argument that the FCC has not regulated it by any means, let alone prohibited states from doing so.

> Shared transport between local tandem switches sometimes is used by competing carriers for 'transiting' – a means of indirectly interconnecting with other competing carriers for the purpose of terminating local and intraLATA traffic. …To date, the Commission's rules have not required incumbent LECs to provide transiting. … The Commission plans to address transiting in its pending Intercarrier Compensation rulemaking proceeding. <u>See</u> <u>Developing a Unified Intercarrier Compensation Regime</u>, CC Docket No. 01-92, Notice of Propose Rulemaking, 16 FCC Rcd 9610 (2001) ((<u>Intercarrier Compensation NPRM</u>).

<u>In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capability</u>, CC Docket Nos. 01-338, 96-98, 98-147, FCC Rcd ¶ 534 n. 1640 (2003).

The State respectfully submits that Congress's and FCC's permissive nonaction on the specific issue of state authority to regulate transit traffic, i.e., indirect interconnection, does not translate into a prohibition. The U.S. Supreme Court came to that conclusion in interpreting the so called "combination" rules[11].

> Of course, it is true that the statute would not be violated literally by an incumbent that provided elements so that a requesting carrier could combine them, and thereafter sat on its hands while any combining was done. But whether it is plain that the incumbents have a right to sit is a question of context as much as grammar. If Congress had treated incumbents and entrants as equals, it probably would be plain enough that the incumbents' obligations stopped at furnishing an element that could be combined. The Act, however, proceeds on the understanding that incumbent monopolists and contending competitors are unequal, cf. § 251(c) ('Additional obligations of incumbent local exchange carriers'), and within the actual statutory confines it is not self-evident that in obligating incumbents to furnish, Congress negated a duty to combine that is not inconsistent with the obligation to furnish, but not expressly mentioned. Thus, it takes a stretch to get from permissive statutory silence to a statutory right on the

---

[11]  47 CFR §§ 51.315(c)-(f).

> part of the incumbents to refuse to combine for a requesting carrier, say, that is unable to make the combination, First Report and Order ¶ 294, or may even be unaware that it needs to combine certain elements to provide a telecommunications service.  Id., ¶ 293.

Verizon Communications, Inc. v. FCC, 535 U.S. 467, 533-34, 122 S.Ct. 1646, 152 L.Ed.2d 701

(2002) ("Verizon").

The preceding discussion supports the State's argument that neither Congress nor the

FCC has ever determined that CTTS must be excluded from § 251(c)(2) interconnection.  There

is neither an explicit nor tacit prohibition on states commissions to treat it as such.  Thus, nothing

precludes the DPUC from regulating under state law CTTS in order to protect the public's

interest in affordable, high quality telecommunications service and to promote competition in the

Connecticut telecommunications market.  A holding that SNET does not have the obligation to

provide CTTS at rates determined by the DPUC in accordance with both federal and state law

would make a very odd partner with § 251(a)(1) of the 1996 Act requiring ILECs to

"interconnect directly or indirectly with the facilities and equipment of other telecommunications

carriers."

SNET's reliance on the FCC's ruling in In the Matter of Petition of WorldCom, Inc.

Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of

the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon

Virginia, Inc., and for Expedited Arbitration, CC Docket Nos. 00-218, 00-249, 00-251 (SNET's

Opposition Memorandum of Law, pp. 24-25), is misplaced.  Paragraph 117, referenced by

SNET, confirms that the FCC has not determined whether ILECs have a duty to provide transit

service under § 251(c)(2).  Further, in the absence of such a precedent or rule, the FCC declined,

on delegated authority, to determine for the first time that Verizon has a § 251(c)(2) duty to

provide transit service at TELRIC rates.  This language hardly amounts to an implicit, let alone an express prohibition to regulate CTTS.

Equally unavailing is FCC's <u>First Report and Order</u>, <u>supra</u>.  Paragraph 176 relied upon by SNET (SNET's Opposition Memorandum of Law, p. 25) defines "interconnection" as "the physical linking of two networks for the mutual exchange of traffic."  <u>First Report and Order</u>, ¶ 176.  CTTS is a type of interconnection that does exactly that.  It links physically one CLEC with another.  No transport or termination issues are implicated.  No mutual compensation issue exists either.  Paragraph 209, also referred to by SNET (SNET's Opposition Memorandum of Law, p. 25), adds nothing to SNET's argument.  There, the FCC concluded that it "should identify a minimum list of technically feasible points of interconnection that are critical to facilitating entry by competing local service providers."  <u>First Report and Order</u>, ¶ 209.  None of those paragraphs supports SNET's contention that "the FCC has chosen not to include transit services as a regulated § 251(c) interconnection."  (SNET's Opposition Memorandum of Law, p. 25).

