UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2003 OCT 27  A 11: 40

US D............ ..........
B..... .. .....

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY,                    :

          Plaintiff,          :

      v.                              :   Civil Action No. 3:03CV00278 (SRU)

THE CONNECTICUT DEPARTMENT OF       :
PUBLIC UTILITY CONTROL, et al.,      :

          Defendants.          :
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OF LAW OF COX CONNECTICUT TELCOM, L.L.C., IN REPLY TO SNET'S MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT FILED BY THE DEFENDANTS AND INTERVENING DEFENDANTS

Thomas G. Rohback  (CT-01096)
Gail L. Gottehrer  (CT-19346)
LEBOEUF, LAMB, GREENE
    & MACRAE, L.L.P.
225 Asylum Street, 13th Floor
Hartford, Connecticut 06103
Telephone:  (860) 293-3500
Fax:  (860) 293-3730
E-mail:  trohback@llgm.com
E-mail:  glgotteh@llgm.com

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT.......................................................................................................1

I.    SNET Is Attempting to Manufacture a Federal Claim from a Decision
      Based on State Law in Order to Avoid the State Courts.......................................1

II.   The DPUC Has Properly Exercised Its Authority to Regulate CTTS
      under Both Federal and State Law.......................................................................3

      A.   The DPUC's Final Decision Is Not Inconsistent with Federal Law ..............3

      B.   The DPUC Properly Exercised Its Authority under State Law ....................7

III.  The DPUC's Final Decision Does Not Impair Contracts
      in Violation of Article I, Section 10, of the United States Constitution ...............8

CONCLUSION....................................................................................................10

## TABLE OF AUTHORITIES

### FEDERAL CASES

Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978)..........................................9

Bethlehem Steel Co. v. New York State Labor Relations Bd.,
    330 U.S. 767, 67 S. Ct. 1026 (1947)......................................................................5

Energy Reserves Group, Inc. v. Kansas Power & Light Co.,
    459 U.S. 400, 103 S. Ct. 697 (1983)......................................................................9

Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,
    458 U.S. 141, 102 S. Ct. 3014 (1982)....................................................................5

MCI Telecomm. Corp. v. U.S. West Communications,
    204 F.3d 1262 (9th Cir. 2000) ...............................................................................3

Michigan Bell Tel. Co. v. MCIMetro Access Transmission Serv., Inc.,
    323 F.3d 348 (6th Cir. 2003) ................................................................................3

Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.,
    339 F.3d 428 (6th Cir. 1993) ............................................................................ 5-6

Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S. Ct. 988 (1978)............................... 5-6

Southern New Eng. Tel. Co. v. State of Connecticut, No. 3-02-CV-1022,
    2003 U.S. Dist. LEXIS 17473 (D. Conn. Sept. 30, 2003) ....................................7

Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,
    208 F.3d 475 (5th Cir. 2000) ........................................................................... 5-6

Veix v. Sixth Ward Building & Loan Ass'n, 310 U.S. 32 (1940)....................................9

### FEDERAL COMMUNICATIONS COMMISSION DECISION

In re Application of BellSouth Corp., 17 F.C.C.R. 25828 (2002)................................4, 5

### STATE CASE

Southern New Eng. Tel. Co. v. Department of Pub. Util. Control,
    261 Conn. 1, 803 A.2d 879 (2000) ..............................................................3, 7, 8

## **FEDERAL STATUTES**

47 U.S.C. § 251(d)(3) ...............................................................................................3

Pub. L. 104-104, Title VI § 601, Feb. 8, 1996,
     110 Stat. 143, codified at 47 U.S.C. §152 (Historical Note) ............................ 3-4

Defendant Cox Connecticut Telcom, L.L.C. ("Cox"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in Reply to SNET's Memorandum in Opposition to Motions to Dismiss and for Summary Judgment Filed by the Defendants and Intervening Defendants, dated October 24, 2003.

## INTRODUCTION

SNET has failed to show that its decision to bring this action in this Court was not an exercise in forum shopping, reflecting its preference for this Court over the Connecticut appellate courts.  Likewise, SNET has not shown the Final Decision of the Connecticut Department of Public Utility Control ("DPUC") to be inconsistent with the federal Telecommunications Act of 1996, 47 U.S.C. § 151, et seq. (the "Telecom Act" or the "1996 Act").  Finally, SNET has not demonstrated a violation of the Contracts Clause or a denial of its Due Process rights.  The cross-motions for summary judgment filed by Cox and SNET make clear that summary judgment should be granted in Cox's favor.

## ARGUMENT

**I.      SNET Is Attempting to Manufacture a Federal Claim from a Decision Based on State Law in Order to Avoid the State Courts.**

SNET mischaracterizes Cox's argument against the Court's assertion of jurisdiction in this matter.  See SNET's Memorandum of Law in Opposition to Motions to Dismiss and for Summary Judgment Filed by the Defendants and Intervening Defendants and in Further Support of its Motion for Summary Judgment, dated October 6, 2003 ("SNET Memorandum"), at 22. Cox does not assert that the Court lacks jurisdiction because there has been no proven violation of federal law.  See id.  Rather, Cox argues that the DPUC based its authority in the Final Decision on state law, and that, therefore, there is no federal question.  See Memorandum of Law of Cox Connecticut Telcom, L.L.C., in Support of its Motion for Summary Judgment, dated July

21, 2003 ("Initial Memorandum"), at 11-12. As noted in Cox's Initial Memorandum, the Final

Decision sets forth that:

> The Department is asserting authority over the Telco's CTTS based
> on Conn. Gen. Stat. §§ 16-247b(b) in conjunction with 16-247f(a)
> and 16-247a.

See Initial Memorandum at 12; see also Final Decision at 10 (attached to Affidavit of Gail L.

Gottehrer in Support of Cox's Motion for Summary Judgment, dated July 21, 2002 ("Gottehrer

Aff."), as Exhibit 3). That being the case, SNET's assertion that Cox argued initially in the

underlying administrative proceedings that the 1996 Act gave the DPUC additional authority to

regulate CTTS, see SNET Memorandum at 22, is irrelevant here. The DPUC decided otherwise.

See Final Decision at 10. Indeed, to the extent the parties' arguments in the underlying

administrative proceedings are relevant here, SNET argued repeatedly in those proceedings that

the 1996 Act was inapplicable to transit service. See Complaint, ¶ 25; Initial Memorandum at

13-14. SNET cannot have it both ways.

