# EXHIBITS

2003 WL 22273538                                                                                         Page 1
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

Only the Westlaw citation is currently available.


United States District Court,
D. Connecticut.

SOUTHERN NEW ENGLAND, TELEPHONE COMPANY, Plaintiff,
v.
STATE of Connecticut, Department of Public Utility Company, et al., Defendants.

No. 3-02-CV-1022 (JCH).

Sept. 30, 2003.


Incumbent local exchange carrier (ILEC) brought action seeking judicial review of decision by state public service commission requiring it to treat calls originating in state and terminating in another state in another local access and transport area that used local numbers corresponding with long distance call destinations (interstate interLATA FX traffic) involving competing local exchange carrier (CLEC) as "local," and thus subject to reciprocal compensation pursuant to interconnection agreement between parties. CLEC intervened. On cross-motions for summary judgment, the District Court, Hall, J., held that: (1) commission's interpretation of interconnection agreement was subject to federal review; (2) interconnection agreement did not violate Telecommunications act; and (3) commission's failure to address ILEC's argument was arbitrary and capricious.

Motions denied.


[1] Telecommunications ⚷263

372k263 Most Cited Cases

State public service commission's interpretation of interconnection agreement between incumbent local exchange carrier (ILEC) and competing local exchange carrier (CLEC) pursuant to state law was subject to review in federal district court under Telecommunications Act. 28 U.S.C.A. § 1331; 47 U.S.C.A. § 252(e)(6).

[2] Statutes ⚷219(6.1)
361k219(6.1) Most Cited Cases

Federal review of state public service commission decisions pursuant to Telecommunications Act does not implicate rationale of *Chevron* doctrine, which accords deference to federal agencies in their areas of expertise. 47 U.S.C.A § 252.

[3] Telecommunications ⚷14
372k14 Most Cited Cases

State public service commission's interpretation of federal law is reviewed de

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

Page 2

novo in federal court action brought pursuant to Telecommunications Act. 47 §252.

**[4] Telecommunications** 🗝14
372k14 Most Cited Cases

State public service commission's factual findings are reviewed in federal court proceedings brought pursuant to Telecommunications Act under deferential arbitrary and capricious standard. 47 §252.

**[5] Telecommunications** 🗝267
372k267 Most Cited Cases

State public service commissions have authority under Telecommunications Act to interpret interconnection agreements, as well as to approve or reject them. 47 U.S.C.A. § 252.

**[6] Telecommunications** 🗝267
372k267 Most Cited Cases

Interconnection agreement that included reciprocal compensation for internet service provider (ISP) bound interstate calls did not violate Telecommunications Act or with regulations or rulings of Federal Communications Commission (FCC). 47 U.S.C.A. §§ 251, 252.

**[7] Telecommunications** 🗝263
372k263 Most Cited Cases

**[7] Telecommunications** 🗝267
372k267 Most Cited Cases

It was arbitrary and capricious for state public service commission to rule that calls originating in state and terminating in another state in another local access and transport area that used local numbers corresponding with long distance call destinations (interstate interLATA FX traffic) involving competing local exchange carrier (CLEC) were subject to reciprocal compensation pursuant to CLEC's interconnection agreement with incumbent local exchange carrier (ILEC) without addressing ILEC's contention that parties' amendment specifically excluded interLATA FX traffic from local compensation, and thus matter would remanded to commission for further proceedings. 47 U.S.C.A. §§ 153(21, 48), 252.

RULING ON MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 18, 33, 37]

HALL, District J.

*1 In this case, the Southern New England Telephone Company ("SNET") seeks review of a decision by the State of Connecticut, Department of Public Utility Control ("DPUC") requiring SNET to treat certain telecommunications traffic involving its competitor PaeTec Communications, Inc. ("PaeTec") as "local," and thus subject to reciprocal compensation pursuant to an interconnection agreement between the parties. PaeTec is an intervener in the case.

