UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY,<br>       Plaintiff,<br>  v.<br><br>THE CONNECTICUT DEPARTMENT OF<br>PUBLIC UTILITY CONTROL, et al.,<br>         Defendants,<br><br>   and<br><br>AT&T COMMUNICATIONS OF NEW ENGLAND, INC., and<br>COX CONNECTICUT TELECOM, LLC,<br>         Intervenors-Defendants. | Civil Action<br>No. 303-CV-00278-SRU<br><br><br>October 27, 2003 |

**AT&T COMMUNICATIONS OF NEW ENGLAND, INC.'s**
**REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The arguments floated by Southern New England Telephone Company's ("SNET") summary judgment opposition papers were for the most part anticipated and refuted in the initial summary judgment submissions and subsequent opposition papers filed by AT&T Communications of New England, Inc. ("AT&T"), the Connecticut Department of Public Utility Control ("DPUC"), and Cox Connecticut Telecom, LLC ("Cox"). In this reply brief, AT&T responds briefly to several misleading arguments forwarded by SNET in its October 6, 2003 Memorandum in Opposition to Motions to Dismiss and for Summary Judgment ("SNET Opposition Memorandum").

**Reply Argument**

I.    **THE 1996 ACT'S INTERCONNECTION REQUIREMENTS CANNOT BE READ IN ISOLATION.**

SNET concedes that its offering of Connecticut Transit Traffic Service ("CTTS") is required by the Telecommunications Act of 1996 (the "1996 Act"). *See* SNET Opposition Memorandum at 24. Specifically, SNET concedes that it is required to offer CTTS, a mode of indirect interconnection, pursuant to 47 U.S.C. § 251(a), which obligates all telecommunications carriers to interconnect "directly or indirectly with the facilities and equipment of other telecommunications carriers." *See id.* SNET protests, however, that CTTS is not a required mode of interconnection under 47 U.S.C. § 251(c)(2), which would obligate SNET to offer the service "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory[.]" SNET contends that the interconnection duty and accompanying pricing obligation of § 251(c)(2) is limited to direct interconnection and does not apply to indirect means of interconnection like CTTS.

The language of § 251(c)(2), however, contains no language limiting its application to direct interconnection. Furthermore, as AT&T established in its initial summary judgment brief, when § 251(c)(2) is read in context with § 251(a), there is little question that indirect interconnection rates must be priced at reasonable and nondiscriminatory rates like other modes of interconnection. *See* AT&T's Memorandum in Support of its Motion for Summary Judgment ("AT&T Initial Brief") at 11. It is a well-settled that courts should "not construe statutory phrases in isolation; [but should] read statutes as a whole." *United States* v. *Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984). When read in context, § 251(c)(2) clearly encompasses the same type of interconnection, either direct or indirect, that is required under § 251(a). Had Congress intended otherwise, it would have

explicitly made reference to "direct" interconnection within § 251(c)(2).  Congress chose not to do this, however, and the most reasonable reading of that statutory section includes indirect interconnection within its ambit.[1]

## II.    THE DPUC HAS BROAD AUTHORITY UNDER STATE LAW TO PROMOTE LOCAL TELECOMMUNICATIONS COMPETITION.

SNET does not contest the principle that the DPUC's interpretation of its own authority under state law is entitled to deference under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).  *See* SNET Opposition Memorandum at 30.  SNET contends, rather, that the Department's decision relied upon an interpretation of federal law that the DPUC is not entrusted to administer.  *See id.*  The plain language of the DPUC decision reveals otherwise.  The Department principally relied upon its broad authority under state statute to promote local telecommunications competition in deciding to lower SNET's inflated CTTS rate.  *See* AT&T Initial Brief at 4-5.  The DPUC is unquestionably an administrative agency entrusted to administer these state statutory provisions and its interpretation of its authority under those provisions,

---

[1] Even if indirect connection falls outside the scope of 47 U.S.C. § 251(c)(2), SNET concedes that its CTTS rates would still need to be "just and reasonable" under 47 U.S.C. §§ 201 and 202.  *See* SNET Opposition Memorandum at 32.  Even by SNET's own measure, its current CTTS rates fail to meet that statutory requirement.  SNET claims that §§ 201 and 202 are satisfied by its entrance into arms-length agreements with "similarly situated carriers."  *Id.*  One of the important findings of the DPUC regarding CTTS, however, was that SNET occupied a uniquely advantaged market position in its provision of transit services.  *See* Complaint, Exhibit F at 14 (DPUC's final decision noting that SNET is, for all intents and purposes, "the only market force by which its CTTS rates have been based.")  Given its uniquely advantaged bargaining position, SNET's agreements with its competitors for CTTS cannot be characterized as agreements with "similarly situated carriers."  The DPUC, therefore, would have authority to act pursuant to 47 U.S.C. §§ 201 and 202 as SNET's CTTS rates do not satisfy the "just and reasonable" standard.

therefore, is entitled to *Chevron* deference. *See id.*; *see also Southern New England Telephone Co. v. Department of Public Utility Control*, 261 Conn. 1, 22, 803 A.2d 879, 893 (2002).

