jurisdiction" over § 252(e)(6) claims); see also Ohio Bell Tel. Co., 2000 WL 1469356 at *4 (S.D. Ohio, Sept. 29, 2000).

The reasoning of these cases is equally applicable here. The Plaintiff has brought this suit pursuant to, inter alia, § 252(e)(6), 28 U.S.C. § 1331, and the Supremacy Clause. Regardless of the regulatory scheme that Connecticut may have developed over the years, the fact remains that § 252(e)(6) gives this Court the primary responsibility to review state commission decisions concerning interconnection agreements, and under the Supremacy Clause, the federal law must prevail. As in all of the cases cited above, this Court must determine whether the DPUC has issued its Decisions in accordance with the 1996 Act, which is federal law. The claim does not require the Court to interpret state law. Nor is there a risk that the suit will require the Court to interfere with the existing state regulatory scheme. As the Sixth Circuit recently explained in rejecting a Burford argument on nearly identical facts, "Congress has invested the federal courts with primary responsibility for adjudicating FTA challenges to state telecommunications regulations, and because this case does not concern a disputed issue of state law, but rather a potential conflict between state and federal telecommunications laws, Burford abstention is inappropriate." Strand, 209 F.3d at 920-21. This Court should reject the DPUC's arguments to abstain under Burford.

It is significant that the DPUC has failed to cite to even one decision where a court, under Burford, has abstained from exercising its jurisdiction in a case involving the 1996 Act. As indicated above, all of the courts that have considered Burford abstention in the context of § 252(e)(6) actions have concluded that abstention was inappropriate.

In the absence of supporting case law, the DPUC relies on a series of non-telecommunications cases to bolster its policy argument that this Court should abstain under Burford

21

due to general principles of federal-state comity. DPUC Br. at 23-27. These cases all are distinguishable and inapplicable to the instant case. Most significantly, none of the cases involved a statute providing the federal courts with express primary authority to consider whether the state's conduct violated federal law, as in the instant case. Moreover, the industries at issue in those cases were substantially more local in nature than telecommunications law (e.g. intrastate transportation in the Alleghany Airlines, Inc. and Alabama Public Serv. Comm'n cases and healthcare for the mentally retarded in Bethphage). Finally, in Bethphage, the district court would have had to interpret state law if it did not abstain, a factor not present here. Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1247 (2d Cir. 1992).

For all of the foregoing reasons, the Burford doctrine is not applicable to the instant case, and this Court should not abstain from exercising the exclusive jurisdiction granted to it by Congress under § 252(e)(6).

## C.   Cox's Jurisdictional Challenges Are Equally Untenable

In its written comments in the underlying administrative proceeding here, Cox argued that §251 not only gave the DPUC the authority to regulate CTTS, but that the 1996 Act mandated such regulation. Interim Decision (Compl. Ex. B; Rcd. XII-1) at 2 (discussing Cox's written comments). Now, however, Cox claims that the underlying proceeding was not about federal law.

Specifically, Cox concludes that there has been no proven violation of federal law and that because there has been no proven violation of federal law, there cannot be a federal question (Cox Br. at 13-14). This argument puts the cart before the horse – it is the federal question that provides jurisdiction, not whether or not the merits of the cause of action have been proven: "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not

22

implicate subject matter jurisdiction, *i.e.* the court's statutory or constitutional *power* to adjudicate the case." Verizon Md., Inc., 535 U.S. at 642-43 (quoting Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 89 (1998)). There is no legal support for the proposition that SNET must first prove its case on the merits to support jurisdiction.

Cox carries this argument further, claiming, without providing any context or citing to any legal support, that the federal question must be "substantial" to invoke federal jurisdiction (Cox Br. at 15). For jurisdictional purposes, the federal question here is whether the DPUC complied with the 1996 Act and the FCC's interpretations of the Act and whether the DPUC's actions violated Constitutional principles. To the extent the federal question need be "substantial," it is in this case. Indeed, the court in Strand, 209 F.3d at 915, held that while a claim under federal law should be "substantial," "substantial" means "any arguable basis in law."

In sum, the DPUC's actions under the guise of state law were actually made under and exceeded the scope of authority provided to it by the 1996 Act. This is SNET's claim. This is an issue of federal law and the DPUC's authority to regulate based on the limited power it gets from the 1996 Act. Therefore this Court has jurisdiction over this matter.

## III.    THE DPUC ACTED OUTSIDE ITS LIMITED FEDERAL GRANT OF AUTHORITY WHEN IT RENDERED ITS DECISIONS

As a preliminary matter, it is important to understand the distinction between 47 U.S.C. §§ 251(a) and 251(c) and why SNET's CTTS comes under § 251(a), not § 251(c).

Section 251(a)(1) obligates all telecommunications carriers to interconnect their networks. Carriers may satisfy this obligation through direct interconnection or through indirect interconnection. The obligation is on a carrier "to interconnect directly or indirectly with the

23

under § 251(a).  See discussion of pricing under 47 U.S.C. §§ 201 and 202, infra at 32 - 33.

Conversely, § 251(c)[7] does not discuss, mention or require indirect interconnection.  Rather, the duty under § 251(c) is limited to a requesting telecommunications carrier's direct interconnection with the ILEC's network.  See SNET Br. at 13-14 (citing to In re Application of BellSouth Corp., 17 F.C.C.R. 25828, ¶155 (2002) (§ 251(c) does not encompass transit services) and In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499, ¶¶ 176, 209 (1996) (§ 251(c) applies to the direct interconnection of a carrier's network to the incumbent local exchange carrier's network for the purpose of terminating traffic on the incumbent's network).  Thus, the FCC has chosen not to include transit services as a regulated § 251(c) interconnection.

Finally, § 251(c) requires an ILEC to provide "for the facilities and equipment of any requesting telecommunications carrier, interconnection . . . for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A).  SNET's CTTS service is not a "telephone exchange service" as defined by 47 U.S.C. § 153(47)[8] or an "exchange access"

---

[7] Section 251(c) places additional obligations on ILECs for direct connection.  For example, ILECs, like SNET, must provide for direct "interconnection" by another carrier with SNET's network:

   (A) for the transmission and routing of telephone exchange service and exchange access;
   (B) at any technically feasible point within the carrier's network;
   (C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and
   (D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

47 U.S.C. § 251(c)(2).

[8] "Telephone exchange service" is defined as a:

   (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service

as defined under § 153(16).[9]  The Act solely requires a LEC to provide interconnection for the transmission and routing of telephone exchange service and exchange access.  47 U.S.C. § 251(c)(2)(A).  CTTS is neither a "telephone exchange service" nor an "exchange access service" because SNET's end users are not part of these transit calls.  Indeed, the calls neither terminate nor originate from SNET's network or end users.  CTTS is not offered to the public but to CLECs as a wholesale product.  Thus, by its terms, § 251(c) obligations do not apply to SNET's CTTS.

This is consistent with the FCC's interpretation of these statutory provisions.  See SNET Br. at 13-18; see also Jan. 31, 2003 Petition for Reconsideration of the Southern New England Telephone Company (Rcd. III-18) at 4-12.  It is therefore clear that CTTS is a § 251(a) service and is outside the scope of the additional obligations under § 251(c).  The FCC has confirmed this.  This fact precludes the DPUC from interfering with the manner and on what terms SNET offers CTTS.  By interfering here, the DPUC is acting inconsistent with the FCC's implementation of the 1996 Act.

## A.    The DPUC Does Not Have The Power To Regulate CTTS Under State Law, Federal Law Or The **EPS** Decision

The DPUC asserts authority for its actions under Conn. Gen. Stat. §§ 16-247b(a), 16-247b(b) and 16-247f and the 1996 Act.  Final Decision (Compl. Ex. F; Rcd. XII-2) at 9-10.   While the Act does not prohibit the DPUC from regulating telecommunications services in general, it does preclude the DPUC from regulating services like CTTS specifically.  This is clear from the FCC's decision

---

provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

47 U.S.C. § 153(47).

[9] "Exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination and termination of telephone toll services." 47 U.S.C. § 153(16).

not to regulate transit services. To the extent the <u>EPS</u> decision applies to these facts, it is consistent with this position.

A closer look at the relevant statutes is instructive and shows why the DPUC does <u>not</u> have the power to regulate CTTS:

- Conn. Gen. Stat. **§ 16-247b(a)** gives the DPUC the authority to ensure that SNET does not set telecommunications rates that discriminate among customers. There has been no claim of discrimination in this case. That point aside, under § 16-247b(a), the DPUC has the authority to <u>review</u> SNET's rates charged customers and to <u>review</u> costs through analysis of neutral cost criteria. Section 16-247b(a), however, does not give the DPUC authority to specify a maximum mark-up for these rates. <u>EPS</u>, 261 Conn. at 29. Therefore, the DPUC does not have power under § 16-247b(a) to set the maximum mark-up rate that SNET charges for CTTS.

- Conn. Gen. Stat. **§ 16-247b(b)** is narrower and only provides the DPUC with authority over "necessary" services. <u>EPS</u>, 261 Conn. at 25. Recently, the FCC reaffirmed "necessary" in the context of the 1996 Act and § 251:

> We conclude that a proprietary network element is 'necessary' . . . if, taking into consideration the availability of alternative elements outside the incumbent's network, including self-provisioning by a requesting carrier or acquiring an alternative from a third-party supplier, lack of access to that element would, as a practical, economic, and operational matter, preclude a requesting carrier from providing the services it seeks to offer.