### 2.    The DPUC's Decisions Are Consistent With State Law.

For SNET to claim that its appeal does not raise state law claims and then to discuss various state law issues over 10 pages (SNET's Opposition Memorandum of Law, pp. 26-36), is disingenuous.

#### a.    The DPUC's Decisions Are Consistent with P.A. 94-83.

First, SNET challenges the DPUC's interpretation and application of Conn. Gen. Stat. §§ 16-247b(a), 16-247b(b), 16-247f and 16-247a.  SNET launches its attack from the erroneous premise that the 1996 Act "does preclude the DPUC from regulating services like CTTS specifically."  (SNET's Opposition Memorandum of Law, p. 26).  As the State has discussed

earlier, the 1996 Act contains no such prohibition.  State law, on the other hand, imposes a duty

on the DPUC to set rates for interconnection pursuant to Conn. Gen. Stat. § 16-247b(b), to

regulate telecommunications carriers so as to promote competition and protect the public

interest, Conn. Gen. Stat. § 16-247f(a), and to ensure the achievement of the legislative goals

expressed in Conn. Gen. Stat. § 16-247a(a).

  The Connecticut regulatory scheme confers a broad grant of authority upon the DPUC to

protect the public interest similar to that afforded to the FCC under the 1996 Act.  Conn. Gen.

Stat. § 16-247f(a) expressly states that "[t]he department shall regulate the provision of

telecommunications services in the state in a manner designed to foster competition and protect

the public interest."  Conn. Gen. Stat. § 16-247a(a) enumerates the goals of the legislature as

follows:  "(1) to ensure the universal availability and accessibility of high quality, affordable

telecommunications services to all residents and businesses in the state, (2) to promote the

development of effective competition as a means of providing customers with the widest

possible choice of services, ..., (4) facilitate the efficient development and deployment of an

advanced telecommunications infrastructure, including open networks with maximum

interoperability and interconnectivity, (5) encourage shared use of existing facilities and

cooperative development of new facilities where legally possible, and technically and

economically feasible, … ."  Conn. Gen. Stat. § 16-247a(a).  The legislature then added: "The

department shall implement the provisions of this section, sections 16-1, …, 16-247b, …. in

accordance with these goals."  Conn. Gen. Stat. § 16-247a(a).

  With that legislative directive in mind, the DPUC construed and applied § 16-247b(b).

The statute provides:

> Each telephone company shall provide reasonable nondiscriminatory access and
> pricing to all telecommunications services, functions and unbundled network

26

elements and any combination thereof necessary to provide telecommunications services to customers.  The department shall determine the rates that a telephone company charges for telecommunications services, functions and unbundled network elements and any combination thereof, that are necessary for the provision of telecommunications services.  **The rates for interconnection** and unbundled network elements and any combination thereof shall be based on their respective forward looking long-run incremental costs, and shall be consistent with the provisions of 47 USC 252(d).

Conn. Gen. Stat. § 16-247b(b) (emphasis added).

The State respectfully submits that the unambiguous language of the statute bestows upon the DPUC authority to set the rates for any type of interconnection.  There exists no requirement to first find that such interconnection is "necessary."  Interconnection is, by definition, **sine qua non** to the provision of any and all types of telecommunications services.  The Connecticut legislature recognized the "necessary" nature of interconnection services and their value to an integrated telecommunications network when drafting Conn. Gen. Stat. § 16-247b(b).  It did not require a finding of "necessary" as a condition precedent to exercising authority to regulate rates for interconnection.  Importantly, the legislature requires such a finding with respect to the unbundled network elements.  The deliberate omission to include "interconnection" in that mandate is an indication that the legislature did not mean to require one.  The statute explicitly and unconditionally gives the DPUC the power to set rates for interconnection.  The legislature is aware of how to use language when it wants to express its intent to qualify the operation of a statute.  Skakel v. Benedict, 54 Conn. App. 663, 667, 738 A.2d 170 (1999).