SNET does not address this point, but instead argues that federal jurisdiction arises

because the DPUC's decision was inconsistent with the 1996 Act. See SNET Memorandum at

23. SNET's position in the underlying administrative proceedings that the 1996 Act was wholly

inapplicable to transit service illustrates that SNET's filing of this action in federal court is

merely an attempt to establish a basis for federal court jurisdiction in order to collaterally attack

the DPUC's Final Decision in federal court rather than state court.[1] Indeed, SNET offers no

---

[1] Contrary to SNET's assertions, see SNET Memorandum at 23, Cox has not argued that a
federal question must be substantial in order to establish jurisdiction. Rather, Cox has argued
that there is no federal question, and that SNET has attempted to raise one where none exists
solely for the purpose of obtaining relief in federal court rather than state court. See Initial
Memorandum at 11-14.

2

explanation for why it did not appeal the DPUC's Final Decision in state court, despite the fact

that SNET has utilized the state courts to appeal DPUC decisions in the past.

**II.     The DPUC Has Properly Exercised Its Authority to Regulate CTTS under Both Federal and State Law.**

    A.     The DPUC's Final Decision Is Not Inconsistent with Federal Law.

SNET's argument in favor of preemption is based on a single, erroneous premise.

Specifically, SNET asserts conclusively that the Federal Communications Commission ("FCC")

has articulated a policy that transit services may not be regulated.  See SNET Memorandum at

25, 26-27, 29, 30.  SNET attempts to conceal its lack of support for this conclusion by offering

numerous reasons why the DPUC allegedly exceeded its authority under state law, rather than

focusing on the purported inconsistency of the Final Decision with federal policy.  See SNET

Memorandum at 23-33.

SNET's detailed discussion of 47 U.S.C. §§ 251(a) and 251(c) relating to direct and

indirect interconnection sidesteps the threshold issue of whether the DPUC's decision to regulate

transit services is preempted by the 1996 Act (which it is not).  The 1996 Act specifically

reserves to states the ability to impose additional state requirements so long as they are consistent

with the requirements of the Act and further competition.  See 47 U.S.C. § 251(d)(3) (2003); see

also Michigan Bell Tel. Co. v. MCIMetro Access Transmission Serv., Inc., 323 F.3d 348 (6th

Cir. 2003); MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1265 (9th Cir.

2000); Southern New Eng. Tel. Co. v. Department of Pub. Util. Control, 261 Conn. 1, 17, 803

A.2d 879, 890 (2000) ("[T]he [FCC] is charged with the responsibility of promulgating

regulations necessary to implement the [1996 Act], but the [federal] [a]ct reserves to the states

the ability to impose additional requirements so long as the requirements are consistent with the

[federal act] and further competition."); Pub. L. 104-104, Title VI § 601, Feb. 8, 1996, 110 Stat.

143, codified at 47 U.S.C. §152 (Historical Note) ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."). There is room, therefore, for at least some state regulation in this field, especially in the area of transit service, where, contrary to SNET's assertions, see SNET Memorandum at 24-26, neither Congress nor the FCC has established any policy regarding the regulation of such service. There is no basis for SNET's statements to the contrary. See SNET Memorandum at 25, 26-27, 29, 30.

SNET does not, and cannot, cite to any specific statutory provision or policy because none exists. The FCC decisions cited by SNET to support its argument serve only to defeat SNET's argument and, more importantly, to support Cox's argument that the DPUC's Final Decision was consistent with the Telecom Act. See SNET Memorandum at 25 (citing In re Application of BellSouth Corp., 17 F.C.C.R. 25828, ¶ 155 (2002); In re Implementation of the Local Competition Provisions in the Telecomm. Act of 1996, 11 F.C.C.R. 15499, ¶ 176 (1996)). The portion of BellSouth cited by SNET (on which SNET bases its entire argument) is the following:

> With regard to transit traffic, the [FCC] has not had occasion to
> determine whether incumbent LEC's have a duty to provide transit
> service under section 251(c)(2), and we find no clear [FCC]
> precedent or rules declaring such a duty.

See SNET's Memorandum of Law in Support of its Motion for Summary Judgment, dated July 22, 2003, at 13-14 (quoting BellSouth, 17 F.C.C.R. 25828, ¶ 155); SNET Memorandum at 25 (citing same). This hardly constitutes a declaration of policy by the FCC that transit traffic service is an area that should not be regulated. Nevertheless, SNET argues that this language demonstrates an affirmative decision by the FCC not to regulate transit services and that, therefore, the DPUC cannot regulate CTTS. See SNET Memorandum at 25, 26, 29.

4

SNET's argument is without merit. In <u>BellSouth</u>, the FCC did not undertake any analysis

of the issue of transit traffic regulation, but found only that the state commission's decision that

BellSouth provided interconnection in compliance with the Telecom Act did not constitute "clear

error." <u>See</u> <u>BellSouth</u>, 17 F.C.C.R. 25828, ¶ 155. In effect, the FCC deferred to the decision of

the state utility commission regarding the issue of regulating transit traffic services because there

was no FCC policy on the issue. <u>See id.</u> This is consistent with the statement in <u>Bethlehem</u>

<u>Steel Co. v. New York State Labor Relations Bd.</u>, one of the cases cited by SNET in its

Memorandum of Law in Support of its Motion for Summary Judgment, that states may regulate

unless the failure of federal officials to regulate takes on the character of a ruling that no such

regulation is appropriate:

> [W]hen federal administrative regulation has been slight under a
> statute which potentially allows minute and multitudinous
> regulation of its subject, . . . or even where extensive regulations
> have been made, if the measure in question relates to what may be
> considered a separable or distinct segment of the matter covered by
> the federal statute and the federal agency has not acted on that
> segment, the case will be treated in a manner similar to cases in
> which the effectiveness of federal supervision awaits federal
> administrative regulation. . . . <u>The states are in these cases
> permitted to use their police power in the interval.</u>

<u>See</u> <u>Bethlehem Steel Co. v. New York State Labor Relations Bd.</u>, 330 U.S. 767, 774, 67 S. Ct.

1026, 1030 (1947) (emphasis added).[2] More importantly, it is also consistent with the manner in

---

[2] SNET cites two United States Supreme Court cases in support of its argument that a federal
decision not to regulate precludes states from regulating. <u>See</u> SNET Memorandum at 29 (citing
<u>Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 155, 102 S. Ct. 3014, 3023
(1982); <u>Ray v. Atlantic Richfield Co.</u>, 435 U.S. 151, 178, 98 S. Ct. 988, 1004 (1978)). These
cases are distinguishable because, unlike the instant case, they involve express federal policies
that conflict with state regulations. <u>See</u> <u>de la Cuesta</u>, 458 U.S. at 155, 102 S. Ct. at 3023 (explicit
federal regulation that provided federal savings and loans with the power to decide whether to
include a "due-on-sale" clause in a loan instrument preempted California order forbidding a
federal savings and loan from enforcing such a clause); <u>Ray</u>, 435 U.S. at 178, 98 S. Ct. at 1004
(clear federal intent to have single decisionmaker, namely Secretary of Transportation,
promulgate limitations on vessel size precluded states from enforcing a different size limitation

which the FCC has handled similar regulatory issues in the past. See, e.g., Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc., 339 F.3d 428, 435-36 (6th Cir. 1993) ("The [FCC] has noted that it itself has yet to promulgate an official rule governing such reciprocal compensation. Due to this circumstance, as well as the realization that the [Telecom Act] does not address the issue, the [FCC] has declared that it finds no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic, pending adoption of a rule establishing an appropriate interstate compensation mechanism.") (citation omitted); Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex., 208 F.3d 475, 483 (5th Cir. 2000) (same). Accordingly, in the absence of federal policy regarding regulation of transit services, the DPUC's regulation of CTTS in the Final Decision was consistent with the 1996 Act, and is therefore not preempted.