I. BACKGROUND

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538                                                                                              Page 3
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

A. The Telecommunications Act of 1996

The Telecommunications Act of 1996 ("the Act"), Pub.L. 104-104, 110 Stat. 56, "created a new telecommunications regime designed to foster competition in local telephone markets." *Verizon Maryland v. Pub. Serv. Comm. of Maryland,* 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Before Congress passed the Act, local telephone service throughout the United States was typically provided in a "natural monopoly" fashion, with only one company providing service throughout a given area, often because of state- granted exclusive franchises. *See AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Act facilitated the break up of these monopolies by requiring, *inter alia,* the incumbent local exchange carrier ("LEC") to share its networks with new entrants to the market, referred to as competitor local exchange carriers ("CLEC"). The Act also requires local telephone companies to establish "reciprocal compensation arrangements" for the transport and termination of local calls that originate with one carrier and terminate with another." 47 U.S.C. § 251(b)(5). The Act gives LECs and CLECs the option of negotiating an interconnection agreement governing this access and compensation. An entering CLEC can either opt into an existing interconnection agreement between the LEC and another CLEC, or it can negotiate its own interconnection agreement. *See* 47 U.S.C. § 252(e)(6). The Act provides that disputes over interconnection agreements are to be arbitrated by the state commission that regulates local phone service, in Connecticut the Department of Public Utility Control. The Act further provides that a party aggrieved by a state commission determination can petition for review in the federal district court. The courts have termed this arrangement "cooperative federalism." *See, e.g., Puerto Rico Tel. Co. v. Telecomm, Regulatory Bd. of Puerto Rico,* 189 F.3d 1, 8 (1st Cir.1999).

B. The Dispute Between SNET and PaeTec

In 1999, pursuant to Section 252(i) of the Act, PaeTec opted into a pre- existing interconnection agreement between SNET and WorldCom Technologies, which dealt solely with interconnection in Connecticut. When SNET was acquired by SBC, however, SBC required a single multi-state interconnection agreement for all of its member providers. Accordingly, PaeTec and SBC entered into a "SBC-13state" interconnection agreement ("the Agreement"), which was filed on January 8, 2001, with the DPUC and approved by it on April 18, 2001. [FN1]

*2 The overlap of different telephone service providers creates complex issues of compensation and classification. Telecommunications service is divided, much like concentric circles, into several geographical territories of increasing specificity. Generally, a call which originates and terminates within the same physical calling area is termed a "local call." A call which originates in one physical calling area and terminates within another physical calling area, but is still within a larger "local access and transport area" ("LATA"), is termed an "intraLATA" call. A call which, on the other hand, terminates in a different "LATA" is termed an "interLATA" call. Because some states have more than one LATA, a call can be "intrastate interLATA" or "interstate interLATA." The state of Connecticut, however, is all within the same "LATA," though some areas of Greenwich are included in the New York City calling area. Calls are tracked and classified by the first digits of the telephone number, e.g., in a hypothetical 203-555-0000 telephone number, by the "203-555" portion of the number. The "203"

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538                                                                                                Page 4
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

is called the "NPA" code and the "555" is called the NXX" code.

Generally stated, local calls are subject to the reciprocal compensation of the Act. With the advent of the internet and other phone networks, however, this classification has become more complicated. Telephone service providers have begun offering local numbers (local NPA/NXX codes) that correspond with long distance call destinations--what that the Agreement calls "Virtual FX" traffic. A customer may dial a local number that actually corresponds to a number outside his or her local calling area, so that the call seems local but actually terminates in a different calling area; similarly, he or she may dial a local number to access an Internet Service Provider ("ISP"), but connect through that number to services and websites outside his or her local calling area. This situation has created confusion about whether such "local" numbers should be classified as "local calls" for purposes of billing.

In the Agreement, SBC and PaeTec specified interconnection compensation terms. The Agreement contained an "Appendix Reciprocal Compensation" ("the Appendix") that specified that "calls delivered to or from numbers that are assigned to an exchange within a common mandatory local calling area but where the receiving or calling party is physically located outside the common mandatory local calling area of the exchange .... are not Local Calls for intercarrier compensation and are not subject to local reciprocal compensation." Appendix at § 2.7.

The parties, however, also executed an amendment to the Agreement ("the Amendment"), which overrides conflicting provisions of the Agreement. Amendment at § 1.1. Section 3.1 provided:
  If PaeTec Communications, Inc. designates different rating and routing points
  such that traffic that originates in one rate center terminates to another
  routing point designated by PaeTec Communications, Inc. in a rate center that is
  not local to the calling party even though the NXX is local to the calling party,
  such traffic ("Virtual Foreign Exchange" traffic) shall be rated in reference to
  the rate centers associated with the NXX prefixes of the calling and called
  parties' numbers but treated as Local traffic for purposes of compensation.
 *3 Section 3.2 further defined "Compensable Local Traffic." Section 3.2.1 then exempted certain "InterLATA toll" and "IXC-carried intraLATA toll" from "total Compensable Local Traffic."