SNET attempts to read narrowly what is actually quite a broad grant of statutory authority to the DPUC under Connecticut law. SNET tries to do so through the use of nonsensical statutory interpretations that have been rejected by the Connecticut Supreme Court. *Compare* SNET Opposition Memorandum at 27 *with* AT&T's Initial Brief at 5-9.

SNET claims that the DPUC's authority to set a maximum mark-up for excessive or discriminatory rates under CONN. GEN. STAT. ANN. § 16-247f is somehow constricted by the DPUC's past approval of interconnection agreements over five years ago which included terms related to CTTS. *See* SNET Opposition Memorandum at 28 (citing to Krom Affidavit at Exhibit 4.) This argument finds no support in the language of the statute. The DPUC's initial approval of rates for regulated telecommunications services does not mean those rates are never subject to revision at some time in the future. Any finding the DPUC may have made concerning CTTS rates in 1998 interconnection agreement proceedings does not restrict its prerogative to reduce those rates in 2003 when petitioned by a party and presented with evidence that they are inflationary and anticompetitive. SNET's cramped interpretation of the Department's statutory authority would effectively handcuff its telecommunications policymaking, a large portion of which effects carriers' obligations under interconnection agreements. As AT&T observed in its initial brief, most interconnection agreements contain "change of law" provisions which anticipate the impact of regulatory agency decisions upon its terms. *See* AT&T Initial Brief at 16-17. AT&T's interconnection agreement with SNET in Connecticut is no exception. *See id.*

### III.    THE DPUC'S DECISION TO REDUCE SNET'S INFLATED CTTS RATES IS NOT PREEMPTED BY FEDERAL LAW.

The FCC's mere decision "not to regulate" transit services under 47 U.S.C. §§ 251 & 252 within its *BellSouth* Order does not preempt the DPUC's decision to reduce CTTS rates; SNET's claim to the contrary is without merit. *See* SNET Opposition Memorandum at 26-27, 29. As AT&T established in its opposition brief, a decision by the FCC "not to regulate" transit services does not create an affirmative federal requirement triggering conflict preemption in this case. *See* AT&T Opposition at 6-7. In order for conflict preemption to apply, parallel and affirmative federal and state requirements must exist that are impossible to comply with simultaneously. *See* AT&T Initial Brief at 12-13 (citing to *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315, 1322 (2nd Cir. 1990)). The FCC's decision not to regulate transit services creates no such affirmative requirement. This case does not involve any conflict between state requirements and contrary federal requirements, and thus SNET's claim of preemption has no basis.

### IV.    SNET MISSTATES THE LAW APPLICABLE TO ITS CONTRACT CLAUSE CLAIM.

SNET remarks that just because it "is part of a regulated industry does not mean it has any less protection from government violations of the Contract Clause." *See* SNET Opposition Memorandum at 38. Even a cursory review of the applicable caselaw shows that SNET is mistaken.

Companies within heavily regulated industries like telecommunications do have less protection under the Contract Clause because the challenged government regulation is generally more foreseeable than in other contexts. *See* AT&T Initial Brief at 17 (citing to *Serrano* v. *Aetna Insurance Co.*, 233 Conn. 437, 664 A.2d 279, 286 (1995)). As AT&T established in its initial brief,

5

the DPUC's action here was foreseeable because, like other state commissions, the DPUC routinely reviews the rates charged by carriers for interconnection and other services for compliance with state and federal requirements. *See id.* at 16-17.

SNET's resurfaces its conclusory argument that the DPUC's acceptance of the original CTTS rates in 1998 hamstrings its decision here by making the Department's current action unforeseeable. *See* SNET Opposition Memorandum at 38. As addressed in Section II, however, this vision of Department policymaking has no basis in reality. The DPUC and other state commissions routinely review interconnection and other rates approved in the past to determine their appropriateness for the future. SNET's assertion that the Department's decision represents a "sudden" and unforeseeable change in course should not be taken seriously.

**Conclusion**

For the reasons stated above and in AT&T's initial summary judgment memorandum and opposition to SNET's motion for summary judgment, AT&T respectfully urges this Court to uphold the DPUC's decision to reduce CTTS rates and establish an alternative transit offering, and to enter judgment dismissing SNET's complaint with prejudice.

**AT&T COMMUNICATIONS OF
NEW ENGLAND, INC.,**

By its attorneys:

_____
David L. Belt (Ct 04274)
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
P.O. Box 606
New Haven, CT 06503
Telephone No.: (203) 772-3100
Facsimile No.: (203) 772-1691
dbelt@jacobslaw.com

Kenneth W. Salinger (Ct 24603)
John T. Bennett (Ct 25018)
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0561
ksalinger@palmerdodge.com

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served by first class mail on October 27, 2003, upon:

Keith M. Krom, Esq.
The Southern New England Telephone Company
310 Orange Street
New Haven, CT 06510

Timothy P. Jensen, Esq.
Tyler, Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT 06510-1910

Tatiana D. Eirmann, Esq.
Assistant Attorney General
10 Franklin Square
New Britain, CT 06051

Gail L. Gottehrer, Esq.
LeBoeuf, Lamb, Greene & MacRae, LLP
225 Asylum Street, 13th Floor
Hartford, CT  06103

_____
David L. Belt