Triennial Review Order, FCC 03-36, ¶170. Rates for necessary services are to be set based on forward looking costs and, like all rates, may not be discriminatory. Because CTTS is <u>not</u> a necessary service, <u>see</u> discussion at Section III.C., <u>infra.</u>, this provision does not apply and cannot give the DPUC authority to regulate CTTS. Notably, the DPUC in <u>EPS</u> did not have jurisdiction for its actions under § 16-247b(b). <u>EPS</u>, 261 Conn. at 34 n.30.

27

Even assuming that a determination of whether CTTS is "necessary" is not required under §16-247b(b), as the DPUC claims, the statute requires it "be consistent with the provisions of §252(d)," which in turn only applies to § 251(c) direct interconnections.[10]  As stated above, transit service is an indirect interconnection that does not fall under the ambit of § 251(c).

●    Conn. Gen. Stat. **§ 16-247f** gives the DPUC authority to regulate in the public interest and this authority extends to <u>all</u> telecommunications providers, not just SNET.  When combined with Conn. Gen. Stat. § 16-247a, this authority includes the ability to set a maximum mark-up for excessive and/or discriminatory rates.  <u>See, e.g.,</u> <u>EPS</u>, 261 Conn. at 30-31.  <u>The rate at issue here, however, has already been determined by the DPUC to be non-discriminatory and in the public interest and therefore not excessive</u>:

> **The Department has reviewed the proposed Interconnection Agreement and has found that no terms discriminate against a telecommunications carrier not a party to the Interconnection Agreement, or that the implementation of the proposed Interconnection Agreement is inconsistent with the public interest, convenience, and necessity.**

<u>See</u> generally the DPUC decisions on individual CTTS interconnection agreements, copies attached to Krom Aff. as Exhibit 4.

Inasmuch as the DPUC claims that the "same" issues before this Court were resolved in favor of the DPUC in <u>EPS</u>, it is wrong.  DPUC Br. at 11.  The <u>EPS</u> case did not deal with CTTS, but with enhanced provisioning services and the material issue was not whether the rate for the service was excessive, but whether the rate was discriminatory.  Nor had the rates in <u>EPS</u> been approved

---

[10] 47 U.S.C. § 252(d)(1) provides in part: "Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251. . . ." <u>See also</u> § 251(c)(2)(D) cross-referenced to § 252.

previously by the DPUC. Here, there is and can be no claim of discrimination under §16-247f as evidenced by the DPUC's prior finding in 56 dockets that the rates were just and reasonable. See, e.g., EPS, 261 Conn. at 22 (rate discriminatory when lower fee charged to one customer). Nor is there a supportable claim for excessive rates. See SNET Br. at 20-21 and discussion infra at Section IV. In fact, the DPUC previously found this rate to be in the public interest. See Krom Aff., Exhibit 4.

Even setting aside the DPUC's 56 prior findings that CTTS rates were not discriminatory and were in the public interest as a reason for the DPUC's lack of authority to regulate CTTS rates as discriminatory or excessive under §16-247f, the DPUC still must act within the confines of the Act and the FCC's interpretation of the Act. EPS, 261 Conn. at 22; see also id. at 36 (analyzing whether the DPUC's action was inconsistent with federal law). Because the FCC has chosen not to regulate transit services, the DPUC may not regulate CTTS and act consistent with federal law. See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 155 (1982) (federal regulation that "consciously has chosen not to mandate" particular action bars state from taking such action); Ray v. Atlantic Richfield Co., 435 U.S. 151, 171-72 (1978).

Indeed, the FCC implemented the goals of the 1996 Act by limiting, not expanding, the services to be regulated, providing that regulation under the Act should not be used except to promote a "significant enhancement in competition." United States Telecom Assoc., 290 F.3d. at 429.[11] The DPUC blindly ignores this point. Here, the DPUC found nothing in the record to

---

[11] With respect to an issue regarding additional unbundling of ILEC's networks, the Court of Appeals for the District of Columbia noted that "nothing in the Act appears a license to the Commission to inflict on the economy the sort of costs . . . under conditions where it had no reason to think doing so would bring a significant enhancement of competition." United States Telecomm Assoc., 290 F.3d. at 429.

indicate that its actions would bring about a "significant enhancement of competition." Nor could the DPUC rationally make such a finding given that it refused to compel Cox to produce any evidence on the cost of obtaining transit service from other providers. Its decision to cut CTTS rates and require additional services to be developed and offered by SNET is inconsistent not only with the 1996 Act's goals of reducing regulation, but it directly contravenes the FCC's decision not to regulate transit services.

## B.    The DPUC's Actions Are Not Immunized From Federal Preemption

The court applies "de novo review to state agency's legal interpretation of the 1996 Act" including the agency's determination of the scope of its authority to alter rates determined by the parties to the interconnection agreement. AT&T Communications of N. J., Inc., 270 F.3d at 169; see also EPS, 261 Conn. at 13 (statutory construction of state and federal law de novo). Under de novo review, it is clear that the DPUC's actions are inconsistent with federal law and thus preempted.

As an initial matter, the DPUC can be entitled to no deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). The Court in Chevron reviewed a federal agency's (EPA) interpretation of a federal statute (Clean Air Act) that the agency was required to administer. Here, however, this Court is reviewing a state agency's interpretation of federal law and the state agency's interpretation of the federal agency's implementation of federal law.

Under Chevron, a reviewing court will first look to "the unambiguously expressed intent of Congress." Chevron at 843. Where, however, the Congressional intent is "silent or ambiguous with respect to the specific issue," the reviewing court will give deference to the federal agency's

30

construction of the federal law. Id. (permissible). A state agency interpreting federal law is entitled to no such deference under Chevron and its actions are subject to de novo review. See Turner v. Perales, 869 F.2d 140, 141 (2d Cir. 1989) (whether regulation promulgated by state agency consistent with federal law subject to de novo review); MCI Telecomm. Corp., 271 F.3d at 516; MCI Telecommunications Corp. v. New York Tel. Co., 134 F. Supp.2d at 501; compare Perry v. Dowling, 95 F.3d 231, 235-36 (2d Cir. 1996) (applying Chevron where federal law (Medicaid) was a joint state-federal law and the federal agency specifically concurred with the state's position).

The analysis before this Court concerns the DPUC's interpretation of how its actions were consistent with federal law. Because the DPUC is not "charged" with the Act's enforcement, the FCC has this duty, the DPUC's opinions on the Act are entitled to no deference, especially where the FCC has already spoken. It is therefore misplaced to argue that Chevron provides the appropriate standard of review here.

Even if Chevron applied, the DPUC would fare no better. For example, there is no "permissive silence" to interpret -- the FCC has spoken on the issue here and has determined not to regulate transit services. See discussion Section III generally, infra. Any deference given to the DPUC would be superceded by the greater deference given to the FCC's interpretation on this matter.

Moreover, as discussed above, the DPUC's actions conflict with and stand as an obstacle to the objectives of the 1996 Act and the FCC's implementation of the Act. In Hines v. Davidowitz, the Supreme Court pointed out that the court's "primary function" in preemption cases was "to determine whether, under the circumstances of this particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 312

31

U.S. 52, 67-68 (1941). The clear and manifest purpose of the 1996 Act was to take telecommunications regulation away from the states and to promote competition within the industry. AT&T Corp., 525 U.S. at 378, n. 6. This design left the states with only derivative powers over telecommunications. To the extent the state is allowed to and volunteers to act in this area, it must do so consistent with the 1996 Act. Id.; see also EPS, 261 Conn. at 17.

Congress and the FCC chose to require that only certain telecommunications services provided by incumbent local exchange carriers be regulated under § 251(c) and their rates subject to the price restrictions in § 252(d). Where the service is not specifically regulated by these sections, the incumbent may offer the service, but the rate for the service is subject only to 47 U.S.C. §§ 201 and 202, and is determined by what the market will bear. See, e.g., Triennial Review Order, FCC 03-36, ¶663 (services not under § 252(d)(1) pricing are subject to §§ 201 and 202), id., ¶664 ("just and reasonable" under §§ 201 and 202 equates to market based rates). The FCC found that a carrier may prove compliance with 47 U.S.C. §§ 201 and 202 by demonstrating that it has entered into arms-length agreements to provide service with other similarly situated carriers. Id.[12] As discussed above, SNET produced evidence of 56 interconnection agreements – agreements with CTTS market-based rates reviewed and approved by the DPUC as complying with the 1996 Act and in the public interest.

---

[12] The FCC held further that the rate at which the carrier offers comparable functions through its interstate access rates would also be a good analogue. Id. (Triennial Review Order, ¶ 664). Notably, the FCC applied this test in its disposition of Nuvox's claims that BellSouth's transit service was excessively priced -- rejecting any claim that transit service fell under section 251(c) and accepting BellSouth's prices for the service, which were based on interstate access rates. Memorandum and Opinion and Order, In the Matter of Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., And BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in Alabama, Kentucky, Mississippi, North Carolina, and South Carolina, 17 FCC Rcd 17595 (2002), ¶ 222 and n. 849. SNET Br. at 17.

32

Because the FCC has found transit service not subject to § 252(d)(1), (SNET Br. at 13-14

(citing BellSouth Corp. finding that there is no FCC precedent or rule requiring transit service under

§251(c)(2)); see also SNET Br. 15-18), CTTS rates are subject to the standards of 47 U.S.C. §§ 201

and 202 which mandate a just and reasonable rate; in other words, a market-based rate.  By

regulating CTTS as a § 251(c)(2) service, and imposing the cost-based rate restrictions of §

252(d)(1), the Decisions contravene the FCC's articulated pricing policies and therefore stand as an

obstacle to furthering the goals of the 1996 Act and are thus preempted.