In light of the remedial purposes of Conn. Gen. Stat. §§ 16-247a, 16-247f(a) and 16-247b(b), the Court should read the DPUC's authority emanating from them broadly so as to effectuate the legislature's intent.  EPS Decision, 261 Conn. at 29-30.  (Appendix A).  More over, "the legislature's broad grant of power may be interpreted to include the conferral of such lesser powers as are necessary to fulfill a legislative mandate.  EPS Decision, 261 Conn. at 30,

citing <u>Greenwich v. Dept. of Public Utility Control</u>, 219 Conn. 121, 126, 592 A.2d 372 (1991)

(department has authority to equalize rates, despite no express authority, in light of "remedial

purpose" of statute and "evident legislative intent to rely on the [department's] expertise");

<u>Connecticut Light & Power Co. v. Dept. of Public Utility Control</u>, 219 Conn. 51, 64, 591 A.2d

1231 (1991) (Conn. Gen. Stat. § 16-19e creates "broad grant of regulatory authority [to the

department that] carries with it the necessarily equally broad discretion, to be exercised within

legal limit").

The DPUC's exercise of authority under Conn. Gen. Stat. § 16-247b(b) should be upheld

in light of the <u>EPS Decision</u>, 261 Conn. <u>supra</u>  (Appendix A), as well.  There, the State Supreme

Court construed the statutes relevant to this case and concluded that they are consistent with the

1996 Act and that the DPUC properly applied them.  <u>EPS Decision</u>, 261 Conn. at 36.  (Appendix

A).  Moreover, the DPUC's exercise of its authority under state law is consistent with the goal of

the 1996 Act to promote competition.  <u>See</u> H.R. Rep. No. 104-204, p. 47 (1995), reprinted in

1996 U.S.C.C.A.N. 10, 11.

Second, SNET turns to the State Supreme Court's <u>EPS Decision</u>, 261 Conn. <u>supra</u>, and

attempts to distinguish that case from the subject of the Decisions before this Court by

contending that "the material issue was not whether the rate for the service was excessive, but

whether the rate was discriminatory."  (SNET's Opposition Memorandum of Law, p. 28).  Such

distinction, however, is without a difference.  In point of fact, "[T]he competing carriers had

claimed that the plaintiff [SNET] was charging excessive rates for the enhanced provisioning

services and that the plaintiff had charged either a minimal fee or no fee to its own customers."

<u>EPS Decision</u>, 261 Conn. at 22.  More importantly, the State Supreme Court concluded:  "It is

evident, therefore, that these claims fall within the department's purview of regulating to foster

effective competition and to protect the public's interest in affordable telephone services." <u>EPS Decision</u>, 261 Conn. at 22; <u>see</u> also <u>Id</u>. at 25-26.  SNET's attempt to undermine the State Supreme Court's <u>EPS Decision</u> fails.  The latter is a valid interpretation of the Department's obligations under P.A. 94-83.

Third, to the extent that SNET relies on the negotiated agreements approved by the Department to discredit the claim of excessiveness of its CTTS rates (SNET's Opposition Memorandum of Law, p. 28), such reliance must fail.  It needs to be emphasized that the issue of CTTS rates had NEVER been decided by the DPUC.  (Affidavit by Peter A. Pescosolido, Attachment 1).

Finally, SNET reverts, yet again, to its contention that the FCC "consciously has chosen not to mandate" regulation of CTTS, therefore, SNET concludes, the states are barred from taking such action.  (SNET's Opposition Memorandum of Law, p. 29).  The State indicated earlier that the FCC has not made any choice and had acknowledged as much.  The FCC has declined to rule on the issue of transit traffic regulation in settings limited to the application and implementation of other provisions of the 1996 Act.  More importantly, the FCC has acquiesced to a state commission's finding that transit traffic is an interconnection within the meaning of § 251(c)(2).  <u>BellSouth Florida/Tennessee Order</u>, ¶ 155 and footnote 564.