As a final effort to manufacture an inconsistency between the DPUC's Final Decision and the 1996 Act where none in fact exists, SNET argues that the FCC's "policy" against regulating transit service (though there is no such policy) means that CTTS rates are subject to the "just and reasonable" mandate of 47 U.S.C. §§ 201-202. See SNET Memorandum at 32-33. Leaving aside the fact that SNET's argument is based on the erroneous premise that the FCC has set forth a policy against the regulation of transit services, SNET's argument lacks merit because, to the extent 47 U.S.C. §§ 201-202 even apply, the DPUC's Final Decision is consistent with these federal statutes. The DPUC simply determined, based on the evidence before it, that the CTTS rates were not reasonable. See infra Part II.B.; Initial Memorandum at 16-18.

---

on vessels).

B.    The DPUC Properly Exercised Its Authority under State Law.

As previously set forth, SNET's argument that the state statutes relied upon by the DPUC

did not give the DPUC authority to regulate CTTS misses the mark.[3]  It is well-settled that the

DPUC has broad authority to regulate the provision and pricing of a service necessary for the

provision of telecommunications.  See Initial Memorandum at 16 (citing Conn. Gen. Stat. § 16-

247b(b) (2003)); Southern New Eng. Tel. Co., 261 Conn. at 10, 803 A.2d at 886-87)).  SNET

concedes that the state statutes provide the DPUC with the authority to review costs and regulate

necessary services.  See SNET Memorandum at 27.[4]  SNET's interpretation of these statutes is

irrelevant.  The DPUC utilized its full discretion to determine the credibility of the witnesses and

the facts placed before it and, in so doing, concluded that transit service was a necessary service

in Connecticut.  See Initial Memorandum at 16-18 (citing Non-Proprietary Prefiled Testimony of

F. Wayne Lafferty at 3 (Gottehrer Aff., Exhibit 1); Public Hearing Tr. at 130 (testimony of F.

Wayne Lafferty that "SNET's transit traffic service priced appropriately is critical to the

continued expansion of competition in the state") (Gottehrer Aff., Exhibit 4); Non-Proprietary

Prefiled Testimony of F. Wayne Lafferty at 17 ("[T]here are no real market alternatives for

CTTS.  Thus, no market exists to establish a rate."); Initial Brief of Cox, dated October 17, 2002,

at 8); see also Final Decision at 11 n.15.

---

[3] In the event the Court were to review the DPUC's application of Connecticut law in the Final
Decision, the proper standard of review would be the "arbitrary and capricious" standard.  See
Southern New England Tel. Co. v. State of Connecticut, No. 3-02-CV-1022, 2003 U.S. Dist.
LEXIS 17473, at *16 (D. Conn. Sept. 30, 2003) (attached hereto as Exhibit A).  The DPUC
articulated a well reasoned decision, supported by an extensive evidentiary record, and
demonstrated a "rational connection" between the facts in the record and the DPUC's decision.
As such, SNET cannot show that the DPUC's Final Decision was arbitrary and capricious.  See
Initial Memorandum at 16-18.

[4] The DPUC also determined that it had authority to regulate CTTS even if it was not a necessary
service.  See Initial Memorandum at 17-18.

Similarly, SNET's claims that the DPUC failed to provide it with due process are singularly without merit. The DPUC granted SNET party status and gave SNET numerous opportunities to be heard and to present its position. See Initial Memorandum at 20-21. As the record shows, SNET participated fully in every stage of the DPUC docket. See id. at 20-21. Moreover, the DPUC issued its Final Decision only after allowing all parties involved the opportunity to comment in writing and to present oral argument. See id. at 16-18, 20-21.

Additionally, as set forth in Cox's Initial Memorandum, the Supreme Court of Connecticut has expressly upheld the authority of the DPUC, pursuant to sections 16-247f(a) and 16-247a of the Connecticut General Statutes, to set limits on the maximum markup that an incumbent carrier is permitted to charge once the DPUC finds the incumbent has charged excessive rates for the service contrary to the public interest. Southern New Eng. Tel. Co., 261 Conn. at 30-31, 803 A.2d at 897-98. In the instant case, the record from the DPUC proceeding contains testimony demonstrating that SNET's CTTS markup and rates are excessive, harmful to competition and pose a barrier to entry into the local telephone market. See Non-Proprietary Version of Prefiled Testimony of F. Wayne Lafferty at 3; Public Hearing Tr. at 130; Final Decision at 3, 11 n.15. Thus, the DPUC's Final Decision was in accordance with Connecticut state law and supported by substantial record evidence which demonstrated that the reduction ordered by the DPUC in the CTTS markup would foster local telephone competition.

III.    **The DPUC's Final Decision Does Not Impair Contracts in Violation of Article I, Section 10, of the United States Constitution.**

SNET's argument that the DPUC's Final Decision violates the Contract Clause should also be rejected. SNET bases its argument on the assertion that the DPUC previously found that certain negotiated CTTS rates were reasonable and that SNET relied on this agency opinion for eight years. See SNET Memorandum at 37-38. The types of contracts at issue, however,

8

typically contain "change of law" provisions to protect both parties, in recognition of the fact that telecommunications is a heavily-regulated area where <u>changes are anticipated by the parties</u>. SNET cannot contend that it could not reasonably have anticipated that its contracts might be affected by changes in state regulation. Indeed, as the dominant incumbent local exchange service and a regulated utility, SNET's operations and contractual relationships are subject to DPUC oversight, thereby making courts far less willing than otherwise to find "substantial impairment" of contracts. <u>See Energy Reserves Group, Inc. v. Kansas Power & Light Co.</u>, 459 U.S. 400, 413-14, 98 S. Ct. 697, 705-07 (1983) (holding that Contract Clause was not violated in utilities industry case because parties operated in heavily-regulated industry); <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234, 250, 98 S. Ct. 2716, 2725 (1978) (citing <u>Veix v. Sixth Ward Building & Loan Ass'n</u>, 310 U.S. 32, 38 (1940)). In this docket, upon completion of a full rate investigation and an analysis of cost studies prepared by SNET, the DPUC held that SNET's CTTS rate was excessive, contrary to the public interest, and hindered competition. <u>See</u> Final Decision at 18. The DPUC's Final Decision was therefore also a proper exercise of the DPUC's police powers. <u>See</u> Initial Memorandum at 19-20 (citing cases).