From January to September 2001, PaeTec sent reciprocal compensation invoices to SNET for PaeTec's termination of "Local Traffic," which PaeTec claimed comported with the Agreement and Amendment. Those invoices contained calls between numbers with the same NXX prefixes but that originated with SNET users in Connecticut and terminated with PaeTec users in New York. SNET objected to the inclusion of this interstate traffic as "local traffic" and refused to make reciprocal billing payment. PaeTec invoked the dispute resolution procedures in the Agreement, and began applying amounts it owed SNET as offsets to SNET's unpaid reciprocal compensation charges.

On August 22, 2001, filed a Complaint and Petition with the DPUC, requesting that the DPUC issue an order compelling SNET to pay PaeTec all past-due reciprocal compensation amounts, and requiring such payments to be timely in the future. In its final decision, the DPUC found that PaeTec's InterLATA FX traffic was, under the Amendment, subject to reciprocal compensation.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

SNET has appealed that ruling to this court. SNET asserts: (1) that the DPUC does not have the authority to regulate or otherwise determine compensation for interstate interLATA traffic; and (2) that the DPUC's decision incorrectly applied Connecticut contract law in interpreting the Agreement and Amendment and concluding that the Amendment encompassed interstate interLATA traffic. SNET, DPUC, and PaeTec, which intervened in the action, have all filed motions for summary judgment.

II. JURISDICTION

A. Subject Matter Jurisdiction

The application of the Act's "cooperative federalism" has created numerous interpretive problems regarding the scope of federal court jurisdiction to review state agency actions implicating interconnection agreements. The Supreme Court has acknowledged that the Act is "not a model of clarity," but is instead "in many important respects a model of ambiguity or indeed even self- contradiction." *AT & T Corp.,* 525 U.S. at 395-96.

SNET's lawsuit implicates several layers of jurisdictional analysis. While the Act explicitly invests the federal courts with jurisdiction to review a state commission's action in approving or disapproving an interconnection agreement, federal courts may also review state commissions' interpretation of existing interconnection agreements. In this latter regard, the circuit courts of appeal have based this jurisdiction on Section 252(e)(6) of the Act. *See BellSouth Telecomms, v. MCImetro Access Transmission Servs., Inc.,* 317 F.3d 1270, 1276 (11th Cir.2003) (en banc); *Michigan Bell Tel. Co. v. Strand,* 305 F.3d 580, 582 (6th Cir.2002); *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas,* 208 F.3d 475, 481 (5th Cir.2000); *Southwestern Bell Tel. Co. v. Brooks Fiber Comm. of Oklahoma, Inc.,* 235 F.3d 493, 497 (10th Cir.2000); *Illinois Bell Tel. Co. v. Worldcom Techs., Inc.,* 179 F.3d 566, 570 (7th Cir.1999); *see also Worldcom, Inc. v. Connecticut Dep't of Pub. Util. Control,* 229 F.Supp.2d 109, 114 (E.D.N.Y.2002). However, in its 2002 decision in *Verizon Maryland, Inc. v. Public Service Commission of Maryland,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), the Supreme Court relied on 28 U.S.C. § 1331 instead of Section 252(e)(6), reasoning that "even if Section 262(e)(6) does not *confer* jurisdiction, it at least does not *divest* the federal courts of their general authority under Section 1331 to review the Commission's order for compliance with federal law." *Id.* at 642 (emphasis in original).