Thus, the DPUC's construction of the 1996 Act is entitled to no deference.  Rather, de novo

review reveals that the FCC has determined that transit traffic services such as CTTS are not subject

to cost-based rate regulation.  The FCC's interpretation is entitled to deference here, even where its

choice is not to regulate.  See Ray, 435 U.S. at 171-72.  The DPUC's claimed "reasonable

interpretation and application" of the Act to cover CTTS (DPUC Br. at 32) is inconsistent with the

law as interpreted by the FCC.[13]

### C.    CTTS Is Not A Necessary Service Because CLECs Have Found Other Ways to Provide the Same Service.

The DPUC's determination that CTTS is a necessary service is without support in the record

or in the law.  The DPUC acknowledges that where the party can provide the service on its own, the

service is not necessary.  See DPUC Dec. 15, 1999 Decision at 14-15 (attached as Exhibit C to

SNET Brief). See also Dec. 23, 2002 Written Exceptions of The Southern New England Telephone

---

[13] Curiously, on page 34 of its Brief, the DPUC claims that "[o]nce again, the FCC acquiesced to a state finding that transit traffic is an interconnection within the meaning of §251(c)(2)," citing to the Florida/Tennessee order.  Not only does the Florida/Tennessee Order it cites not stand for that proposition, but there is no authority for that proposition.  See Triennial Review Order, FCC 03-36, ¶534, n.1640 ("To date, the Commission's rules have not required incumbent LEC's to provide transiting.")

Company (Rcd XI-5) at 6-10.  In any event, the EPS decision does not support the DPUC's use of §16-247b(b) in this matter because that section was not the basis for jurisdiction in EPS.  See EPS, 261 Conn. at 33, n. 30.

Here, the CLECs can provide this service without SNET by directly connecting with any other carrier.  In fact, this is what they have done.  During the administrative proceeding, PaeTec Communications, Inc. ("PaeTec"), a CLEC that used CTTS, wrote to the DPUC explaining it wanted non-party status: "due to . . . the relative unimportance of SNET's transit service to PaeTec, and because PaeTec no longer considers the issues in this proceeding of concern to PaeTec's Connecticut business plan."   Sept. 11, 2002 PaeTec Motion for Non-Party Status (Rcd. III-12).   Apparently CTTS was not necessary for PaeTec's continued service in Connecticut.

That there are alternatives to CTTS is further made clear by Cox's own admission in this matter.  As of May 2002, Cox had "executed interconnection agreements with five CLECs whose traffic represents approximately 75% of Cox-to-CLEC traffic in Connecticut." May 16, 2002 Brief of Cox Connecticut Telcom, L.L.C. in Opposition to The Southern New England Telephone Company's Motion to Dismiss and in Response to the Notice of Request for Written Comments ("Cox Opposition") (Rcd.VIII-1) at 25; Lafferty Test. (Rcd. II-2) at 11:1-3. This fact prevents Cox, or any party, from arguing that CTTS is a necessary service.  Moreover, this fact impeaches the testimony of Cox's expert, cited by the DPUC (DPUC Br. at 43), that direct connection would be cost-prohibitive.  See Lafferty Test. (Rcd. II-2) at 17 ("no real market alternatives for CTTS"). Disturbingly, the DPUC agreed with Lafferty's testimony, despite the incongruity between his testimony that direct connecting was prohibitive and the reality that almost all of Cox's lines were direct connected.

34

Moreover, the DPUC denied requests made by SNET that Cox produce information on its alternative sources. Based even on the limited record developed here, however, it is clear that there are viable alternatives to CTTS or PaeTec and Cox would not be able to service their customers in Connecticut.

## IV. THE DPUC COULD NOT HAVE DETERMINED FROM THE RECORD THAT CTTS RATES WERE EXCESSIVE BECAUSE THERE WAS NO EVIDENCE PRESENTED SHOWING THE COSTS OF SIMILAR SERVICES IN CONNECTICUT

The Decisions in this case suffer from the same infirmity that the Connecticut Supreme Court admonished the DPUC for in the past-- lack of precision and failing to "articulate specific findings of fact and conclusions of law consistent with the statutory requirements in support of its exercise of authority." EPS at 32-33 and n.28. When a court conducts a review of an agency's decision, the court "must be certain that [the agency] has considered all the important aspects of the issue and articulated a satisfactory explanation for its action." Henley v. Food and Drug Admin., 77 F.3d 616, 620 (2d Cir. 1996) (citations omitted). Simply stating that SNET's CTTS charges are excessive, or as in EPS, discriminatory, is not enough. EPS at 32 and n.29. There needs to be evidence to support this conclusion. And when a conclusion is not supported by the evidence, the agency has abused its powers. See Feinson v. Conservation Comm'n of Newtown, 180 Conn. 421, 426-27 (1980).

In the underlying administrative proceeding, the DPUC failed to allow the development of a complete and accurate record upon which it could make a determination about alternatives to CTTS. It thwarted discovery efforts aimed at creating a record on alternate services to which the DPUC could compare CTTS. In fact, any comparisons made by the DPUC were for different services outside the state. The DPUC ignored that PaeTec dropped out of the matter to use other

services and that Cox was able to replace 75% of the CTTS with direct connections. An agency, however, "cannot, consistent with the statute, blind itself to the availability of elements outside the incumbent's network." United States Telecom Assoc., 290 F.3d. at 429 (citations omitted). In this case, the DPUC did just that.

The DPUC's refusal to develop the record on comparable services also created a void on how to determine a viable CTTS rate. See Sept. 17, 2002 Hearing Tr. (Rcd. VII-1) at 189-90 and 197-200 (discovery rulings). Because there was no record developed about comparable services in Connecticut, the DPUC looked to other markets' rates for guidance. By looking at these rates, however, the DPUC did not know the underlying costs for the utility or the mark-up the utility made for these services in other markets. The DPUC looked only at the resulting rates. See Cox Opposition (Rcd. VIII-1) at 27-28 and Ex. A to Opposition (chart comparing other state rates to CTTS, without underlying cost information). This type of information is incomplete and cannot validly support a basis for the rate the DPUC developed in this matter. Therefore there was no evidence in the record by which CTTS could be compared or by which a CTTS rate could be determined.

## V.    THE CONTRACT CLAUSE ALSO PROHIBITS THE DPUC'S ACTIONS HERE

### A.    History Of The CTTS Terms

The rate for CTTS was challenged in arbitration by MCI/WorldCom after SNET first offered the service in 1995 and after the 1996 Act was in effect. At that time, the DPUC did not seek to change this rate or how it was offered. See Krom Aff., Exhibit 4 (decisions approving contract rate). Nor did it claim to have jurisdiction to change the rate or the terms of the agreement. This is consistent with § 252 of the 1996 Act because while the DPUC has the authority to approve or reject

36

negotiated contracts, this authority does not extend to altering terms in the contracts or creating new obligations. Such an extension of its authority would be inconsistent with the FCC's choice not to regulate transit service and compromise the Act's goals with respect to contracting: "Congress, in setting up the negotiation procedure, explicitly excluded the state courts from getting involved in it." Wisconsin Bell, Inc., 340 F.3d at 444, 2003 U.S. App. LEXIS 16514, at *8. Irrespective of the DPUC's attempt to reach beyond its authority, the fact remains that the DPUC approved the very terms it now rejects and specifically determined that they were not discriminatory, not excessive and in the public interest.

From 1996 to the present, the arbitrated contract terms formed the foundation of all CTTS contracts between SNET and participating CLECs. Again, each one of these contracts was approved by the DPUC, which, again in each case found that the rates were not discriminatory, not excessive and were in the public interest. See Krom Aff., Exhibit 4. SNET developed its service and business plans based on these terms. Nothing has changed since 1996 to trigger a need to change these rates; nothing has changed to now give the DPUC the authority to alter these rates or require the development of a new service.

**B.**    **The DPUC's Finding That The Current CTTS Terms Are Not Discriminatory And In The Public Interest Precludes It From Now Impairing The CTTS Agreements**

Under 47 U.S.C. §252(e)(2)(A), the DPUC may only reject a negotiated agreement if it:

1.    discriminates against a telecommunications carrier not a party to the agreement; or

2.    is not consistent with the public interest, convenience, and necessity.

37

By approving these negotiated contracts in the first instance, the DPUC found that the CTTS contracts were not discriminatory and were consistent with the public interest. Indeed, the DPUC has traditionally quoted the § 252 standards in <u>each</u> approved contract, finding that each was nondiscriminatory and in the public interest. <u>See</u> Krom Aff., Exhibit 4. Moreover, there is no evidence in the record indicating that the current rate is not in the public interest. Nor is CTTS discriminatory--SNET offers the same terms and conditions to any requesting CLEC that it has made available to any other CLEC. Pre-Filed Testimony of Patricia H. Pellerin ("Pellerin Test.") (Rcd.II-1) at 4:6-8.

Thus, the DPUC found that the negotiated CTTS rates were reasonable. SNET relied on this agency opinion for eight years. SNET is aware of no change in the market or the laws to necessitate a lowering of the approved CTTS rate. Therefore, under any regulatory scenario, SNET could not reasonably have anticipated that its rates determined eight years prior and repeatedly approved, until now, would suddenly be changed.

AT&T's arguments to the contrary fall short of rebutting the DPUC's express finding approving the rate. Simply because SNET, like AT&T and Cox, is part of a regulated industry does not mean it has any less protection from government violations of the Contract Clause. And while the standard for establishing a violation here may prove to be higher than in an unregulated industry,[14] it cannot be assumed that <u>any</u> change is reasonably foreseeable simply because the

---

[14] "When an industry is heavily regulated, regulation of contracts <u>may be foreseeable</u>." <u>Sanitation and Recycling Indus., Inc. v. New York</u>, 107 F.3d 985, 993 (2d Cir. 1997) (emphasis added). AT&T argues that regulation of the CTTS contracts in this matter by the DPUC "**is**" foreseeable, but this citation does not stand for that proposition. There is a significant difference between regulation that "may be" foreseeable, as stated by the Second Circuit, and claiming that all regulation "is" foreseeable, as argued by AT&T.