      **b.**      **Conn. Gen. Stat. § 16-247b(b) Does Not Require the Finding of "Necessary" Interconnection.  The Evidence on the Administrative Record Supports the DPUC's Conclusion that SNET's Markup for the CTTS Rates Was Excessive, Anticompetitive and Against the <u>Public Interest in Violation of State Law</u>.**

      SNET's next claims based on state law concern the alleged finding of "necessary" service (SNET's Opposition Memorandum of Law, pp. 33-35) and the Department's conclusion that SNET's markup for its CTTS rate are excessive (SNET's Opposition Memorandum of Law, pp. 35-36).

      The DPUC's Final Decision expressly states that "the Department has authority over rates and charges for interconnection services including the Telco's CTTS without first having to demonstrate the necessity of such services."  (DPUC's Final Decision, p. 11).  (Appendix G). SNET ignores entirely the Department's reliance on the explicit language concerning interconnection in Conn. Gen. Stat. § 16-247b(b) and alleges here, for the first time on appeal, that the DPUC's "determination that CTTS is a necessary service is without support in the record or in the law."  (SNET's Opposition Memorandum of Law, p. 33).  SNET's assertion is wrong.

      The Department made no such determination, the Connecticut General Assembly did. After limiting the ratemaking authority of the Department to "necessary" telecommunications services, functions and unbundled network elements and any combination thereof only, but not to interconnection, Conn. Gen. Stat. § 16-247b(b) provides that the "rates for interconnection and unbundled network elements and any combination thereof shall be based on their respective forward looking long-run incremental costs, and shall be consistent with the provisions of 47 USC 252(d)."  Conn. Gen. Stat. § 16-247b(b).  As it has been indicated earlier, the Department interpreted that language to mean that a separate factual finding of the "necessary" nature of the interconnection is not required.

> The Department believes that the Legislature recognized the 'necessary' nature of interconnection services and their value to an integrated telecommunications network (i.e., the public switched telecommunications network) when drafting Conn. Gen. Stat. § 16-247b(b). To interpret the exception otherwise would be of little value to individual telecommunications service providers since end users would only be able to communicate with other subscribers to their respective service providers or require the maintaining of multiple service accounts with other service providers to reach those subscribers of those providers. Clearly, interconnection was a necessary function in the Legislature's eyes in order to provide for an efficient mutual exchange of telecommunication traffic.

(DPUC's Final Decision, pp. 12-13). (Appendix G).

Since CTTS is, undisputedly, an interconnection, the Department is not required to demonstrate that it is "necessary" in order to set its rates under Conn. Gen. Stat. § 16-247b(b).

Further, the Department's findings of fact or conclusions of law do not contain any determination on that issue. The DPUC responded to SNET's Written Exceptions regarding that question in a footnote where it stated:

> Without conceding that such a finding is required and only in response to the Telco's claim as raised in its Written Exceptions that the evidence on the record does not support a finding of necessity, the Department notes that there is sufficient evidence on the record to render such a finding. In this proceeding, the participating CLECs have demonstrated the need for CTTS so that they may compete effectively in the market. The Telco would have the Department believe that the sparse participation of certificated CLECs in this docket indicates how insignificant the Telco's CTTS service is in its ability to provide service or to compete effectively. However, the Department considers that reasoning flawed and will not indulge in such speculation. The lack of a market for CTTS and the Department's legislative mandate to foster competition justifies Department oversight of CTTS. See also, Conn. Gen. Stat. § 16-247f(a).

(DPUC's Final Decision, p. 11 n. 15). (Appendix G).

The evidence on the administrative record before the Department indicates that while there may be a large number of providers offering transit-like services, only SNET through its extensive network deployed throughout the state as well as the large number of interconnection agreements can offer to the CLECs the economies and efficiencies that they require to offer

competitive services.  (DPUC's Final Decision, p. 14).  (Appendix G).  For example, Mr. F.W.

Lafferty, Cox's witness, testified:

> In Connecticut, SNET is the only carrier that is currently interconnected with
> every other carrier operating in its territory.  Thus, there is no other carrier from
> whom Cox could obtain transit service to interconnect with all of the other
> CLECs, ILECs and wireless carriers operating in SNET's territory.  As in the case
> of MPB[12] arrangements over the past fifteen years, the most economical and
> efficient way for CLECs, wireless carriers and independent ILECs to exchange
> local traffic with each other is through transit arrangements.  Though it may be
> technically feasible to each LEC to directly connect their facilities with each
> other, the cost would be prohibitive.