9

## CONCLUSION

Based on the foregoing, Cox respectfully requests that the Court issue an Order granting

its Motion for Summary Judgment, dated July 22, 2003, in its entirety and awarding Cox such

other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated:   Hartford, Connecticut          COX CONNECTICUT TELCOM, L.L.C.
         October 24, 2003

By: _____
                                       Thomas G. Rohback  (CT-01096)
                                       Gail L. Gottehrer  (CT-19346)
                                       LEBOEUF, LAMB, GREENE &
                                       MACRAE, L.L.P.
                                       225 Asylum Street, 13th Floor
                                       Hartford, Connecticut  06103
                                       Telephone:  (860) 293-3500
                                       Fax:  (860) 293-3730

                                       E-mail:  trohback@llgm.com
                                       E-mail:  glgotteh@llgm.com

                                       Counsel for Cox Connecticut Telcom,
                                       L.L.C.

LEXSEE 2003 U.S. DIST. LEXIS 17473

SOUTHERN NEW ENGLAND, TELEPHONE COMPANY, Plaintiff, v. STATE OF
CONNECTICUT, DEPARTMENT OF PUBLIC UTILITY COMPANY, ET AL.,
Defendants.

CIVIL ACTION NO. 3-02-CV-1022(JCH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2003 U.S. Dist. LEXIS 17473*

September 30, 2003, Decided

DISPOSITION: Parties' motions for summary judgment denied.

LexisNexis (TM) HEADNOTES - Core Concepts:

COUNSEL:    [*1]    For Southern New England Telephone Co, PLAINTIFF: Robert W Allen, Timothy P Jensen, Tyler, Cooper & Alcorn, New Haven, CT USA. Keith M Krom, George M Moreira, Southern New England Telephone Co, New Haven, CT USA.

For CT Dept of Public Utility Control, Donald W Downes, Honorable, O/as Comm of CT Dept of Public Utility Control, Linda Kelly, Honorable, O/as Comm of CT Dept of Public Utility Control, Glenn Arthur, Honorable, O/as Comm of CT Dept of Public Utility Control, John W Betkoski, III, Honorable, O/as Comm of CT Dept of Public Utility Control, Jack R Goldberg, Honorable, O/as Comm of CT Dept of Public Utility Control, DEFENDANTS: Robert S Golden, Jr, Robert L Marconi, Attorney General's Office Public Utility Control, New Britain, CT USA.

For Paetec Communications, Inc, MOVANT: Brad N Mondschein, Updike, Kelly & Spellacy, PC, Hartford, CT USA.

JUDGES: Janet C. Hall United States District Judge.

OPINIONBY: Janet C. Hall

OPINION:

RULING ON MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 18, 33, 37]

In this case, the Southern New England Telephone Company ("SNET") seeks review of a decision by the State of Connecticut, Department of Public Utility Control ("DPUC") requiring SNET to treat [*2] certain telecommunications traffic involving its competitor PaeTec Communications, Inc. ("PaeTec") as "local," and thus subject to reciprocal compensation pursuant to an interconnection agreement between the parties. PaeTec is an intervener in the case.

I. BACKGROUND

A. The Telecommunications Act of 1996

The Telecommunications Act of 1996 ("the Act"), Pub.L. 104-104, 110 Stat. 56, "created a new telecommunications regime designed to foster competition in local telephone markets." *Verizon Md. Inc. v. PSC, 535 U.S. 635, 638, 152 L. Ed. 2d 871, 122 S. Ct. 1753 (2002).* Before Congress passed the Act, local telephone service throughout the United States was typically provided in a "natural monopoly" fashion, with only one company providing service throughout a given area, often because of state-granted exclusive franchises. See *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 142 L. Ed. 2d 834, 119 S. Ct. 721 (1999).* The Act facilitated the break up of these monopolies by requiring, *inter alia,* the incumbent local exchange carrier ("LEC") to share its networks with new entrants to the market, referred [*3] to as competitor local exchange carriers ("CLEC"). The Act also requires local telephone companies to establish "reciprocal compensation arrangements" for the transport and termination of local calls that originate with one carrier and terminate with another." *47 U.S.C. § 251(b)(5).* The Act gives LECs and CLECs the option of negotiating an interconnection

agreement governing this access and compensation. An entering CLEC can either opt into an existing interconnection agreement between the LEC and another CLEC, or it can negotiate its own interconnection agreement. See *47 U.S.C. § 252(e)(6)*. The Act provides that disputes over interconnection agreements are to be arbitrated by the state commission that regulates local phone service, in Connecticut the Department of Public Utility Control. The Act further provides that a party aggrieved by a state commission determination can petition for review in the federal district court. The courts have termed this arrangement "cooperative federalism." See, e.g., *Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 8 (1st Cir. 1999)*.

## B. The Dispute [*4] Between SNET and PaeTec

In 1999, pursuant to *Section 252(i) of the Act*, opted into a pre-existing interconnection agreement between SNET and WorldCom Technologies, which dealt solely with interconnection in Connecticut. When SNET was acquired by SBC, however, SBC required a single multi-state interconnection agreement for all of its member providers. Accordingly, PaeTec and SBC entered into a "SBC-13state" interconnection agreement ("the Agreement"), which was filed on January 8, 2001, with the DPUC and approved by it on April 18, 2001. n1

> n1 The Agreement also covered SBC-owned providers operating in Illinois, Indiana, Michigan, Nevada, Ohio, California, Texas, Missouri, Oklahoma, Kansas, Arkansas, and Wisconsin, some of which in turn covered multiple states.

The overlap of different telephone service providers creates complex issues of compensation and classification. Telecommunications service is divided, much like concentric circles, into several geographical territories of increasing specificity. [*5] Generally, a call which originates and terminates within the same physical calling area is termed a "local call." A call which originates in one physical calling area and terminates within another physical calling area, but is still within a larger "local access and transport area" ("LATA"), is termed an "intraLATA" call. A call which, on the other hand, terminates in a different "LATA" is termed an "interLATA" call. Because some states have more than one LATA, a call can be "intrastate interLATA" or "interstate interLATA." The state of Connecticut, however, is all within the same "LATA," though some areas of Greenwich are included in the New York City calling area. Calls are tracked and classified by the first digits of the telephone number, *e.g.*, in a hypothetical 203-555-0000 telephone number, by the

"203555 " portion of the number. The "203" is called the "NPA" code and the "555" is called the NXX" code.