*4 It is unclear, however, whether, in reviewing a state commission's interpretation of a pre-existing interconnection agreement, the court may also review its interpretation and application of state law. By basing its decision on Section 1331, the Supreme Court in *Verizon* declined to discuss the jurisdictional scope of the Act itself. *Id.* at 642; *see also id.* at 650 n. 4 (Souter, J., concurring). The failure to address that scope raises a question regarding whether interpretation of a reciprocal compensation provision in an interconnection agreement is within the scope of this court's jurisdiction on review. A number of circuits, relying on Section 252(e)(6), have held that a federal court reviewing a state court's interpretation of an interconnection agreement can also review the commission's application of state law. *See Michigan Bell Tel. Co. v. MCImetro Access Transmission Servs., Inc.,* 323 F.3d 348, 356 (6th Cir.2003); *BellSouth*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538                                                                Page 6
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

*Telecomms.*, 317 F.3d at 1278; *Southwestern Bell Tel. Co.*, 208 F.3d at 481-82; *U.S. West Communications v. MFS Intelenet*, 193 F.3d 1112, 1117 (9th Cir.1999). However, the First Circuit, in *Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 9-10 (1st Cir.1999), found there was "no federal jurisdiction over" claims that "in the end amount to an assertion that the Board failed to comply with state law provisions." The Seventh Circuit has similarly held. *MCI Telecomms. Corp. v. Illinois Commerce Comm'n*, 168 F.3d 315, 320 (7th Cir.1999), *on rehearing, MCI Telecomms. Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323 (7th Cir.2000).

The facts of *Puerto Rico Telephone Company*, however, are distinct from this case in a significant way. Although there was an interconnection agreement involved between Puerto Rico Telephone Company ("PTRC") and a cellular service provider, the dispute in that case arose over PTRC charging its customers long-distance charges for calls made to customers of the cellular provider. The commission found that the PRTC had not violated the interconnection agreement. Instead, the commission found that, while PRTC was in compliance with the agreement, it was in violation of other provisions of state law, particularly notice requirements to its customers. Read in light of those facts, the First Circuit's determination that it could not review the state commission's decision because there was not a sufficient nexus with the interconnection agreement and because it essentially raised a question of state law, while still likely a narrower interpretation of federal jurisdiction than that offered by other circuits, does not necessarily counsel that this court should not exercise jurisdiction over the claims at bar.

[1] Rather, reviewing the DPUC's interpretation of the Agreement is an issue closely intertwined with this court's obligation under the Act to review the DPUC's decisions for compliance with federal law. This not only entails reviewing the DPUC's interpretation of federal law, but also insuring that the outcomes of its determinations, whether based on state or federal law, do not violate the Act. "To review a decision for compliance with federal law requires interpreting what terms are contained in the agreement," and "the Federal Communications Commission has determined that interpreting the agreement is a function given to state commissions under the Act ." *Michigan Bell Tel. Co.*, 323 F.3d at 356 (citing *In re Starpower Communications, LLC,* 15 F.C.C.R. 11277, 11280 (2000)). As a result, "interpretation of an agreement is an authorized state commission determination under Section 252," and thus a legitimate subject of federal court review. *Id.* [FN2]

B. Standard of Review

*5 [2][3][4] Federal review of state commission decisions does not implicate the rationale of the *Chevron* doctrine, which accords deference to federal agencies in their areas of expertise. *See Chevron U.S.A ., Inc. v. Nat'l Resources Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also MCI Telecomm. Corp. v. New York Telephone Co.*, 134 F.Supp.2d 490, 500-01 (N.D.N.Y.2002), citing *Turner v. Perales*, 862 F.2d 140, 141 (2d Cir.1989). As a result, the state commission's interpretation of federal law is reviewed *de novo*. *Id.* at 501; *see also Southwestern Bell,* 208 F.3d at 482; *Michigan Bell,* 323 F.3d at 354. The DPUC's factual findings are reviewed under the deferential "arbitrary and capricious" standard. *See MCI Telecomm. Corp.*, 134 F.Supp.2d at 500. [FN3]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The circuits that have held federal courts to have the power to review a state commission's use of state law in the interpretation of an interconnection agreement like the one at issue here, have found that the appropriate standard there is also "arbitrary and capricious." *See, e.g., Southwestern Bell,* 208 F.3d at 482; *Michigan Bell,* 323 F.3d at 354, 357. The court of appeals has explained, in a related though distinct context of review of federal agency decisions, that "[t]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Public Citizen, Inc. v. Mineta* 340 F.3d 39, 53 (2d Cir.2003), *citing Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "This highly deferential standard is particularly appropriate when reviewing findings of fact made by an agency in enforcing the 1996 Act." *MCI Telecomms.,* 134 F.Supp.2d. at 500-01.