38

industry is regulated.  See Equip. Mfrs. Inst. v. Janklow, 300 F.3d 842, 858-59 (8th Cir. 2002).

Indeed, "private contracts are not subject to unlimited modification under the police power."  United

States Trust Co. of New York v. New Jersey, 431 U.S. 1, 22 (1977).

Though the facts are quite different from those here, the Second Circuit in  Sanitation and

Recycling Indus., Inc. sets forth the proper review for a Contract Clause challenge:

> (1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves
> a significant public purpose, such as remedying a general social or economic problem; and,
> if such a public purpose is demonstrated, (3) whether the means chosen to accommodate this
> purpose are reasonable and appropriate.

107 F.3d at 993.[15]  To determine substantial impairment, "[t]he primary consideration . . . is the

extent to which reasonable expectations under the contract have been disrupted."  Id.  "Also relevant

. . . is the extent to which the challenged provision provides for 'gradual applicability or grace

periods.'"  Id. (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 247 (1978)).   There

is no requirement that to show impairment, the impairment has to be at its "greatest."  See Sanitation

and Recycling Indus., Inc., 107 F.3d at 993 (noting that contractual impairment is at its greatest when

the government regulation was "wholly unexpected.").   Rather, the impairment need only be

substantial, which standard does not require the "[t]otal destruction of contractual expectations."

See Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411 (1983) (law valid

---

[15] In Santitation and Recycling Indus., Inc., waste haulers challenged a new law designed to directly regulate, among other things, waste hauling contracts.  The law was enacted  in response to pervasive corruption and racketeering involved in the industry for over 50 years.  Santitation and Recycling Indus., Inc., 107 F.3d at 990. Plaintiffs facially challenged the law under the Contract Clause.  Id. at 992.  After emphasizing that a facial challenge "is extraordinarily difficult to mount successfully since [plaintiffs] must demonstrate that the law may not be validly applied under any set of circumstances," the Second Circuit held that the law did not violate the Contract Clause because it could be applied in a valid manner under certain circumstances.  Id. at 993 - 994.

when enacted in response to recent change in federal law and to address emergent pricing issues in the gas industry).

In fact, the rate change here was not reasonably anticipated. Here, the DPUC seeks to reach into contracts negotiated at arms-length and change the most essential term and to do so without any grace period. It is undisputed that this service was not regulated before at the state or federal level. The DPUC's actions have caused classic impairment under the Contract Clause. See United States Trust Co. of New York, 431 U.S. at 19-20 and n. 17 (law changing express terms in agreement causing diminution in revenue deemed impairment). Again, this same rate was approved by the DPUC in 1997 and deemed in the public interest.[16]

It is clear too that the Decisions do not serve a "significant public purpose such as remedying a social or economic problem," nor has the DPUC "demonstrated" such a public purpose. Sanitation and Recycling Indus., Inc.. at 993. Nor could the DPUC justifiably find from the record that the freely negotiated rates were discriminatory, excessive or inconsistent with the public interest. That the DPUC determined the rate to be in the public interest in the first instance vitiates any claim that changing this rate will ameliorate societal or economic ills. Finally, the DPUC makes no apparent claim that its chosen method for accomplishing its putative purpose was reasonable and appropriate. Moreover, based on the Decisions, it does not appear that the DPUC considered any alternatives to achieve its ill-defined purpose other than setting an arbitrary cost for CTTS.

---

[16] Contrary to AT&T's claim (AT&T Br. at 17 n.3), the vast majority of the 56 agreements (55 of 56) were first negotiated prior to Cox's January 30, 2002 Petition in this matter and contained the $0.035 rate. Also, the "change of law" term in the Interconnection Agreement between AT&T and SNET has no significance to SNET's impairment claim here. See AT&T Br. at 16-17. That provision does not anticipate a decision inconsistent with federal law.

SNET has shown that, as a matter of law, its contract expectations were significantly impaired by the DPUC's Decisions and this rate change was not reasonably foreseeable. The DPUC has not articulated a public interest that overrides this substantial contractual impairment.

## C.    The Required New Service Was Not Expected

Additionally, there can be no argument that SNET could reasonably have expected that the DPUC would force it to offer a new transit service. The Final Decision requires SNET to provide a separate CTTS service without the bill clearinghouse function, a function that makes the service logistically and economically viable. See, e.g., Compl., ¶ 19 and discussion below.  This new offering not only will force SNET to produce and contract for a service it believes is not viable without the clearinghouse function, but it will impose upon SNET (and the other CLECs) substantial and unnecessary administrative burdens.  For example, there will be a dramatic increase in complicated billing disputes because the participants will not know what entity to pay or what entity to bill for calls made. See Sept. 17, 2002 Hearing (Pellerin testimony) (Rcd.VII-1) at 46-50, 84-86, 93-94; Dec. 23, 2002 Written Exceptions of the Southern New England Telephone Company, (Rcd. XI-5) at 27-30.  Despite the fact that this new service will not be viable for SNET and will create new and unnecessary burdens on SNET, the DPUC's Final Decision nonetheless requires that it be offered to CLECs under contract.

Forcing SNET to expend resources developing and offering a separate, unviable service under contract is patently unforeseeable and a substantial contractual impairment. The DPUC has failed to articulate and demonstrate how this impairment serves a significant public purpose and that it has chosen reasonable and appropriate means to accommodate this purpose. Thus, the DPUC has failed to justify this order in the Final Decision.

41

## VI.    CONCLUSION

For the reasons above and those set forth in SNET's Memorandum of Law in Support of its Motion for Summary Judgment, this Court has jurisdiction over this matter and because the Decisions are inconsistent with the 1996 Act, FCC's implementing regulations and violate the United States Constitution, summary judgment on all counts of its Verified Complaint should be granted in favor of SNET.

Dated at New Haven, Connecticut this 6th day of October, 2003.

Respectfully Submitted,

**THE PLAINTIFF,
THE SOUTHERN NEW ENGLAND
   TELEPHONE COMPANY**

By_____
Timothy P. Jensen
 Fed Bar No. ct 18888
 TYLER, COOPER & ALCORN, LLP
 205 Church Street
 P.O. Box 1936
 New Haven, Connecticut 06510-1910
 Telephone:    (203) 784-8200
 Facsimile:    (203) 789-2133
 E-Mail:        jensen@tylercooper.com

Keith M. Krom ct 07745
General Attorney
The Southern New England
 Telephone Company
310 Orange Street
New Haven, Connecticut 06510
Telephone:    (203) 771-2509
Facsimile:    (203) 771-6577
E-Mail:        keith.krom@sbc.com

Counsel for The Southern New England Telephone Company

43

## CERTIFICATION

This is to certify that a copy of the Opposition Memorandum, Affidavit of Keith Krom and unpublished decisions have been mailed this 6th day of October, 2003 via first class mail, postage prepaid to the following:


Tatiana D. Eirmann, Esq.
Robert S. Golden, Jr., Esq.
Office of the Attorney General
10 Franklin Square
New Britain, CT  06051

Kenneth W. Salinger, Esq.
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA  02199-7613

Thomas G. Rohback, Esq.
Gail L. Gottehrer, Esq.
LeBeouf, Lamb, Greene & MacRae, LLP
225 Asylum Street, 13th Floor
Hartford, CT  06103

David L. Belt, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
New Haven, CT  06503



Timothy P. Jensen

Ex A

LEXSEE 2003 U.S. APP. LEXIS 16514

**WISCONSIN BELL, INC., d/b/a Ameritech Wisconsin, Plaintiff-Appellee, v. AVE M. BIE, et al., Commissioners of the Public Service Commission of Wisconsin, in their official capacities, Defendants-Appellants, and WORLDCOM, INC., Intervening Defendant-Appellant.**

Nos. 02-3854, 02-3897

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*340 F.3d 441; 2003 U.S. App. LEXIS 16514*

**April 14, 2003, Argued
August 12, 2003, Decided**

**PRIOR HISTORY:** [*1] Appeals from the United States District Court for the Western District of Wisconsin. No. 01-C-0690-C. Barbara B. Crabb, Chief Judge.

**DISPOSITION:** Affirmed.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For WISCONSIN BELL, INCORPORATED, doing business as AMERITECH WISCONSIN, Plaintiff - Appellee (02-3854): Jordan J. Hemaidan, MICAHEL BEST & FRIEDRICH, Madison, WI USA. Robert M. Dow, Jr., MAYER, BROWN, ROWE & MAW, Chicago, IL USA.

For WORLDCOM, Defendant - Appellant (02-3854): Darryl M. Bradford, John R. harrington, JENNER & BLOCK, Chicago, IL USA.

For AVE M. BIE, ROBERT M. GARVIN, BURNEATTA BRIDGE, Defendants (02-3854, 02-3897): Michael S. Varda, PUBLIC SERVICE COMMISSION OF WISCONSIN, Madison, WI USA.

For WISCONSIN BELL, INCORPORATED, doing business as AMERITECH WISCONSIN, Plaintiff - Appellee (02-3897): Robert M. Dow, Jr., MAYER, BROWN, ROWE & MAW, Chicago, IL USA.