 (R., Pre-Filed Testimony of F. Wayne Lafferty, 8/5/02, pp. 9-10).  (Appendix N).

Further, the witness for SNET conceded that the so called Meet Point Billing Service,

which SNET offers, is not an adequate substitute for the CTTS.

> First, Transit Traffic service is used to carry local and intraLATA toll service
> whereas MPB trunks carry intraLATA and interLATA traffic delivered to IXCs.
> Unlike MPB where the IXC purchases the facilities to interconnect with the
> Telco, it is the Telco that must purchase the facilities to terminate a CLEC
> originated Transit Traffic call to a third-party carrier.

(R., Pre-Filed Testimony of Patricia H. Pellerin, 8/5/02, pp. 5-6).  (Appendix O).

The evidence also shows that SNET's markup for CTTS was contrary to the public

interest.[13]   The $0.035 rate is much higher than the cost developed by SNET itself for CTTS.  In

addition, the $0.035 rate is considerably greater than the $0.002136 transit rate charged to IXCs

under SNET's Intrastate Access Tariff for use of its tandem for MPB arrangements.  (R., Pre-

Filed Testimony of F. Wayne Lafferty, 8/5/02, p. 16, Proprietary Version; see also R., LFE-1R,

10/2/02, Revised Attachment A, p. 1, Proprietary Version).  (Appendix Q) (filed under seal).

---

[12]  Meet Point Billing Service.
[13]  The number of carriers which have agreed to SNET's terms and conditions for purchase of
CTTS in their respective interconnection agreements is irrelevant to the issue of the markup's
reasonableness.  (R., SNET's September 10, 2002 Response to the DPUC's Interrogatory TE-2,
Attachment A.  (Appendix P).

Additionally, SNET's markup for its CTTS was unreasonable in light of the U.S.

Supreme Court's decision in <u>Verizon</u>, 535 U.S. 467, <u>supra</u>.

> A reasonable profit' may refer to a 'normal' return based on 'the cost of obtaining debt and equity financing' prevailing in the industry.  First Report and Order ¶ 700.  This latter sense of 'cost' (and accordingly 'reasonable profit') is fully incorporated in the FCC's provisions as to 'risk-adjusted cost of capital,' namely, that 'States may adjust the cost of capital if a party demonstrates … that either a higher or a lower level of cost of capital is warranted, without … conducting a "rate-of-return or other rate based proceeding"' <u>Id</u>., ¶ 702.

<u>Verizon</u>, 535 U.S. at 500 n. 19.

Under the circumstances, the DPUC was required to reduce SNET's markup for the

CTTS to protect the public interest and to promote competition in Connecticut.

The evidence on the record also indicates that SNET's sister companies, SBC's affiliates,

have transit service agreements in different states and none of them includes the so called bill

clearing house function[14].  (<u>R</u>., SNET's September 10, 2002 Response to DPUC's Interrogatory

TE-8, Attachment A).  (Appendix R).  For example, the contracts for transit service between

SBC's affiliates and the respective CLECs in Arkansas (<u>Id</u>., p. 1), California (<u>Id</u>., pp. 2-4),

Illinois (<u>Id</u>., p. 8), Indiana (<u>Id</u>., p. 11), Kansas (<u>Id</u>., p. 12), Michigan (<u>Id</u>., p. 15), Missouri (<u>Id</u>.,

p. 16), Ohio (<u>Id</u>., p. 20), Oklahoma (<u>Id</u>., p. 21), and Texas (<u>Id</u>., p. 22) do not contain a bill

clearing house function.  The DPUC ordered SNET to "file a new transit traffic service offering

that is consistent with that offered by its SBC affiliates."  (<u>R</u>., DPUC's Final Decision, p. 18).

(Appendix G).

Mindful of its duty to implement the state regulatory scheme in the public interest and to

promote competition, the DPUC properly imposed the requirement for comparable treatment of

Connecticut CLECs.  Similarly, the 1996 Act expressly provides that interconnection is offered

"on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(D). Connecticut CLECs depend on the DPUC to investigate and remedy illegal practices by SNET. The DPUC lived up to its obligations.