Generally stated, local calls are subject to the reciprocal compensation of the Act. With the advent of the internet and other phone networks, however, this classification has become more complicated. Telephone service providers have begun offering local numbers (local NPA/NXX [*6] codes) that correspond with long distance call destinations - what that the Agreement calls "Virtual FX" traffic. A customer may dial a local number that actually corresponds to a number outside his or her local calling area, so that the call seems local but actually terminates in a different calling area; similarly, he or she may dial a local number to access an Internet Service Provider ("ISP"), but connect through that number to services and websites outside his or her local calling area. This situation has created confusion about whether such "local" numbers should be classified as "local calls" for purposes of billing.

In the Agreement, SBC and PaeTec specified interconnection compensation terms. The Agreement contained an "Appendix Reciprocal Compensation" ("the Appendix") that specified that "calls delivered to or from numbers that are assigned to an exchange within a common mandatory local calling area but where the receiving or calling party is physically located outside the common mandatory local calling area of the exchange . . . . are not Local Calls for intercarrier compensation and are not subject to local reciprocal compensation." Appendix at § 2.7.

The parties, however, [*7] also executed an amendment to the Agreement ("the Amendment"), which overrides conflicting provisions of the Agreement. Amendment at § 1.1. Section 3.1 provided:

> If PaeTec Communications, Inc. designates different rating and routing points such that traffic that originates in one rate center terminates to another routing point designated by PaeTec Communications, Inc. in a rate center that is not local to the calling party even though the NXX is local to the calling party, such traffic ("Virtual Foreign Exchange" traffic) shall be rated in reference to the rate centers associated with the NXX prefixes of the calling and called parties' numbers but treated as Local traffic for purposes of compensation.

Section 3.2 further defined "Compensable Local Traffic." Section 3.2.1 then exempted certain "InterLATA toll"

and "IXC-carried intraLATA toll" from "total Compensable Local Traffic."

From January to September 2001, PaeTec sent reciprocal compensation invoices to SNET for PaeTec's termination of "Local Traffic," which PaeTec claimed comported with the Agreement and Amendment. Those invoices contained calls between numbers with the same NXX prefixes but that originated [*8] with SNET users in Connecticut and terminated with PaeTec users in New York. SNET objected to the inclusion of this interstate traffic as "local traffic" and refused to make reciprocal billing payment. PaeTec invoked the dispute resolution procedures in the Agreement, and began applying amounts it owed SNET as offsets to SNET's unpaid reciprocal compensation charges.

On August 22, 2001, filed a Complaint and Petition with the DPUC, requesting that the DPUC issue an order compelling SNET to pay PaeTec all past-due reciprocal compensation amounts, and requiring such payments to be timely in the future. In its final decision, the DPUC found that PaeTec's InterLATA FX traffic was, under the Amendment, subject to reciprocal compensation.

SNET has appealed that ruling to this court. SNET asserts: (1) that the DPUC does not have the authority to regulate or otherwise determine compensation for interstate interLATA traffic; and (2) that the DPUC's decision incorrectly applied Connecticut contract law in interpreting the Agreement and Amendment and concluding that the Amendment encompassed interstate interLATA traffic. SNET, DPUC, and PaeTec, which intervened in the action, have all filed [*9] motions for summary judgment.

## II. JURISDICTION

### A. Subject Matter Jurisdiction

The application of the Act's "cooperative federalism" has created numerous interpretive problems regarding the scope of federal court jurisdiction to review state agency actions implicating interconnection agreements. The Supreme Court has acknowledged that the Act is "not a model of clarity," but is instead "in many important respects a model of ambiguity or indeed even self-contradiction." *AT&T Corp., 525 U.S. at 395-96.*

SNET's lawsuit implicates several layers of jurisdictional analysis. While the Act explicitly invests the federal courts with jurisdiction to review a state commission's action in approving or disapproving an interconnection agreement, federal courts may also review state commissions' interpretation of existing interconnection agreements. In this latter regard, the circuit courts of appeal have based this jurisdiction on

*Section 252(e)(6) of the Act.* See *BellSouth Telecomms. v. MCImetro Access Transmission Servs., Inc., 317 F.3d 1270, 1276 (11th Cir. 2003)*(en banc); *Michigan Bell Tel. Co. v. Strand, 305 F.3d 580, 582 (6th Cir. 2002);* [*10] *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas, 208 F.3d 475, 481 (5th Cir. 2000); Southwestern Bell Tel. Co. v. Brooks Fiber Comm. of Oklahoma, Inc., 235 F.3d 493, 497 (10th Cir. 2000); Illinois Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 570 (7th Cir. 1999);* see also *Worldcom, Inc. v. Connecticut Dep't of Pub. Util. Control, 229 F. Supp. 2d 109, 114 (E.D.N.Y. 2002).* However, in its 2002 decision in *Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635, 152 L. Ed. 2d 871, 122 S. Ct. 1753 (2002),* the Supreme Court relied on *28 U.S.C. § 1331* instead of *Section 252(e)(6),* reasoning that "even if *Section 252(e)(6)* does not *confer* jurisdiction, it at least does not *divest* the federal courts of their general authority under *Section 1331* to review the Commission's order for compliance with federal law." *Id. at 642* (emphasis in original).

It is unclear, however, whether, in reviewing a state commission's interpretation of a pre-existing interconnection agreement, the court may also review its interpretation and [*11] application of state law. By basing its decision on *Section 1331,* the Supreme Court in Verizon declined to discuss the jurisdictional scope of the Act itself. *Id. at 642;* see also *id. at 650 n.4* (Souter, J., concurring). The failure to address that scope raises a question regarding whether interpretation of a reciprocal compensation provision in an interconnection agreement is within the scope of this court's jurisdiction on review. A number of circuits, relying on *Section 252(e)(6),* have held that a federal court reviewing a state court's interpretation of an interconnection agreement can also review the commission's application of state law. See *Michigan Bell Tel. Co. v. MCImetro Access Transmission Servs., Inc., 323 F.3d 348, 356 (6th Cir. 2003); BellSouth Telecomms., 317 F.3d at 1278; Southwestern Bell Tel. Co., 208 F.3d at 481-82; US WEST Communs., Inc. v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999).* However, the First Circuit, in *Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 9-10 (1st Cir. 1999),* found there was "no [*12] federal jurisdiction over" claims that "in the end amount to an assertion that the Board failed to comply with state law provisions." The Seventh Circuit has similarly held. *MCI Telecomms. Corp. v. Illinois Commerce Comm'n, 168 F.3d 315, 320 (7th Cir. 1999),* on rehearing, *MCI Telecomms. Corp. v. Illinois Bell Telephone Co., 222 F.3d 323 (7th Cir. 2000).*