The arbitrary and capricious standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* In reviewing the agency's decision, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." The court looks for a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43, *citing Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). A reviewing court may uphold an agency decision of "less than ideal clarity if the agency's path may reasonably be discerned." *Public Citizen,* 340 F.3d at 53. The court may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

III. SNET'S ALLEGATIONS THAT DPUC'S DECISION VIOLATED FEDERAL LAW

SNET argues that the DPUC's decision violates federal law because it implicates interstate interLATA traffic. Authority on this issue, however, strongly suggests the opposite.

[5] As discussed above, it is well-established that state commissions have authority to interpret interconnection agreements, as well as to approve or reject them. *Verizon,* 535 U.S. at 642. *See also BellSouth Telecomms.,* 317 F.3d at 1276; *Michigan Bell Tel. Co.,* 305 F.3d at 582; *Brooks Fiber,* 235 F.3d at 497; *Southwestern Bell,* 208 F.3d at 481; *Illinois Bell Tel. Co.,* 179 F.3d at 570; *see also Worldcom, Inc.,* 229 F.Supp.2d at 114. The main question raised by SNET's claim that the Commission violated federal law, then, is whether the DPUC's interpretive authority extends to interpreting an interconnection agreement in a way that implicates interstate traffic.

*6 In a 1999 declaratory ruling, *In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996,* ("the 1999 Ruling"), the FCC issued an "order holding that calls made to ISPs would be considered as nonlocal for purposes of the Commission's rules regulating reciprocal compensation." *Global Naps. Inc. v. FCC,* 291 F.3d 832, 834 (D.C.Cir.2002), *citing* 14 F.C.C.R. 3689, 1999 WL 98037 (Feb. 26, 1999). While classifying the majority of ISP-bound traffic as interstate, the FCC "left open the possibility that state regulators could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly." *Id.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The FCC further acknowledged in its 1999 Ruling that it had historically directed state commissions to treat such calls as "local." *Brooks Fiber,* 235 F.3d at 500, *citing* 1999 Ruling, 14 F.C.C.R. at ¶ 23.

The District of Columbia Circuit reviewed the FCC order and vacated it on March 24, 2000, for "want of reasoned decision-making," specifically questioning the FCC's reasoning that ISP calls should be classified by an "end-to-end" analysis that led the commission to classify such calls as nonlocal. *Bell Atlantic Tel. Co. v. F.C.C.,* 206 F.3d 1, 9 (D.C.Cir.2000). On remand, the FCC issued another decision, again finding that ISP-bound traffic was not subject to reciprocal compensation under the Act. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 2001 WL 455869 (F.C.C.), 16 F.C.C. Recd. 9151 (April 18, 2001) ("2001 Ruling"); *see also New England Tel. and Tel. Co. v. Conversant Comm. of Rhode Island,* 178 F.Supp.2d. 81, 86 (D.R.I.2001). The FCC also ruled that it maintained jurisdiction to issue regulations regarding ISP-bound traffic, and prospectively prohibited state commissions from taking action regarding inter-carrier compensation for ISP-bound traffic. The FCC declined, however, to overturn state commission decisions that had ruled that ISP-bound traffic was subject to reciprocal compensation, or to invalidate any previously negotiated agreements granting reciprocal compensation for ISP-bound traffic. *Id.* Instead, the new rule takes effect upon expiration of the existing agreements. 16 F.C.C. Recd. 9151 at 9189. On appeal, the D.C. Circuit again remanded for reconsideration but without vacating the FCC Ruling. *Worldcom, Inc. v. F.C.C.,* 288 F.3d 429, 434 (D.C.Cir.2002).

The Agreement in this case was submitted for approval on January 8, 2001, and approved on April 18, 2001. As such, case law regarding reciprocal compensation for Virtual FX traffic was unsettled at the time of the negotiation. Similarly, the Agreement qualified as a "previously negotiated agreement" under the terms of the FCC's 2001 Ruling, thus permitting the DPUC to interpret its terms as including reciprocal compensation for interstate Virtual FX calls.