**JUDGES:** Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges. CUDAHY, Circuit Judge, dissenting.

**OPINIONBY:** POSNER

**OPINION:**

POSNER, *Circuit Judge.* Local telephone companies such as Wisconsin Bell have a degree of monopoly power because of the cost to a competitor of duplicating the grid of telephone wires and switching equipment that constitutes a local telephone network. The competitor will find it difficult to compete unless it is interconnected with the local network. The *Telecommunications Act of 1996* provides a machinery for encouraging interconnection. The competitor can require the local phone company to negotiate, in good faith, an agreement authorizing interconnection on mutually agreeable terms. If negotiations fail, the competitor can seek arbitration by the state regulatory commission, and the commission's arbitral decision can be challenged in federal district court on the ground that the decision fails to comply with *47 U.S.C. § § 251 or 252*, sections that establish pricing and other standards for interconnection. See *Verizon Communications, Inc. v. FCC, 535 U.S. 467, 492-97, 152 L. Ed. 2d 701, 122 S. Ct. 1646 (2002).* [*2] But the commission's decision cannot be challenged in state court. *47 U.S.C. § § 252(e)(4), (6).*

The question presented by this appeal is whether a state may create an alternative method by which a competitor can obtain interconnection rights. Wisconsin's public utility commission simply ordered Wisconsin Bell to file tariffs setting forth the price and other terms on which competitors such as WorldCom shall be entitled to interconnect with Wisconsin Bell's local telephone

network, rather than arbitrating a disagreement between WorldCom and its competitors concerning the terms on which those competitors could interconnect with Wisconsin Bell's local network. Wisconsin Bell challenged the order in federal district court. The judge held that the order is barred by the federal act, and these appeals (by the commission itself, and by WorldCom) followed.

Whether as the district judge ruled the state's tariff-filing order is preempted by the provisions of the federal act creating the contractual route to interconnection depends on whether the state requirement interferes with the federal procedure. The *Federal Telecommunications Act* is explicit that a state commission's [*3] regulations concerning interconnection are not preempted "if such regulations are not inconsistent with the provisions of [the Federal Telecommunications Act]." *47 U.S.C. § 261(b)*; *Verizon North, Inc. v. Strand, 309 F.3d 935, 937-44 (6th Cir. 2002)*. But if they are inconsistent, they are preempted. A conflict between state and federal law, even if it is not over goals but merely over methods of achieving a common goal, is a clear case for invoking the federal Constitution's *supremacy clause* to resolve the conflict in favor of federal law, see, e.g., *Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 103-04, 120 L. Ed. 2d 73, 112 S. Ct. 2374 and n. 2 (1992)*--and so WorldCom acknowledges in its reply brief.

There is an initial question, however, whether the state's tariff order has any practical significance. Wisconsin disclaims authority to fix the rates in the tariffs that it has ordered Wisconsin Bell to file. If taken literally, the disclaimer implies that if Wisconsin Bell wants to prevent WorldCom or other would-be competitors from bypassing the contractual route, and thus to thwart utterly the state commission's [*4] alternative procedure, it has only to specify a ridiculously high price in the tariffs that it files. But against this the Wisconsin commission, while disclaiming authority to fix the rates in Wisconsin Bell's interconnection tariffs, asserts a right to insist that the rates be "reasonable." "The commission may not, and is not, specifying the tariff rates, terms, and conditions . . . . However, compliance with this order for tariffing does require good faith on the part of Ameritech; it cannot post a price, or impose terms and conditions, so totally unreasonable as to amount to a de facto avoidance of compliance. An unreasonable price, term, or condition is one that is patently obvious to any reasonably well-informed buyer as intended to discourage or prevent the purchase of the service. Having said that, however, the Commission recognizes that, in any challenge to a price, term or condition, the proponent would have a heavy burden to prove Ameritech's noncompliance with this

order." *Final Decision*, Investigation into Ameritech Wisconsin Operational Support Systems, Docket No. 6720-TI-160, at 20, available at http://psc.wi.gov/pdffiles/ord_notc/3823.pdf (Public Service Commission [*5] of Wisconsin Sept. 25, 2001).

In the usual type of common carrier or public utility regulation, the reasonableness of a rate is determined by reference to the cost of the tariffed service; the carrier or utility is constrained to fix a rate no higher than necessary to cover the cost of the service. The passage we just quoted from the Commission's decision suggests that only an outlandish discrepancy between the tariffed rate and the cost of service will trigger a finding of unreasonableness. This implies that Wisconsin Bell's pricing freedom is constrained only to the extent that it may not fix a rate that exceeds the upper end of the range of prices likely to emerge from a negotiation with a would-be competitor in accordance with the procedures set forth in the federal act. The tariffing requirement would still be pretty empty because the would-be competitor would expect to be able to do better in a negotiation subject to arbitration than merely to bow to the telephone company's opening bid.

We were led by these ruminations to direct the parties to file supplemental briefs explaining just what is at stake in this case. We learn from these briefs that while indeed disclaiming power [*6] to fix Wisconsin Bell's rates, the Wisconsin commission has ruled that the rates in the tariffs that it has required Wisconsin Bell to file must be based on the cost of the tariffed services as determined in accordance with cost-accounting procedures prescribed by the commission; specifically, the rates must be based on "the sum of the Total Element Long Run Incremental Cost (TELRIC) and a reasonable allocation of forward-looking joint and common costs." *Final Decision*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, at 22-23, available at http://psc.wi.gov/pdffiles/ord_notc/4534.PDF (Public Service Commission of Wisconsin Mar. 22, 2002). Rates so determined will prevent Wisconsin Bell from setting a "take it or leave it" rate that might deter all prospective entrants from taking the tariff route. "As explained in the *Final Decision*, this order does not establish [the tariff rates] themselves, but determines the details of a methodology that can be used to determine cost-based [tariffs] as required. For example, the Commission made the determinations in its *Final Decision* for the appropriate cost of capital, depreciation [*7] rates, level of spare capacity (fill), contract prices and joint and common markup to comply with forward-looking TELRIC pricing standards to name a few such details." *UNE Compliance Order*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No.

6720-TI-161, at 61, available at http://psc.wi.gov/pdffiles/ord_notc/6145.PDF (Public Service Commission of Wisconsin July 9, 2003). These decisions make clear that it is the commission, not Wisconsin Bell, that is making the tariff in a realistic sense. The statement by our dissenting colleague that the decisions from which we have quoted do not concern the tariffs that the Commission has ordered Wisconsin Bell to file is incorrect. The decisions expressly direct Wisconsin Bell to file conforming tariffs on unbundled network elements (UNE), March 22 order, *supra*, at 2, which are a component of operational support systems (OSS), the general term for the provision of access by a local phone company to a new entrant. Sept. 25 order, *supra*, at 1 n. 1.

The district court was right to hold that the state's tariffing requirement is preempted. See *Verizon North, Inc. v. Strand, supra,* 309 F.3d at 941; **[*8]** *MCI Telecommunications Corp. v. GTE Northwest, Inc., 41 F. Supp. 2d 1157, 1178 (D. Ore. 1999);* but cf. *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Services, Inc., 323 F.3d 348, 358-60 (6th Cir. 2003).* The requirement *has* to interfere with the procedures established by the federal act. It places a thumb on the negotiating scales by requiring one of the parties to the negotiation, the local phone company, but not the other, the would-be entrant, to state its reservation price, so that bargaining begins from there. And it allows the other party to challenge the reservation price, and try to get it lowered, by challenging the tariff before the state regulatory commission, with further appeal possible to a state court--even though Congress, in setting up the negotiation procedure, explicitly excluded the state courts from getting involved in it. At the very least, the tariff requirement complicates the contractual route by authorizing a parallel proceeding.

It is true that the arbitral procedure prescribed by the federal act is not completely freewheeling. The state commission is required, in the event the parties cannot come to an agreement, **[*9]** to establish terms of interconnection based on the same TELRIC pricing standard that the commission would apply to a tariff challenge. *Verizon Communications, Inc. v. FCC, supra,* 535 U.S. at 493-97. But it does not follow that the tariff route and the negotiation route are the same or have the same effects. An appeal from the commission's resolution of an entrant's challenge to a tariff would go to a state court, rather than a federal court, a difference that cannot be assumed to be inconsequential. And given the vagaries of the regulatory process, which requires such stabs in the dark as making "reasonable projections" of the use that a prospective entrant will make of access to the local network if interconnection is ordered, *id. at 496 n. 16,* and the fact, as the Court noted in that case, that in

setting rates the state commissions are subject to an "important limitation previously unknown to utility regulation," *id. at 493,* the results of a negotiation between the local phone company and a prospective entrant are not preordained--if it were, the federal law would not have made recourse to the commission a last resort if negotiations **[*10]** fail. The tariff procedure short-circuits negotiations, making hash of the statutory requirement that forbids requests for arbitration until 135 days after the local phone company is asked to negotiate an interconnection agreement. *47 U.S.C. § 253(b)(1).*

The commission and WorldCom argue that by providing an alternative means of obtaining interconnection, the state's tariff requirement promotes the procompetitive policy of the federal act. But to identify the policy underlying a statute and then run with it is a dangerous method of interpretation; it is likely to run roughshod over the compromise between interest groups that enabled the statute to be passed in the first place. *Rodriguez v. United States, 480 U.S. 522, 525-26, 94 L. Ed. 2d 533, 107 S. Ct. 1391 (1987)* (per curiam); *Hrubec v. National Railroad Passenger Corp., 49 F.3d 1269, 1270 (7th Cir. 1995); Bethlehem Steel Corp. v. EPA, 723 F.2d 1303, 1309 (7th Cir. 1983);* Philip P. Frickey, "From the Big Sleep to the Big Heat: The Revival of Theory in Statutory Interpretation," *77 Minn. L. Rev. 241, 251 (1992).* The negotiation procedure established **[*11]** by the federal act provides the local phone company with a degree of protection that it would lack if the state commission could, by requiring the company to file a tariff that the commission might invalidate as unreasonable, enable would-be entrants to bypass the federally ordained procedure.

AFFIRMED.