Further, under Conn. Gen. Stat. § 16-22, the burden of proving that the rates for CTTS are just and reasonable is on SNET. That statute reads: "**At any hearing involving a rate** or the transfer of ownership of assets or a franchise of a public service company, **the burden of proving that said rate under consideration is just and reasonable** or that said transfer of assets or franchise is in the public interest **shall be on the public service company**." Conn. Gen. Stat. § 16-22 (emphasis added). The administrative proceeding was initiated by a request to investigate SNET's rates for CTTS. Clearly, the burden of proving that such rates were just and reasonable fell on SNET. SNET failed to meet that burden.

Finally, the DPUC, acting in conformance with the provisions of the UAPA, afforded SNET adequate administrative fairness. It is well settled that the procedures provided by the UAPA exceed the minimal safeguards required by due process. Pet v. Dept. of Health Services, 228 Conn. 651, 661, 638 A.2d 6 (1994). Administrative hearings are not required to match the model of a court trial. They only need to "meet some modicum of orderly and fair procedure." Zanavich v. Board of Education, 8 Conn. App. 508, 512, 513 A.2d 196, cert. denied, 201 Conn. 809, 515 A.2d 381 (1986). The DPUC acted in accordance with all applicable UAPA statutes.

    **C.**    **The DPUC's Final Decision Does Not Violate the Contract Clause of the United States Constitution, Art. I, § 10**.

Having found that SNET's CTTS rates were excessive, the DPUC ordered SNET to reduce its CTTS charges to reflect a 35% markup. (R., DPUC's Final Decision, p. 18)

---

[14] A separate and distinct from the actual interconnection service function of billing CLECs for the CTTS.

(Appendix G).  SNET's arguments proffered in support of its claim that the DPUC's Final

Decision violates the Contract Clause of the United States Constitution, Art. I, § 10 (SNET's

Opposition Memorandum of Law, pp. 36-41) have no merit.

Where state legislative action does not impair the rights of third parties, as is the case

with Conn. Gen. Stat. § 16-247b(b), state control over its units of local government will not

violate the Contract Clause.  To illustrate, even though a municipality has a valid franchise with

a utility indicating rates, the state public service commission can, so far as the Contract Clause is

concerned, increase the rate upon application of the utility.  Railroad Com. of California v. Los

Angeles R. Corp., 280 U.S. 145, 50 S.Ct. 71, 74 L.Ed. 234 (1929).  **Only one form of**

**government action is outlawed by the Contract Clause – namely, the passing of laws or**

**legislative action.**

> In order to come within the provision of the Constitution of the United States,
> which declares that no state shall pass any law impairing the obligation of
> contracts, not only must the obligations of contract be impaired, but it must have
> been impaired by some act of the legislative power of the state and not by a
> decision of the judicial department only.  Central Land Co. of West Virginia v.
> Laidley, 159 U.S. 103, 16 S.Ct. 80, 82, 40 L.Ed. 91, 94 (1895).

Behavior of the executive or administrative departments of government will not

ordinarily be deemed violative of the Contract Clause.  New Orleans Waterworks Co. v.

Louisiana Sugar Refining Co., 125 U.S. 18, 8 S.Ct. 741, 31 L.Ed. 607 (1888).  Thus, a

governmental decision to breach a contract, though actionable, is not a violation of the Contract

Clause.  Hays v. Port of Seattle, 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243 (1920).

Legislative action forbidden by the Contract clause can take the form of state statutes,

U.S. ex rel. Hoffman v. City of Quincy, 71 U.S. 535, 18 L.Ed. 403 (1866), state constitutional

clauses, Ohio & M.R. Co. v. McClure, 77 U.S. 511, 19 L.Ed. 997 (1870); Coombes v. Getz, 285

U.S. 434, 52 S.Ct. 435, 76 L.Ed. 866 (1932) and municipal ordinances, <u>John P. King Mfg. Co. v. City Council of Augusta</u>, 277 U.S. 100, 48 S.Ct. 489, 72 L.Ed. 801 (1928).

Moreover, when a state permits within its jurisdiction certain contracts, it always reserves the right as a sovereign to make whatever changes are necessary to protect the public health, safety, morality or general welfare.  As early as 1878, the United States Supreme Court ruled that even though a corporate charter was a contract, the State could impose necessary police power controls upon the recipient to protect the public health.  <u>Northwestern Fertilizer Co. v. Hyde Park</u>, 97 U.S. 659, 24 L.Ed. 1036 (1878).  Two years later, the Supreme Court also ruled that controls deemed necessary to protect the public morality could be imposed, thus terminating a lottery by legislative act even though the grant of authority to operate a lottery was admittedly a contract within the meaning of the Contract Clause.  <u>Stone v. Mississippi</u>, 101 U.S. 814, 25 L.Ed. 1079 (1880).