The facts of *Puerto Rico Telephone Company,* however, are distinct from this case in a significant way. Although there was an interconnection agreement

involved between Puerto Rico Telephone Company ("PTRC") and a cellular service provider, the dispute in that case arose over PTRC charging its customers long-distance charges for calls made to customers of the cellular provider. The commission found that the PRTC had not violated the interconnection agreement. Instead, the commission found that, while PRTC was in compliance with the agreement, it was in violation of other provisions of state law, particularly notice requirements to its customers. Read in light of those facts, the First Circuit's determination that it could not review the state commission's decision because there was not a sufficient [*13] nexus with the interconnection agreement and because it essentially raised a question of state law, while still likely a narrower interpretation of federal jurisdiction than that offered by other circuits, does not necessarily counsel that this court should not exercise jurisdiction over the claims at bar.

Rather, reviewing the DPUC's interpretation of the Agreement is an issue closely intertwined with this court's obligation under the Act to review the DPUC's decisions for compliance with federal law. This not only entails reviewing the DPUC's interpretation of federal law, but also insuring that the outcomes of its determinations, whether based on state or federal law, do not violate the Act. "To review a decision for compliance with federal law requires interpreting what terms are contained in the agreement," and "the Federal Communications Commission has determined that interpreting the agreement is a function given to state commissions under the Act." *Michigan Bell Tel. Co., 323 F.3d at 356* (citing *In re Starpower Communications, LLC, 15 F.C.C.R. 11277, 11280 (2000)*). As a result, "interpretation of an agreement is an authorized state commission [*14] determination under *Section 252*," and thus a legitimate subject of federal court review. Id. n2

    n2 Indeed, the agreement itself might be considered to be more of a federally mandated agreement than a commercial contract, thus further supporting the conclusion that the very interpretation of the agreement inherently raises issues of federal law. See *Bellsouth, 317 F.3d at 1282* (Anderson, J., concurring in part).

**B. Standard of Review**

Federal review of state commission decisions does not implicate the rationale of the Chevron doctrine, which accords deference to federal agencies in their areas of expertise. See *Chevron U.S.A., Inc. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837, 842-43, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)*; see also *MCI*

*Telecoms. Corp. v. N.Y. Tel. Co., 134 F. Supp. 2d 490, 500-01 (N.D.N.Y. 2002)*, citing *Turner v. Perales, 869 F.2d 140, 141 (2d Cir. 1989)*. As a result, the state commission's interpretation [*15] of federal law is reviewed *de novo. Id. at 501*; see also *Southwestern Bell, 208 F.3d at 482*; *Michigan Bell, 323 F.3d at 354*. The DPUC's factual findings are reviewed under the deferential "arbitrary and capricious" standard. See *MCI Telecomm. Corp., 134 F. Supp. 2d at 500*. n3

    n3 The court notes that, as applied in this context, there is "no meaningful difference" between an "arbitrary and capricious" standard and the "substantial evidence" standard. See *GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999)*.

The circuits that have held federal courts to have the power to review a state commission's use of state law in the interpretation of an interconnection agreement like the one at issue here, have found that the appropriate standard there is also "arbitrary and capricious." See, e.g., *Southwestern Bell, 208 F.3d at 482*; *Michigan Bell, 323 F.3d at 354, 357*. The court of appeals has explained, [*16] in a related though distinct context of review of federal agency decisions, that "the scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Public Citizen, Inc. v. Mineta 340 F.3d 39, 53 (2d Cir. 2003)*, citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42-43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)*. "This highly deferential standard is particularly appropriate when reviewing findings of fact made by an agency in enforcing the 1996 Act." *MCI Telecomms., 134 F. Supp. 2d. at 500-01.*

The arbitrary and capricious standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. In reviewing the agency's decision, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." The court looks for a "rational connection between the facts found and the choice made." *State Farm, 463 U.S. at 43*, [*17] citing *Burlington Truck Lines v. United States, 371 U.S. 156, 168, 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962)*. A reviewing court may uphold an agency decision of "less than ideal clarity if the agency's path may reasonably be discerned." *Public Citizen, 340 F.3d at 53*. The court may not supply a reasoned basis for the agency's action that the agency itself has not given." Id.

## III. SNET'S ALLEGATIONS THAT DPUC'S DECISION VIOLATED FEDERAL LAW

SNET argues that the DPUC's decision violates federal law because it implicates interstate interLATA traffic. Authority on this issue, however, strongly suggests the opposite.

As discussed above, it is well-established that state commissions have authority to interpret interconnection agreements, as well as to approve or reject them. *Verizon, 535 U.S. at 642*. See also *BellSouth Telecomms., 317 F.3d at 1276*; *Michigan Bell Tel. Co., 305 F.3d at 582*; *Brooks Fiber, 235 F.3d at 497*; *Southwestern Bell, 208 F.3d at 481*; *Illinois Bell Tel. Co., 179 F.3d at 570*; see also *Worldcom, Inc., 229 F. Supp. 2d at 114*. [*18] The main question raised by SNET's claim that the Commission violated federal law, then, is whether the DPUC's interpretive authority extends to interpreting an interconnection agreement in a way that implicates interstate traffic.

In a 1999 declaratory ruling, In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996, ("the 1999 Ruling"), the FCC issued an "order holding that calls made to ISPs would be considered as nonlocal for purposes of the Commission's rules regulating reciprocal compensation." *Global Naps, Inc. v. FCC, 351 U.S. App. D.C. 424, 291 F.3d 832, 834 (D.C. Cir. 2002)*, citing *14 F.C.C.R. 3689, 1999 WL 98037 (Feb. 26, 1999)*. While classifying the majority of ISP-bound traffic as interstate, the FCC "left open the possibility that state regulators could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly." Id. The FCC further acknowledged in its 1999 Ruling that it had historically directed state commissions to treat such calls as "local." *Brooks Fiber, 235 F.3d at 500*, citing *1999 [*19] Ruling, 14 F.C.C.R. at P23*.