*7 The fact that the Agreement, as interpreted by the DPUC, implicates interstate traffic does not in itself mean that the decision violates federal law. A number of other courts have also addressed the contention that a state commission's decision interpreting an interconnection agreement to include reciprocal compensation for interstate ISP-bound calls violates federal law. While many of these disputes involved agreements negotiated before the Agreement in this case, those courts also determined that state commissions' interpretation of them to include reciprocal compensation for ISP-bound interstate calls did not violate federal law. *See Southwestern Bell Tel. Co.,* 208 F.3d at 483; *Brooks Fiber,* 235 F.3d at 500; *Illinois Bell Tel. Co.,* 179 F.3d at 574; *Global Naps,* 226 F.Supp.2d at 294.

[6] Nor does the fact that the agreement was submitted for approval in early 2001, after the FCC's 1999 ruling make the DPUC's interpretation of the Amendment to include reciprocal compensation for ISP-bound calls contrary to federal law. First, the FCC's 1999 Ruling kept open the possibility that state commissions could continue to treat interstate Virtual FX traffic as local traffic, pending the adoption of a FCC rule governing compensation. 14 F.C.C.R. 3689 at 3690; *Global Naps. Inc.,* 291 F.3d at 834. Second, the 1999 Ruling was vacated and strongly criticized by the D.C. Circuit, which questioned the very conclusion

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538                                                                                                   Page 9
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

that ISP-bound traffic is non-local. *Bell Atlantic Tel. Co.* 206 F.3d at 7. While the 1999 Ruling provided some indication of the FCC's position on the matter and might bear on the party's intent, the D.C. Circuit's vacating of the 1999 Ruling left open the question of whether ISP-bound traffic would be considered local or non-local for purposes of reciprocal compensation. It was against this uncertainty, and before the FCC's 2001 Ruling, that the parties in this case negotiated their agreement. The FCC's 2001 Ruling then declined to invalidate previously negotiated interconnection agreements such as the agreement at issue here. The court thus agrees with PaeTec and the DPUC that the DPUC's decision did not violate federal law.

IV. SNET'S ALLEGATION THAT THE DPUC MISINTERPRETED THE INTERCONNECTION AGREEMENT

SNET further alleges that, regardless of whether the DPUC's decision violated federal law, it improperly interpreted the Interconnection Agreement. This amounts to an argument that the DPUC improperly applied Connecticut contract law, a decision which this court reviews under the "arbitrary and capricious" standard. *See, e.g., Michigan Bell,* 323 F.3d at 354, 357; *Public Citizen,* 340 F.3d at 53.

The "Appendix: Reciprocal Compensation" to the parties' original Agreement provided that "[r]eciprocal compensation applies for transport and termination of Local Calls." Appendix at § 2.2. The Appendix specified that "Local Calls must actually originate and actually terminate to End Users physically located within the same common local or common mandatory local calling area." *Id.* at § 2.6. In an additional paragraph, the Appendix further emphasized, "[t]he Parties agree that Internet Calls are not subject to reciprocal compensation under this Appendix or under the Act." *Id.* at § 2.5.

*8 Paragraph 3.1 of the parties' Amendment to the Agreement, however, provides:
If PaeTec Communications, Inc. designates different rating and routing points such that traffic that originates in one rate center terminates to another routing point designated by PaeTec Communications, Inc. in a rate center that is not local to the calling party even though the NXX is local to the calling party, such traffic ("Virtual Foreign Exchange" traffic) shall be rated in reference to the rate centers associated with the NXX prefixes of the calling and called parties' numbers but treated as Local traffic for purposes of compensation.
Similarly, Section 3.2 defines "total Compensable Local Traffic" to include "Local, Mandatory Local, and Optional EAS traffic eligible for reciprocal compensation ... combined with traffic terminated to Internet Service Providers." Section 3.2.1, however, lists specific types of calls that are excluded from the operation of 3.2, significantly including "InterLATA toll and IXC-carried intraLATA toll." The Agreement itself defines "IntraLATA Toll Traffic" as the "IntraLATA traffic between two locations within one LATA where one of the locations lies outside of the normal local calling areas as defined by the applicable Commission." Agreement § 1.1.67. The Agreement does not define "InterLATA toll," but defines "InterLATA" as "As defined in the Act." *Id.* at § 1.1.64. The Act, in turn, defines "InterLATA Service" as "telecommunications between a point located in a local access and transport area and a point located outside such an area." 47 U.S.C. § 153(21).