**DISSENTBY:** CUDAHY

**DISSENT:**

CUDAHY, *Circuit Judge,* dissenting. The starting point for the present analysis must be the strong presumption against preemption of state law, especially in the area of local telephone service where, until the passage of the Telecommunications Act of 1996 (the Act or FTA), Pub. L. No. 104-104, 110 Stat. 56 , the states had historically exercised an *exclusive* jurisdiction. *See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996); Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 90 L. Ed. 2d 369, 106 S. Ct. 1890 (1986).* No doubt the FTA prescribes a specific, but I believe non-exclusive, process for determination of prices to be charged by incumbent carriers to aspiring competitors. But the Act makes clear that state regulatory processes are not to be voided unless

they can be shown to [*12] conflict with federal purposes. In fact, as the majority notes, the FTA clearly addresses the issue of preemption as follows:

> Nothing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part.

47 U.S.C. § 261(b). Plus, the Act has a more general savings clause. "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." FTA § 601(c)(1). Not only did Congress limit the general preemptive power of the Act, but it further expressly delegated an important and integral role to the state commissions in establishing prices under the act as follows:

> (1) Interconnection and network element charges. Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this [*13] title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section--
>
> (A) shall be--
>
>> (i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and
>>
>> (ii) nondiscriminatory, and
>
> (B) may include a reasonable profit.

47 U.S.C. § 252(d)(1) (emphasis added). n1

> n1 The F.C.C. has implemented these standards with regulations outlining the TELRIC costing methodology. For example, 47 C.F.R. § 51.503(b) provides in pertinent part:

>> (b) An incumbent LEC's rates for each element it offers shall comply with the rate structure rules set forth in §§ 51.507 and 51.509, and shall be established, at the election of the state commission--
>>
>>> (1) Pursuant to the forward-looking economic cost-based pricing methodology set forth in §§ 51.505 and 51.511 . . . .

> (emphasis added) and 47 C.F.R. § 51.505(a) provides in pertinent part:

>> (a) In general. The forward-looking economic cost of an element equals the sum of:
>>
>>> (1) The total element long-run incremental cost of the element, as described in paragraph (b); and
>>>
>>> (2) A reasonable allocation of forward-looking common costs, as described in paragraph (c).

[*14]

The only question we must answer is whether a Wisconsin order requiring an incumbent carrier to offer by tariff the same network elements available by negotiated and arbitrated interconnection agreements is "inconsistent" with the "provisions" of the Act. The majority says yes. I disagree.

There are several points to be made in response to the majority. The majority, in essence, reduces the conflict to one of an alternative procedure when it bemoans that, "at the very least[,]" the tariff authorizes a "parallel procedure," and that tariffing is "making hash" of the 135 day waiting period before the state can be summoned to arbitrate in a manner similar to its function in the tariffing process. In this discussion, the majority appears to echo the errors of the Sixth Circuit, which has similarly justified preemption based on interference with § 252's procedure. The Sixth Circuit found preemption

by misinterpreting the Supreme Court decision in *Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 120 L. Ed. 2d 73, 112 S. Ct. 2374 (1992)*, involving the preemptive effect of the *Federal Occupational Safety and Health Act* (OSHA) on parallel state regulation. [*15] *Verizon North, Inc. v. Strand, 309 F.3d 935, 940 (6th Cir. 2002); cf. Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc., 323 F.3d 348, 360 (6th Cir. 2003)* (finding no preemption because tariff did not give entrant an "alternative route around the entire interconnection process"). These Sixth Circuit cases argue that, because the negotiation method was prescribed by § 252, any other method allowing one to foreshorten negotiation/arbitration must be preempted.

This result is reached, however, by seizing upon a quotation from *Gade* and using it out of context. *Gade, 505 U.S. at 103* ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal.") (alterations in original), quoting *Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494, 93 L. Ed. 2d 883, 107 S. Ct. 805 (1987)*. However, *Gade* was based on a finding that, with respect to occupational safety and health, Congress had intended to occupy the whole field. The quotation cited by the Sixth Circuit, in context, merely reinforces *Gade's* conclusion that OSHA preempted the entire [*16] field of parallel state regulation. Therefore, of course, any state law that circumvented the procedure outlined in OSHA would be preempted. By contrast, with respect to competition for local telephone service, no one has claimed that Congress intended to occupy the whole regulatory field. As the excerpt that I have quoted from the Act shows, the state commissions occupy a key role in the regulatory scheme. Hence, the whole idea that the *method* of negotiation/arbitration is exclusive and preemptive has no sound legal basis. While *Gade* showed a clear intent to exclude parallel state regulation, the Act here does not exclude, but rather specifically embraces, such parallel regulation. So a finding of preemption here requires much more than merely a parallel procedure. Something about tariffing must interfere with the purpose and structure of the Act. *See, e.g., In re Public Utility Commission of Texas, 13 F.C.C.R. 3460, 3526 (1997)* (finding that state tariffing of telecommunications services for resale not preempted because it did not prohibit entrants from demanding negotiation/arbitration under § 252).

The majority appears to be reaching for an argument [*17] that the tariff interferes with more than a method when it laments the economic "thumb on the negotiating scales" it believes that tariffing imposes on Wisconsin Bell. But in context this argument lacks substance--the § 252 mechanism already contemplates a very similar "thumb" inherent in its negotiation/arbitration method of

interconnection. What the Public Service Commission of Wisconsin (PSC or commission) has told us is that it would use the federal TELRIC n2 methodology mandated by the F.C.C. and approved by the Supreme Court, if called upon to evaluate a proposed tariff. *Verizon, 535 U.S. 467, 152 L. Ed. 2d 701, 122 S. Ct. 1646*. This is the methodology the PSC must use whenever it is requested to arbitrate interconnection negotiations under the Act, or to approve an arbitrated interconnection agreement under the Act or to approve the eerily tariff-like Statement of Generally Available Terms that Wisconsin Bell could choose to file under § 252(f). n3 So any negotiation of an interconnection agreement is an option backed by the readiness of a state commission to intervene at any time on the request of any party, at which point the commission will set rates, and [*18] will use the TELRIC methodology to do so. The state's role as a ratemaker, even under the regime of the Act, is still central. *See Verizon, 535 U.S. at 476-77, 489, 493* (explaining that the FTA clearly contemplates a central role for state commissions in setting interconnection lease rates under the standards set by the F.C.C., i.e., TELRIC). In fact, the state's function and the appropriateness of TELRIC have been the subjects of two lawsuits pursued to the Supreme Court by incumbent companies. *Id.; AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 142 L. Ed. 2d 834, 119 S. Ct. 721 (1999)*. n4

> N2 TELRIC is Total Element Long-Run Incremental Cost, the costbased methodology for determining the price of network elements necessary to interconnection under the Act. It was prescribed by the F.C.C. under the terms of the Act. *See Verizon Communications, Inc. v. F.C.C., 535 U.S. 467, 152 L. Ed. 2d 701, 122 S. Ct. 1646 (2002)*.
>
> n3 *See 47 U.S.C. § 252(d); 47 C.F.R. §§ 51.501-505*.
>
> n4 Historically, state commissions (although not necessarily Wisconsin's) generally favored the former Bell system companies in their struggles with the F.C.C.'s preaching of competition.

[*19]

To ponder the majority opinion is to imagine that the tariff requirement would somehow bludgeon Wisconsin Bell into revealing negotiating secrets, like its reservation price, that it would otherwise be able to protect, or into otherwise bargaining from an inferior position. The reality is that any entrant that does not feel satisfied with Wisconsin Bell during negotiations can summon the PSC to follow a procedure virtually

identical to what is going on unilaterally during the tariffing process at issue. In fact, if anything, the statutory role of the PSC as arbitrator is more intrusive than the tariffing process at issue here. In tariffing, Wisconsin Bell has the opportunity to propose the terms of the tariff, which ordinarily are not disturbed. As arbitrator, however, the PSC dictates the rate, in accordance with TELRIC. In other words, the tariff procedure (a process employed since time immemorial in the regulation of local telecommunications carriers) gives a very similar result through a process just like the negotiation/arbitration method, lacking only the initiating request from an entering competitor to negotiate. And at the end of either process, negotiation/arbitration or [*20] tariffing, an aggrieved Wisconsin Bell can challenge the result in federal court. I believe the majority is incorrect when it claims that a tariffing challenge would go to state court. Insofar as the challenge would concern the state's application of the TELRIC standard in evaluating a tariff, it is likely that the federal courts would have jurisdiction over the matter, just as they would over a challenge to an arbitrated interconnection agreement. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland, 535 U.S. 635, 641-44, 152 L. Ed. 2d 871, 122 S. Ct. 1753 (2002).*

But, says the majority, the method of *§ 252* represents Congress's careful compromise of interest group positions and any regulation that influences or alters that process risks undermining the "protection" afforded incumbents like Wisconsin Bell. That is an interesting thought, but unsupported by the statute. And even if one does believe the method outlined in *§ 252* is designed to provide some measure of protection to incumbents, any postulated loss of supposed protection through the tariffing method is illusory. One need only examine two hypothetical negotiations to see this. In one negotiation [*21] there exists a PSC-approved tariff and in the other there is no tariff. In the tariff negotiation, Wisconsin Bell will likely obtain no price higher than its tariff offers since the entrant will either accept the tariff or negotiate with Wisconsin Bell for a price lower than the tariff. In the non-tariff negotiation Wisconsin Bell can, as the majority believes proper, propose any price it chooses. The entrant, however, knowing that it can always look to the state to participate eventually, will not accept a price greater than what it would eventually get from the state--presumably an amount roughly equal to what the tariff price would be (since the same methodology would be used in both instances).n5 Either way, the applicability of the ubiquitous TELRIC standard limits incumbents' bargaining power. Wisconsin Bell cannot avoid the fact that its "reservation" price is, in this way, always quasi-public in all interconnection environments.