By 1914 the Supreme Court could say it was "settled" that "neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community."  <u>Atlantic Coast Line R. Co. v. Goldsboro</u>, 232 U.S. 548, 34 S.Ct. 364, 368, 58 L.Ed. 721 (1914).  Embraced within the concept of general welfare are legitimate attempts to legislate for the economic health of the community.  Accordingly, in the language of the U.S. Supreme Court, "[T]he economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts."  <u>Home Bldg. & Loan Asso. v. Blaisdell</u>, 290 U.S. 398, 437, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

Thus, where the state, as is the case at hand, is not involved in a contract, then supervening regulation is constitutional when necessary to protect the health, safety, morality or general welfare of the community and it matters not whether remedies or obligations are affected. The approach is analogous to the long-standing "rule of reason" incorporated in the due process clauses. Significant is the language Chief Justice Hughes used in this respect:

> The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.

Home Bldg. & Loan Asso. v. Blaisdell, 290 U.S. at 438

There the Supreme Court said:

> It does not matter that legislation appropriate to that end has the result of modifying or abrogating contracts already in effect.

Home Bldg. & Loan Asso. v. Blaisdell, 290 U.S. at 437.

The Connecticut legislature expressly authorized the DPUC to implement and enforce the regulatory scheme "in a manner designed to foster competition and protect the public interest." Conn. Gen. Stat. § 16-247f(a). The legislature also required the DPUC to implement Conn. Gen. Stat. § 16-247b(b), the statute at the center of this case, in accordance with those goals. Conn. Gen. Stat. § 16-247a(a). Investigation of excess markup in SNET's charges for CTTS and remedying the problem, which directly impacts the competition and the public interest, is squarely within the ambit of those provisions.

The DPUC's Decision does not implicate the Contract Clause of the U.S. Constitution.

Finally, SNET's voluntarily negotiated interconnection agreements are unavailing. No one raised the claim of excessive markup for CTTS rates and the Department did not review it. SNET's assertion that the DPUC found the negotiated CTTS rates to be reasonable (SNET's Opposition Memorandum of Law, p. 38) is factually inaccurate. Indeed, none of the letters

approving the interconnection agreements SNET submitted to this Court, contains any such finding or confirmation.

More importantly, SNET fails to mention that agreements arrived at through voluntary negotiations are not covered by the standards set forth in § 251 (b) and (c).  47 U.S.C. § 252(a)(1).  When approving such agreements state commissions may reject them only if "(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or (ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity."  47 U.S.C. § 252(e)(2)(A).  Again, the DPUC never before had a chance to review the markup for the CTTS vis-à-vis a claim for excessiveness and frustration to competition and breach of public interest.  Indeed, SNET was not discriminating against other CLECs, SNET simply charged every CLEC excessive rates.

In light of the preceding discussion, the State respectfully submits that the DPUC's Decisions do not violate SNET's contractual rights.  SNET's claim under the United States Constitution Art. I, § 10 must be rejected.

DEPARTMENT OF PUBLIC
UTILITY CONTROL


BY:  _____
Tatiana D. Eirmann
Assistant Attorney General
Federal Bar No. ct03398
10 Franklin Square
New Britain, CT  06051
Tel: (860) 827-2620
Fax: (860) 827-2893
E-mail:  tatiana.eirmann@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing **Memorandum of Law** was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 23rd day of October, 2003,  first class postage prepaid to:

Timothy P. Jensen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New haven, CT 06510-1910

Keith M. Krom, Esq.
The Southern New England Telephone Company
310 Orange Street
New Haven, CT 06510

David L. Belt, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
New Haven, CT 06503

Kenneth W. Salinger, Esq.
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199-07613

Thomas G. Rohback, Esq.
Gail L. Gottehrer, Esq.
LeBoeuf, Lamb, Greene & MacRae, LLP
225 Asylum Street, 13th Floor
Hartford, CT 06103

_____

Tatiana D. Eirmann
Assistant Attorney General

39