The District of Columbia Circuit reviewed the FCC order and vacated it on March 24, 2000, for "want of reasoned decision-making," specifically questioning the FCC's reasoning that ISP calls should be classified by an "end-to-end" analysis that led the commission to classify such calls as nonlocal. *Bell Atlantic Tel. Co. v. F.C.C., 340 U.S. App. D.C. 328, 206 F.3d 1, 9 (D.C. Cir. 2000)*. On remand, the FCC issued another decision, again finding that ISP-bound traffic was not subject to reciprocal compensation under the Act. In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, *2001 WL 455869 (F.C.C.), 16 F.C.C. Recd. 9151 (April 18, 2001)* ("2001 Ruling"); see also *New England Tel. and Tel. Co. v. Conversent Comm. of Rhode Island, 178 F. Supp. 2d 81,*

*86 (D.R.I. 2001)*. The FCC also ruled that it maintained jurisdiction to issue regulations regarding ISP-bound traffic, and prospectively prohibited state commissions from taking action regarding inter-carrier compensation for ISP-bound traffic. The FCC declined, however, to overturn state commission decisions that had [*20] ruled that ISP-bound traffic was subject to reciprocal compensation, or to invalidate any previously negotiated agreements granting reciprocal compensation for ISP-bound traffic. Id. Instead, the new rule takes effect upon expiration of the existing agreements. 16 F.C.C. Recd. 9151 at 9189. On appeal, the D.C. Circuit again remanded for reconsideration but without vacating the FCC Ruling. *Worldcom, Inc. v. F.C.C., 351 U.S. App. D.C. 176, 288 F.3d 429, 434 (D.C. Cir. 2002)*.

The Agreement in this case was submitted for approval on January 8, 2001, and approved on April 18, 2001. As such, case law regarding reciprocal compensation for Virtual FX traffic was unsettled at the time of the negotiation. Similarly, the Agreement qualified as a "previously negotiated agreement" under the terms of the FCC's 2001 Ruling, thus permitting the DPUC to interpret its terms as including reciprocal compensation for interstate Virtual FX calls.

The fact that the Agreement, as interpreted by the DPUC, implicates interstate traffic does not in itself mean that the decision violates federal law. A number of other courts have also addressed the contention that a state commission's decision [*21] interpreting an interconnection agreement to include reciprocal compensation for interstate ISP-bound calls violates federal law. While many of these disputes involved agreements negotiated before the Agreement in this case, those courts also determined that state commissions' interpretation of them to include reciprocal compensation for ISP-bound interstate calls did not violate federal law. See *Southwestern Bell Tel. Co., 208 F.3d at 483*; *Brooks Fiber, 235 F.3d at 500*; *Illinois Bell Tel. Co., 179 F.3d at 574*; *Global Naps, 226 F. Supp. 2d 279, 294*.

Nor does the fact that the agreement was submitted for approval in early 2001, after the FCC's 1999 ruling make the DPUC's interpretation of the Amendment to include reciprocal compensation for ISP-bound calls contrary to federal law. First, the FCC's 1999 Ruling kept open the possibility that state commissions could continue to treat interstate Virtual FX traffic as local traffic, pending the adoption of a FCC rule governing compensation. *14 F.C.C.R. 3689 at 3690*; *Global Naps, Inc., 291 F.3d at 834*. Second, the 1999 Ruling was vacated and strongly [*22] criticized by the D.C. Circuit, which questioned the very conclusion that ISP-bound traffic is non-local. *Bell Atlantic Tel. Co. 206 F.3d at 7*. While the 1999 Ruling provided some indication of the FCC's position on the matter and might bear on the

party's intent, the D.C. Circuit's vacating of the 1999 Ruling left open the question of whether ISP-bound traffic would be considered local or non-local for purposes of reciprocal compensation. It was against this uncertainty, and before the FCC's 2001 Ruling, that the parties in this case negotiated their agreement. The FCC's 2001 Ruling then declined to invalidate previously negotiated interconnection agreements such as the agreement at issue here. The court thus agrees with PaeTec and the DPUC that the DPUC's decision did not violate federal law.

## IV. SNET'S ALLEGATION THAT THE DPUC MISINTERPRETED THE INTERCONNECTION AGREEMENT

SNET further alleges that, regardless of whether the DPUC's decision violated federal law, it improperly interpreted the Interconnection Agreement. This amounts to an argument that the DPUC improperly applied Connecticut contract law, a decision which this court reviews under the "arbitrary [*23] and capricious" standard. See, e.g., *Michigan Bell, 323 F.3d at 354, 357*; *Public Citizen, 340 F.3d at 53*.

The "Appendix: Reciprocal Compensation" to the parties' original Agreement provided that "reciprocal compensation applies for transport and termination of Local Calls." Appendix at § 2.2. The Appendix specified that "Local Calls must actually originate and actually terminate to End Users physically located within the same common local or common mandatory local calling area." Id. at § 2.6. In an additional paragraph, the Appendix further emphasized, "the Parties agree that Internet Calls are not subject to reciprocal compensation under this Appendix or under the Act." Id. at § 2.5.

Paragraph 3.1 of the parties' Amendment to the Agreement, however, provides:

> If PaeTec Communications, Inc. designates different rating and routing points such that traffic that originates in one rate center terminates to another routing point designated by PaeTec Communications, Inc. in a rate center that is not local to the calling party even though the NXX is local to the calling party, such traffic ("Virtual Foreign Exchange" traffic) shall [*24] be rated in reference to the rate centers associated with the NXX prefixes of the calling and called parties' numbers but treated as Local traffic for purposes of compensation.

Similarly, Section 3.2 defines "total Compensable Local Traffic" to include "Local, Mandatory Local, and Optional EAS traffic eligible for reciprocal compensation . . . combined with traffic terminated to Internet Service Providers." Section 3.2.1, however, lists specific types of calls that are excluded from the operation of 3.2, significantly including "InterLATA toll and IXC-carried intraLATA toll." The Agreement itself defines "IntraLATA Toll Traffic" as the "IntraLATA traffic between two locations within one LATA where one of the locations lies outside of the normal local calling areas as defined by the applicable Commission." Agreement § 1.1.67. The Agreement does not define "InterLATA toll," but defines "InterLATA" as "As defined in the Act." Id. at § 1.1.64. The Act, in turn, defines "InterLATA Service" as "telecommunications between a point located in a local access and transport area and a point located outside such an area." *47 U.S.C. § 153(21).*

PaeTec argues [*25] that section 3.2.1's "InterLATA toll" does not implicate the types of calls disputed in this case. First, PaeTec invokes the Agreement's definition of "Telephone Toll Service" in Section 1.1.30, which relies on the Act's definition of "Telephone toll service" as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." *47 U.S.C. § 153(21).* PaeTec further argues that because SNET does not impose a separate toll charge for Virtual FX traffic, the traffic "may be 'interLATA' but it is clearly not 'toll.'" Essentially, PaeTec argues that "InterLATA toll" calls are a subset of all InterLATA calls.