PaeTec argues that section 3.2.1's "InterLATA toll" does not implicate the types of calls disputed in this case. First, PaeTec invokes the Agreement's definition

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

of "Telephone Toll Service" in Section 1.1.30, which relies on the Act's definition of "Telephone toll service" as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." 47 U.S.C. § 153(21). PaeTec further argues that because SNET does not impose a separate toll charge for Virtual FX traffic, the traffic "may be 'interLATA' but it is clearly not 'toll.'" Essentially, PaeTec argues that "InterLATA toll" calls are a subset of all InterLATA calls.

SNET argues that the Amendment should be read as follows: (1) Section 3.1 includes both inter- and intraLATA Virtual FX traffic in the definition of Local Calls; and (2) Section 3.2.1 carves out the exclusion of interLATA toll and IXC-carried intraLATA toll. SNET argues that this excludes interLATA FX traffic from local compensation. SNET points the court to Section 2.1 of the Appendix, which divides traffic exchanged between PaeTec and SNET into 5 classes: "Local Calls, Transit Traffic, Optional Calling Area Traffic, intraLATA Toll Traffic, and interLATA Toll Traffic." The Agreement thus seems not to create or define any category of interLATA traffic that is not toll traffic. SNET also notes that Section 2.7 of the Appendix defines Foreign Exchange or "FX" traffic as including both inter-LATA and intra-LATA calls. Finally, SNET argues that interstate Virtual FX calls are still "toll" calls; the difference is who pays the toll, the customer or SNET.

*9 In the hearing in this case, the DPUC took testimony and determined that PaeTec had made significant concessions in the Amendment in order to receive reciprocal compensation for both inter- and intraLATA Virtual FX calls. The DPUC found that Paragraph 3.1 of the Amendment conflicted with, and superceded, the Agreement in accordance with Paragraph 1.1, which provides that "[a]ny inconsistencies between the provisions of this Amendment and other provisions of the current or future Interconnection Agreements through May 31, 2003, will be governed by the provisions of this Amendment."

SNET argues that the DPUC's interpretation of the interconnection agreement was "arbitrary and capricious." In support of this argument, SNET points particularly to the DPUC's failure to specifically address SNET's contention that Section 3.2.1, which removes "interLATA toll" calls from the scope of "Total Compensable Local Traffic," excluded interLATA ISP and Virtual FX calls because they are included in "interLATA toll." SNET argues that the DPUC entirely failed to consider this argument and instead focused solely on Section 3.1.

The DPUC issued two drafts of its opinion before issuing the final Decision. After both initial drafts, SNET pressed its argument in the form of written exceptions. At page 8 of its February 13, 2002 exceptions to the Draft Decision, SNET contented that Section 3 .2.1 excluded "interLATA toll," thus excluding "interLATA FX, interLATA ISP." Ex. B to Dkt. No. 1. That argument is incorporated by footnote in its April 12, 2002 exceptions to the DPUC's Revised Draft Decision. However, SNET's argument about the exclusion of 3.2.1 was part of a larger argument about why interLATA FX traffic was distinct from the traffic that SNET claimed that the Amendment intended to treat as local. In its argument to the DPUC, SNET pointed mainly to the initial Agreement's provision that interLATA FX traffic would be treated as "Feature Group A" ("FGA") traffic for the purposes of compensation, and subject to the compensation provisions of the FGA Appendix.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The DPUC thoroughly considered the FGA argument and found that the Amendment, which did not parse out "Virtual FX" into intraLATA and interLATA but instead specifically included the whole of Virtual FX and ISP traffic in Local Compensation, had altered the compensation structure for interLATA FX calls and thus superceded the Agreement on that issue in accordance with the party's agreement that Amendment would supercede any conflicting provisions of the Agreement.