This presumes, of course, that, as the TELRIC methodology promises, the resulting tariff is not merely a one-size-fits-all menu of prices and services, but is, instead, sensitive to the variations in cost from entrant to entrant. *See Verizon, 535 U.S. at 496 n.16* ("The actual TELRIC rate charged to an entrant leasing the element would be a fraction of the TELRIC figure, based on a 'reasonable projection' of the entrant's use of the element (whether on a flat or per-usage basis) as divided by aggregate total use of the element by the entrant, the incumbent, and any other competitor that leases it."). The majority makes much of the fact that the PSC has asserted that Wisconsin Bell (and everyone else) is bound by the TELRIC costing methodology. But this is merely a restatement of what federal law, implemented by a federal agency, has decreed. *See* note 1, *supra.*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*22]

From all appearances, requiring a tariff is not inconsistent with the negotiation of a price or with the ultimate prescription of a price determined by the state commission as arbitrator. This is especially so, given that the tariff does not impede the right of an entrant to demand negotiation. It may be that the majority, the district court and some other courts that have viewed this problem have looked upon the negotiation phase as providing a purely "free market" solution as opposed to a regulatory solution. I think this dichotomy simply does not exist here, where all parties are bound to the TELRIC method of rate determination. In fact, as the Supreme Court has recognized in rejecting the challenges of incumbent companies, TELRIC controls throughout. *See* Daniel F. Spulber & Christopher S. Yoo, *Access to Networks: Economic and Constitutional Connections,* 88 *Cornell L. Rev. 885, 969 (2003)* ("TELRIC thus governs all of the important pricing aspects of the access regime created by the 1996 Act.").

Finally, the majority includes a discussion of the hypothetical process by which a tariff is proposed and then approved by the PSC. But what is involved here is simply [*23] a facial challenge to the PSC's ability to require tariffing under any circumstances. No price term or any other term for the tariff has yet been proposed.

Speculation about possible terms is, therefore, beside the point in this facial challenge, and the only issue is whether there is any set of facts under which the PSC can require tariffing.

In fact, the majority's hypothetical discussion goes seriously astray by fortifying its arguments with quotations from PSC decisions and orders that do not concern the Operational Support Systems (OSS) tariffs at issue here, but are, instead, orders and decisions with respect to the establishment of TELRIC standards for the *negotiation and arbitration mechanism* of the Act. n6 *See UNE Compliance Order*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, available at http://psc.wi.gov/pdffiles/ord_notc/6145.PDF (Public Service Commission of Wisconsin July 9, 2003); *Final Decision*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, available at http://psc.wi.gov/pdffiles/ord_notc/4534.PDF (Public Service Commission Wisconsin Mar. 22, 2002) ("*UNE Final* [*24] *Decision*"). I am tempted to dismiss these decisions as simply inappropriate and irrelevant with respect to the present case's evaluation of OSS tariffs, especially as used by the majority. Or I might point out that the majority's claim that "it is the commission, not Wisconsin Bell, that is making the tariff in a realistic sense" does not logically follow from the part of the decision quoted because that refers to PSC actions on standards for arbitration and has nothing to say about the OSS tariffs. n7 Or, in the alternative, I might note a certain irony in how the "realistic sense" in which the PSC is allegedly "making the tariff" is actually the PSC acting as arbitrator to the interconnection process that the majority ostensibly seeks to protect. But instead, I will only comment that the UNE decisions' TELRIC discussions cited by the majority reinforce my basic premise, which is that the tariffing is not markedly different from the negotiating and arbitrating procedure. The differences are purely matters of form, not involving substance, and are not inconsistent with the provisions of the Act.

n6 The PSC was the first to bring the two UNE Orders into the present case when, in its second supplemental brief, it used a quotation from the UNE Final Decision to support its claim that TELRIC is a methodological means, not a rate-setting end. However, the majority overreaches when it uses these documents to demonstrate that the PSC exercises control over the final result of the tariffing process. [*25]

n7 In fact, when one continues to read onward, but a few pages later, the PSC does finally have something to say about tariffs (but not the OSS tariffs). These tariffs are required under the *UNE Final Decision* as a temporary offering made available to entrants who have requested interconnection and are to be used only during the pendency of the negotiation/arbitration. *UNE Final Decision* at 187 ("[Wisconsin Bell] is required to file UNE tariffs in addition to the tariffs already required under the OSS order. . . . Those tariffs [the OSS tariffs] will meet the tariffing requirement in this order, but are not time limited as are the other tariffs ordered herein."). The PSC notes, tellingly,

> To implement this tariffing decision, the Commission required [Wisconsin Bell] to file proposed tariffs in its compliance filing. However, in Wisconsin, when tariffs are placed on file, *Commission approval is not required*. Additionally, *[Wisconsin Bell] is allowed to revise tariffs without Commission approval*. Accordingly, when issues arise about the terms and conditions of offerings, it is expected that arbitration panels will determine whether terms of offerings are nondiscriminatory and comply with federal and state requirements. The tariffs filed as a result of this proceeding do not limit an arbitration panel's ability to establish such compliant terms and conditions.

*UNE Compliance Order*, at 65 (emphasis added). To the extent that this Order is relevant to the present case, I do not believe it offers support to the majority opinion.

[*26]

When one strips away the tangential distractions, the majority has ruled that Congress intended there to be only one method to achieve interconnection and establish its terms. The Act does not support this conclusion.

I therefore respectfully dissent.



2000 WL 1469356
(Cite as: 2000 WL 1469356 (S.D.Ohio))

Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

THE OHIO BELL TELEPHONE COMPANY, Plaintiff,

v.

ICG TELECOM GROUP, INC., et al.

and

PUBLIC UTILITIES COMMISSION OF OHIO, et al. Defendants.

**No. C2-99-552.**

Sept. 29, 2000.

*OPINION AND ORDER*

SARGUS, J.

*1 This matter is before the Court for consideration of a series of motions, including the Defendants Public Utilities Commission of Ohio ("PUCO") and Commissioners Motion to Dismiss (Doc. # 14); Motion of the United States of America to Intervene (Doc. # 19-1); Motion of the Defendants Public Utilities Commission of Ohio and Commissioners to Strike (Doc. # 28); and the Motion of MCI World Com, Inc. ("MCI") for Leave to File Supplemental Authority (Doc. # 48-1). For the reasons that follow, the Motion of the Public Utilities Commission of Ohio and individual Commissioners to dismiss is GRANTED in part and DENIED in part. The objections to the Order of the Magistrate Judge, dated November 10, 1999 are DENIED. The Motion of the United States of America to Intervene is GRANTED subject to the limitations hereinafter set forth. The Motion of Defendants PUCO and Individual Commissioners to Strike is GRANTED. The Motion of MCI for Leave to File Supplemental Authority is GRANTED.

I.

In this case, the Ohio Bell Telephone Company, dba Ameritech Ohio, challenges certain determinations made by the PUCO through its Commissioners with respect to certain interconnection agreements. Jurisdiction is vested in this Court pursuant to § 252(e)(6) of the Telecommunications Act of 1996 ("the Act"), 42 U.S.C. § 252(e)(6). The Plaintiff seeks declaratory and injunctive relief from four PUCO orders requiring Ameritech Ohio to pay reciprocal compensation to other telecommunication carriers regarding calls placed by Ameritech Ohio customers to internet service providers ("ISPs") which are customers of the carriers named as defendants herein.

The Plaintiff has named as party-defendants the Public Utilities Commission of Ohio, together with Commission members named solely in their official capacities. The PUCO and the individual Commissioners have filed a Motion to Dismiss the Complaint. The Motion raises three propositions of law which question the subject matter jurisdiction of this Court. The Motion raises two additional propositions which assert that the Complaint fails to state cognizable federal claims.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Following the filing of the Motion to Dismiss, Magistrate Judge Norah McCann King ordered on November 10, 1999 that the parties initially brief only the first three issues raised in the PUCO and Commissioner's Motion. All three of these issues involve issues of subject matter jurisdiction, which the Magistrate Judge appropriately determined should be resolved before the Court addresses other issues raised in the Motion, which necessarily presuppose that the Court has subject matter jurisdiction over the action. While the PUCO and individual Commissioners have filed objections to the Order of the Magistrate Judge, the parties have completed briefing the Motion to Dismiss in a manner consistent with the prior Order.

The PUCO and individual Commissioners filed an objection to the November 10, 1999 Order of the Magistrate Judge claiming that the Order was an effective denial with regard to the fourth and fifth propositions raised in their Motion. They contend that these matters are also threshold jurisdictional issues which should be resolved at the same as the subject matter jurisdictional issue.

*2 This Court disagrees. Initially, the Court notes that prior to the filing of the objections to the Magistrate Judge's Order, all of the parties in this case, including the movant, entered into a joint report and proposed schedule dated September 15, 1999. Such report included the statement that the Commissioners anticipated moving to dismiss all or part of the Complaint. The schedule thereupon separated jurisdictional issues from the merits of Plaintiffs' claims. The Court concludes that the procedure ordered by the Magistrate Judge is consistent with the Joint Scheduling Order and promotes efficient disposition of this case. Further, all matters relating to subject matter jurisdiction should be resolved prior to disposition of other challenges to the Plaintiff's Complaint. For these reasons, the objections of the PUCO and Commissioners to the Order of the Magistrate Judge dated November 10, 1999 are not well-taken and the Defendants' motion is denied.