SNET argues that the Amendment should be read as follows: (1) Section 3.1 includes both inter- and intraLATA Virtual FX traffic in the definition of Local Calls; and (2) Section 3.2.1 carves out the exclusion of interLATA toll and IXC-carried intraLATA toll. SNET argues that this excludes interLATA FX traffic from local compensation. SNET points the court to Section 2.1 of the Appendix, which divides traffic exchanged between PaeTec and SNET into 5 classes: [*26] "Local Calls, Transit Traffic, Optional Calling Area Traffic, intraLATA Toll Traffic, and interLATA Toll Traffic." The Agreement thus seems not to create or define any category of interLATA traffic that is not toll traffic. SNET also notes that Section 2.7 of the Appendix defines Foreign Exchange or "FX" traffic as including both inter-LATA and intra-LATA calls. Finally, SNET argues that interstate Virtual FX calls are still "toll" calls; the difference is who pays the toll, the customer or SNET.

In the hearing in this case, the DPUC took testimony and determined that PaeTec had made significant

concessions in the Amendment in order to receive reciprocal compensation for both inter- and intraLATA Virtual FX calls. The DPUC found that Paragraph 3.1 of the Amendment conflicted with, and superceded, the Agreement in accordance with Paragraph 1.1, which provides that "any inconsistencies between the provisions of this Amendment and other provisions of the current or future Interconnection Agreements through May 31, 2003, will be governed by the provisions of this Amendment."

SNET argues that the DPUC's interpretation of the interconnection agreement was "arbitrary and capricious." In [*27] support of this argument, SNET points particularly to the DPUC's failure to specifically address SNET's contention that Section 3.2.1, which removes "interLATA toll" calls from the scope of "Total Compensable Local Traffic," excluded interLATA ISP and Virtual FX calls because they are included in "interLATA toll." SNET argues that the DPUC entirely failed to consider this argument and instead focused solely on Section 3.1.

The DPUC issued two drafts of its opinion before issuing the final Decision. After both initial drafts, SNET pressed its argument in the form of written exceptions. At page 8 of its February 13, 2002 exceptions to the Draft Decision, SNET contended that Section 3.2.1 excluded "interLATA toll," thus excluding "interLATA FX, interLATA ISP." Ex. B to Dkt. No. 1. That argument is incorporated by footnote in its April 12, 2002 exceptions to the DPUC's Revised Draft Decision. However, SNET's argument about the exclusion of 3.2.1 was part of a larger argument about why interLATA FX traffic was distinct from the traffic that SNET claimed that the Amendment intended to treat as local. In its argument to the DPUC, SNET pointed mainly to the initial Agreement's provision that [*28] interLATA FX traffic would be treated as "Feature Group A" ("FGA") traffic for the purposes of compensation, and subject to the compensation provisions of the FGA Appendix.

The DPUC thoroughly considered the FGA argument and found that the Amendment, which did not parse out "Virtual FX" into intraLATA and interLATA but instead specifically included the whole of Virtual FX and ISP traffic in Local Compensation, had altered the compensation structure for interLATA FX calls and thus superceded the Agreement on that issue in accordance with the party's agreement that Amendment would supercede any conflicting provisions of the Agreement.

The court is concerned, however, that the DPUC's Decision nowhere mentions Section 3.2.1 or the significant issue of the construction of its carve out of "interLATA toll." Even the deferential "arbitrary and capricious" standard requires the agency to have

examined the relevant data." *Public Citizen, 340 F.3d at 53*. On the other hand, given the Act's definition of "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a *separate charge not included in contracts with subscribers* [*29] for exchange service," *47 U.S.C. 153(48)*(emphasis added), combined with other aspects and provisions of the parties' interconnection agreement, including Section 3.2.1, this court is inclined to reach the same conclusion as the DPUC did: the calls at issue are indeed included in local traffic by the Amendment and made subject to reciprocal compensation. n4

> n4 The Virtual FX calls at issue here are clearly "interLATA calls," but do not appear to be "interLATA toll" calls because no separate charge is made to SNET's subscribers for this traffic, though the court leaves that determination to the DPUC if it chooses to address the matter.

While the court could itself interpret the contract, and recognizes that the DPUC is not entitled to the *Chevron* deference due a federal agency, the Act assigns to state commissions a primary role in implementing its provisions. The court is also aware of the language in the FCC's 1999 Ruling demonstrates that the agency clearly contemplates that agreements [*30] like this one will be interpreted in the first instance by state commissions like the DPUC. See, e.g., *14 F.C.C.R. at 3703*. Though this Ruling was vacated, the 2001 Ruling still explicitly reserves to state commissions the power to interpret pre-existing interconnection agreements to determine whether the parties made the type of traffic in dispute here subject to reciprocal compensation. *16 F.C.C.R. at 9189*.

In light of these considerations and the DPUC's comparative expertise on interconnection agreements, the court believes that the better course is to stay this action to allow the parties in interest to request that the DPUC reopen the proceeding to consider the issue in light of Section 3.2.1 of the Amendment.

Given that the parties have not addressed the issue of such a stay, the court allows the parties 10 days in which to object to the entry of a stay. If there is no objection, SNET is ordered to file a report within 30 days from the entry of this order on the status of this matter before the DPUC and provide, if possible, an estimate of the time needed for the DPUC to reconsider this matter if it has chosen to do so.

In light of the above, [*31] all three motions for summary judgment [Dkt. Nos. 18, 33, and 37] are denied

2003 U.S. Dist. LEXIS 17473, *

without prejudice to renew subsequent to any action of the DPUC.

**V. CONCLUSION**

SNET's motion for summary judgment [Dkt. No. 18] is DENIED, DPUC's motion for summary judgment [Dkt. No. 37] is DENIED, and PaeTec's motion for summary judgment [Dkt No. 33] is DENIED, all without prejudice to renew. An initial stay of 90 days is hereby entered, subject to court reconsideration upon any objections filed to this order within 10 days hereof, or to its continuance to permit the DPUC to rule, or until further order of this court. SNET is ordered to file a report on the status of the matter before the DPUC within 30 days of the date of this Order.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 30th day of September, 2003.

/s/

Janet C. Hall

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October 2003, I caused a true and correct copy of the foregoing Memorandum of Law in Reply to SNET's Memorandum in Opposition to Motions to Dismiss and for Summary Judgment Filed by the Defendants and Intervening Defendants to be mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure, first class postage prepaid to:

Keith M. Krom, Esq.
The Southern New England Telephone
Company
310 Orange Street
New Haven, CT  06510

Timothy P. Jensen, Esq.
Tyler, Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT  06510-1910\

Tatiana D. Eirmann, Esq.
Assistant Attorney General
Office of the Attorney General
10 Franklin Square
New Britain, CT  06051

Kenneth W. Salinger, Esq.
John Bennett, Esq.
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA  02199-7613

David L. Belt, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
P.O. Box 606
New Haven, CT 06503

_____
Andrew Moore