[7] The court is concerned, however, that the DPUC's Decision nowhere mentions Section 3.2.1 or the significant issue of the construction of its carve out of "interLATA toll." Even the deferential "arbitrary and capricious" standard requires the agency to have "examine[d] the relevant data." *Public Citizen*, 340 F.3d at 53. On the other hand, given the Act's definition of "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a *separate charge not included in contracts with subscribers for exchange service*," 47 U.S.C. 153(48) (emphasis added), combined with other aspects and provisions of the parties' interconnection agreement, including Section 3.2.1, this court is inclined to reach the same conclusion as the DPUC did: the calls at issue are indeed included in local traffic by the Amendment and made subject to reciprocal compensation . [FN4]

*10 While the court could itself interpret the contract, and recognizes that the DPUC is not entitled to the *Chevron* deference due a federal agency, the Act assigns to state commissions a primary role in implementing its provisions. The court is also aware of the language in the FCC's 1999 Ruling demonstrates that the agency clearly contemplates that agreements like this one will be interpreted in the first instance by state commissions like the DPUC. See, e.g., 14 F.C.C.R. at 3703. Though this Ruling was vacated, the 2001 Ruling still explicitly reserves to state commissions the power to interpret pre-existing interconnection agreements to determine whether the parties made the type of traffic in dispute here subject to reciprocal compensation. 16 F.C.C.R. at 9189.

In light of these considerations and the DPUC's comparative expertise on interconnection agreements, the court believes that the better course is to stay this action to allow the parties in interest to request that the DPUC reopen the proceeding to consider the issue in light of Section 3.2.1 of the Amendment.

Given that the parties have not addressed the issue of such a stay, the court allows the parties 10 days in which to object to the entry of a stay. If there is no objection, SNET is ordered to file a report within 30 days from the entry of this order on the status of this matter before the DPUC and provide, if possible, an estimate of the time needed for the DPUC to reconsider this matter if it has chosen to do so.

In light of the above, all three motions for summary judgment [Dkt. Nos. 18, 33, and 37] are denied without prejudice to renew subsequent to any action of the DPUC.

V. CONCLUSION

SNET's motion for summary judgment [Dkt. No. 18] is DENIED, DPUC's motion for summary judgment [Dkt. No. 37] is DENIED, and PaeTec's motion for summary judgment [Dkt No. 33] is DENIED, all without prejudice to renew. An initial stay of 90 days

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22273538   Page 12
--- F.Supp.2d ---
(Cite as: 2003 WL 22273538 (D.Conn.))

is hereby entered, subject to court reconsideration upon any objections filed to this order within 10 days hereof, or to its continuance to permit the DPUC to rule, or until further order of this court. SNET is ordered to file a report on the status of the matter before the DPUC within 30 days of the date of this Order.

SO ORDERED.

>   FN1. The Agreement also covered SBC-owned providers operating in Illinois, Indiana, Michigan, Nevada, Ohio, California, Texas, Missouri, Oklahoma, Kansas, Arkansas, and Wisconsin, some of which in turn covered multiple states.

>   FN2. Indeed, the agreement itself might be considered to be more of a federally mandated agreement than a commercial contract, thus further supporting the conclusion that the very interpretation of the agreement inherently raises issues of federal law. See *Bellsouth,* 317 F.3d at 1282 (Anderson, J., concurring in part).

>   FN3. The court notes that, as applied in this context, there is "no meaningful difference" between an "arbitrary and capricious" standard and the "substantial evidence" standard. See *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999).

>   FN4. The Virtual FX calls at issue here are clearly "interLATA calls," but do not appear to be "interLATA toll" calls because no separate charge is made to SNET's subscribers for this traffic, though the court leaves that determination to the DPUC if it chooses to address the matter.

2003 WL 22273538, 2003 WL 22273538 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## CERTIFICATION

      This is to certify that a copy of the foregoing has been mailed this 27th day of October, 2003 via first class mail, postage prepaid to the following:

| | |
|---|---|
| Tatiana D. Eirmann, Esq.<br>Robert S. Golden, Jr., Esq.<br>Office of the Attorney General<br>10 Franklin Square<br>New Britain, CT 06051 | Kenneth W. Salinger, Esq.<br>Palmer & Dodge LLP<br>111 Huntington Avenue<br>Boston, MA 02199-7613 |
| Thomas G. Rohback, Esq.<br>Gail L. Gottehrer, Esq.<br>LeBeouf, Lamb, Greene & MacRae, LLP<br>225 Asylum Street, 13th Floor<br>Hartford, CT 06103 | David L. Belt, Esq.<br>Jacobs, Grudberg, Belt & Dow, P.C.<br>350 Orange Street<br>New Haven, CT 06503 |

_____
Timothy P. Jensen