The PUCO and Commissioners raise three related issues in support of their contention that this Court lacks subject matter jurisdiction over the action filed by the Plaintiff. First, the Defendants assert that the Eleventh Amendment to the United States Constitution prevents an action against either the PUCO or individual PUCO Commissioners acting in their official capacity. Second, Defendants assert that the PUCO is the real party in interest, is an indispensable party, and is beyond the subject matter jurisdiction of this Court. Finally, the movants argue that the Court should dismiss this action and allow the state court appellate process to proceed based on the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37 (1971).

The Defendants PUCO and Commissioners acknowledge these issues have been addressed, in part, by the United States Court of Appeals for the Sixth Circuit in *Michigan Bell Tel. Co. v. Climax Tel. Co.,* 202 F.3d 862 (6th Cir.2000). At the time the movants filed their memorandum, the State of Michigan had filed a Petition for Rehearing and Rehearing en banc in *Michigan Bell.* The Sixth Circuit subsequently issued an amended opinion on denial of rehearing and rehearing en banc, dated February 16, 2000. This decision represents the controlling law applicable to this case.

In *Michigan Bell,* the Sixth Circuit reviewed the provisions of the 1996 Telecommunications Act, which authorizes review by a federal district court of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

decisions made by the state public utilities commission regarding interconnection agreements. The Court initially noted that a state public utility commission is not required to assume regulatory authority over interconnection agreements. *Id.* 865. 47 U.S.C. § 252(e)(5) specifically provides that if a state chooses to refrain from exercising such authority, the Federal Communications Commission is directed to assume such regulatory authority. If, however, a state acts as a regulatory authority, § 252(e)(6) authorizes any party "aggrieved by [its] determination [to] bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of Section 251 of this title and this section [252] ." 42 U.S.C. § 252(e)(6). Further, state courts are expressly deprived of jurisdiction to review agreements entered into by state regulatory authorities. 47 U.S.C. § 252(e)(4).

*3 According to the Sixth Circuit, an action against the Commissioner under § 252(e)(6) constitutes "a straight forward *Ex Parte Young* case." *Michigan Bell,* 202 F.3d at 867. In *Ex Parte Young,* 202 U.S. 123 (1908), the Supreme Court recognized an exception to the general rule of sovereign immunity bestowed upon the states pursuant to the Eleventh Amendment. [FN1] Under the *Ex Parte Young* doctrine, suits may be brought against state officials in which injunctive relief is sought for ongoing violations of federal law.

> FN1. The Eleventh Amendment states:
> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
> U.S. CONST. amend. XI.

The Sixth Circuit concluded that the claim filed by the Plaintiff in *Michigan Bell* in essence alleged that the agreement authorized by the members of the Michigan Public Service Commission was in violation of federal law. The relief sought was in the form of an injunction. As a result, the Plaintiff properly stated a claim under the *Ex Parte Young* doctrine. The same considerations apply with equal force to the Plaintiffs' claims against the Commissioners in the case at bar.

This Court also notes that the action brought against the members of the PUCO in this case names individual Commissioners in their official capacity only. It has long been recognized that official capacity suits are, in essence, suits against the public body, in this case the PUCO itself. *Will v. Michigan Department of State Police,* 491 U.S. 58 (1989). In this context, the movant's second argument that the PUCO itself is an indispensable party and is otherwise beyond the jurisdiction of this Court is of no consequence.

While the Defendants may be correct that the PUCO is not a proper party to an *Ex Parte Young* action, it is not a necessary party in such action. Further, the relief available as to the Defendant Commissioners in their individual, official capacities is coextensive with any relief available as to the PUCO. In *GTE North, Inc. v. Strand,* 209 F.3d 909, 922 n. 6 (6th Cir.2000), the Sixth Circuit recently surmised that a state public service commission may not be a proper party with regard to an action filed pursuant to 47 U.S.C. § 252(e)(6). The Court intimated

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 1469356
(Cite as: 2000 WL 1469356 (S.D.Ohio))

that the appropriate method by which to seek review, consistent with the Eleventh Amendment, was to bring an action against the members of the state utility commission in their individual, official capacities. In this limited context, this Court concludes that the PUCO must be DISMISSED, while the claims against the individual Commissioners in their official capacity survives.

The Defendant Commissioners further argue that this Court should abstain and allow the state appeal to proceed under the *Younger* abstention doctrine. *Younger v. Harris*, 401 U.S. 37 (1971). This argument was recently rejected in *GTE North, Inc. v. Strand, supra.* In reviewing provisions of the 1996 Telecommunications Act, the Court of Appeals, faced with a similar argument as that made by the movants herein, concluded:

> *Younger* abstention is also inappropriate. In *Younger,* the Supreme Court held that federal courts should abstain from deciding cases within their jurisdiction only when: (1) there are ongoing state court proceedings; (2) those proceedings involve important state interests; and (3) the parties have an adequate opportunity to raise constitutional issues in the state proceedings....
> [A]bstention is not warranted here because waiting to review the propriety of the February 25 order until it is incorporated into a final arbitration agreement will deny GTE a timely and adequate remedy at law. GTE, whose suit against the NPSC is based on *Ex Parte Young,* cannot recover damages for injuries sustained under the challenged order. Because *Young* limits GTE's recovery to prospective injunctive relief, waiting to decide this case until the Commission approves a final agreement incorporating the challenged terms may well deny GTE a timely and adequate remedy by precluding recovery for harm sustained while the order was in effect.

**\*4** *GTE North, Inc.,* 209 F.3d at 921022 (citation omitted).

Further, the Sixth Circuit noted that the issues in the case did not concern matters of state law, but rather a potential conflict between state and federal telecommunications laws. Abstention is therefore inappropriate under both the *Younger* and *Burford* [FN2] doctrines. *GTE North,* 209 F.3d at 920-21.

FN2. *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943).

Based upon the foregoing, and in light of controlling authority from the United States Court of Appeals for the Sixth Circuit, the Motion of the Defendant Commissioners of the Public Utilities Commission of Ohio is DENIED as to the first three propositions of law. The Motion is GRANTED to the extent that the PUCO is beyond the jurisdiction of this Court; the PUCO is therefore DISMISSED from this action.

II.

As noted above, the prior Order of the Magistrate Judge directed the non- moving parties to respond to only the first three propositions of law raised in the Defendant Commissioners' Motion to Dismiss. Consequently, issues raised in the fourth and fifth propositions regarding whether Plaintiffs have stated a claim for purposes of Fed.R.Civ.P. 12(b)(6), have not been fully briefed by the parties. Further, this Court notes that the issues raised in both of the propositions have been the subject of rapidly developing case law from both the Supreme Court and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the Sixth Circuit. Further, additional matters have arisen with regard to FCC
decisions which impact upon the same issues.

In order to permit a full briefing of the issues by the Commissioners and other
parties, it is ORDERED that the fourth and fifth propositions of law set forth in
the Commissioners' original Motion to Dismiss are conditionally DENIED, provided
that the Commissioners may, within twenty (20) days from the date of this Order,
submit a new motion incorporating the changed circumstances occurring since the
filing of the original motion.

### III.

The United States of America has moved to intervene in this action pursuant to 28
U.S.C. § 517 and § 2403. The Government seeks to intervene for the limited purpose
of addressing the challenges made to this Court's jurisdiction by the
Commissioners based upon the Eleventh Amendment. Specifically, the Government
seeks to defend the constitutionality of various provisions of the
Telecommunications Act of 1996.

The Commissioners filed a partial opposition to the Motion to Intervene, arguing
that the United States has standing to support the constitutionality of the
challenged statute, but has no standing to oppose the Commissioners' argument that
abstention is appropriate. Subsequently, the United States filed a Notice of
Withdrawal of Argument on August 26, 2000 withdrawing its contention that this
Court's subject matter jurisdiction under 47 U.S.C. § 252(e)(6) is exclusive.

The Court GRANTS the Motion of the United States of America to intervene, while
acknowledging that the Commissioners' correctly contend that such intervention is
limited to the defense of the constitutionality of the statutes at issue in this
case. With this limitation, the Motion of the United States to intervene is
GRANTED.

### IV.

*5 The Defendant Commissioners move to strike several documents, including a
Memorandum in Opposition to the Commissioner's Motion to Dismiss filed by
Defendants MCI World Com, Inc. and Time Warner Telecom of Ohio, together with a
Memorandum in Opposition to the Commissioner's Motion to Dismiss filed by co-
defendants IGC Telecom Group, Inc. (Doc. # 28) The Court GRANTS the Motion insofar
as these Defendants have no standing with regard to the issues raised by the
Commissioners in their Motion to Dismiss and otherwise have no stake in the
outcome of the Motion. For these reasons, the Motion of the Defendant
Commissioners to strike is GRANTED.

The Motion of MCI Worldcom, Inc. and MCI Metro Access Transmission Services for
leave to file supplemental authority (Doc. # 48) is well-taken and provides this
Court with additional authority relevant to the issues pending before it. The
Motion is therefore GRANTED.

### V.

For the reasons herein stated, the Motion of the PUCO is Dismiss is GRANTED
(Doc. # 14), while the Motion to Dismiss filed by the individual Commissioners of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 1469356
**(Cite as: 2000 WL 1469356 (S.D.Ohio))**

the PUCO is DENIED. The objections filed to the Magistrate Judge's Order of
November 10, 1999 by the PUCO and Commissioners are DENIED. (Doc. # 23) The Motion
of the United States of America to intervene is conditionally GRANTED. (Doc. # 19)
The Motion of the PUCO and Commissioner's to Strike is GRANTED. (Doc. # 28)
Finally, the Motion of MCI Worldcom, Inc. and MCI Metro Access Transmission
Services for leave to file supplemental authority (Doc. # 48) is GRANTED.

 IT IS SO ORDERED.

2000 WL 1469356, 2000 WL 1469356 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works